# EXHIBIT 32



RAINS LUCIA STERN, PC
Attorneys and Counselors at Law

Michael L. Rains
Attorney at Law
MRains@RLSlawyers.com

July 9, 2009

**VIA HAND DELIVERY**

Captain Anthony Toribio
Oakland Police Department
Police Administration Building
455 Seventh Street
Oakland, CA 94607

    Re:    **Pre-Disciplinary Response, Police Sergeant Derwin Longmire**

Dear Captain Toribio:

## INTRODUCTION

    As you are aware, this office represents Sergeant Derwin Longmire in connection with his proposed termination from employment with the Oakland Police Department. Sergeant Longmire's employment termination is proposed in a May 1, 2009 letter addressed to Sgt. Longmire and signed by Acting Chief of Police Howard A. Jordan. That letter alleges that Sgt. Longmire's termination is based upon violations of Manual of Rules section 370.72-1 (Compromising Criminal Cases) and 314.30-1 (Failure to Obey a Lawful Order).

    You have now been selected to be the *Skelly* hearing officer in this case. Accordingly, we will be appearing in your office on Friday, July 10, 2009, at 10:00 a.m. to respond to the allegations which form the basis of Sgt. Longmire's termination, and will be presenting information to your orally concerning why the termination must be set aside at this stage, and why it will most certainly be rescinded if we are forced to appeal the termination to binding arbitration in the future.

    The purpose of this written pre-disciplinary response is to memorialize the information we intend to present to you orally during the July 10th pre-disciplinary conference and to request that you incorporate this response and include it (in its entirety) with any summary you prepare of the pre-disciplinary hearing so that this document may be fully and thoroughly reviewed by you and your superiors before a final decision is made concerning Sgt. Longmire's employment.

2300 Contra Costa Boulevard | Suite 230 | Pleasant Hill, CA 94523 | T 925.609.1699 | F 925.609.1690 | www.rlslawyers.com

PLEASANT HILL • SACRAMENTO • SAN JOSE • SANTA ROSA

5.  **We Are Still Requesting Discovery Of Information Which Has Been Used By The Department To Question Both Sgt. Longmire And Lt. Joyner, And Has Yet To Be Provided Or Verified.**

In Sgt. Chan's June 27, 2008 memorandum (**Exhibit D** to this letter), there is reference to an FBI "phone toll register" on YBMB telephones. According to Sgt. Chan's memo, "there were several calls from Antar Bey to Longmire. Joyner's residence showed approximately 300 calls to a high-ranking member of the YBMB, Mustafa Bey."

When Lt. Joyner was interviewed by DOJ and asked about these alleged "300 telephone calls," Lt. Joyner asked his interviewers, "I'm not sure what the time frame is for 300 calls. Do you have a time frame of when this happened?" To this, the DOJ interviewer stated, "No." (Joyner, DOJ interview, 149:17-25.) Joyner went on to explain that he has personally never made a single call to the residence by the name of Meisha Bey, who at one time was married to Mustafa Bey (but is no longer). According to Joyner, his wife has advised him that Mustafa and Meisha are either divorced or separated where they have not lived together "for quite some time," and that the relationship between Joyner's wife and Meisha is that they see each other at kids' birthday parties every other year and that Meisha at one time worked at Highland Hospital in the library and Joyner's wife would telephone her there (Joyner, DOJ interview, 149:17-151:11).

Thus, while Sgt. Chan's memo makes reference to all of these telephone calls, and the DOJ interviewers ask questions of Lt. Joyner (and Sgt. Longmire) concerning this information, we have yet to see any reliable indication that this supposed FBI pin register contains the information Sgt. Chan's memo says it does. Certainly, one would think the Department would want to truly know and verify this information referred to in Sgt. Chan's memo, instead of take it at face value.

In order for us to examine this issue and determine its accuracy or reliability, **we are requesting to receive a copy of the actual FBI pin register which will show 300 telephone calls from Joyner's residence to the phone number apparently belonging to Meisha Bey.**

Also, in the October 24, 2008 tape-recorded interview of Jesse Grant by Sgt. Chan, Grant makes reference to "…the letter we intercepted where he's [Yusef Bey IV] clearly asking Longmire to look into what I'm doing, there's no reason at that point for, that's not somebody boasting. He's trying to get something done. And there's clearly a very close relationship there." Sgt. Chan then explains that he has a photocopy of the letter which is entitled "Important," and Grant verifies that they are one and the same letter (see Grant interview, October 24, 2008, 28:17-25).

BEY02001

Captain Anthony Toribio
**Re: Pre-Disciplinary Response, Police Sergeant Derwin Longmire**
July 9, 2009
Page 40

uncle's involvement in a very minor part of the investigation, Lt. Joyner had discussed Sgt. Longmire's continued involvement in the Bailey murder investigation with Capt. Loman, who "...didn't have any concerns." Joyner then talked to Deputy Chief Jeff Israel, who was the Bureau of Investigations Deputy Chief, and Israel stated he had confidence in Sgt. Longmire (Joyner, DOJ interview, 26:25-28:1).

Lt. Joyner also described his attendance at a number of "focus group meetings" concerning the YBMB. According to Joyner, prior to the Bailey murder, the focus group met about ten times, approximately once a week. After the Bailey murder, the focus group met another five to ten times. As Joyner described the focus group meetings, Assistant Chief Jordan kept a sign-in sheet for those in attendance. Fifteen people from every law enforcement branch in the Bay Area showed up for the meetings as well as Assistant District Attorney Tom Rogers. In addition, the focus group meetings were attended by Deputy Chief Jordan, Deputy Chief Israel, Capt. Loman, members of the FBI, Doug Sprague, an Assistant United States Attorney, and members of ATF. "Every bullet point, every step I made in this investigation was clearly laid out to this group, clearly approved and moved forward, and in fact, on several occasions, Assistant Chief Jordan as well as Tom Rogers were giving Derwin Longmire directives on what to do." (Joyner, DOJ interview, 29:6-24; 239:16-240:10.)

With regard to Sgt. Longmire's continuing involvement in the Bailey murder investigation, Lt. Joyner had this to say:

> "So it's no cloak and dagger. There was no mirror. I wasn't trying to hide anything. Derwin was assigned this case. Everyone knew it and now it's just ridiculous that it's falling on my shoulders and that I'm the one responsible for leaving Derwin in charge of this investigation."

(Joyner, DOJ interview, 174:2-7.)

**D.     Sgt. Longmire Clearly Told Prosecutors Assigned To The District Attorney's Office And To Those Reviewing His Work That He Believed Bey IV Was Involved In The Murder Of Chauncey Bailey—He Simply Did Not Have Enough Evidence Initially To Charge Him.**

As Sgt. Longmire explained during his interview, "My opinion is that he [Bey IV] called for this murder, that he instructed this kid [Broussard] to do it...I think that he [Bey IV] called it. I think that he either ordered or implied strongly that this kid Broussard commit the murder." (Longmire, DOJ interview, 206:22-207:16.)

When Assistant District Attorney Tom Rogers was interviewed by the investigator hired by this office concerning the Bailey murder, he indicated that he had been assigned by District

BEY02002

Captain Anthony Toribio
Re: Pre-Disciplinary Response, Police Sergeant Derwin Longmire
July 9, 2009
Page 28

Bakery's criminal activities and did not think of the Bakery as a criminal organization at that time (Longmire, DOJ, 41:12-43:7; 44:5-7).

### C.     Longmire's Reasons For Getting To Know People Throughout The Community

Referring to provisions of the law enforcement code of ethics, Longmire stated during his DOJ interview that it was his responsibility to police the community "equally across the board." That meant that Sgt. Longmire felt he needed to get to know people, which included crooks and criminals: "My job is to walk amongst those people. On the days I was there and I was around, I never felt that my officer safety was compromised." (Longmire, DOJ interview, 45:2-23; 47:11-13.)

### D.     Longmire Understood That There Existed Tension And Mistrust Between The OPD And The YBMB

In 1996, Sgt. Longmire had been promoted and was working in felony assault. While working that assignment, he had received an assignment to investigate a high-profile murder of a young girl named Loesha Lacy. Longmire was able to solve her murder eventually, and her father became an advocate for stopping violence and organized a march for that purpose. He invited Sgt. Longmire to attend the march and Longmire agreed. When Longmire appeared to participate in the march, there was a group of Muslims who were also present for the march. A group of Muslims encircled Mustafa Bey and Yusef Bey Sr., but when Sgt. Longmire saw Mustafa, he started walking over to him to say hello. As Sgt. Longmire approached the area where Mustafa was, the circle of Muslims around him parted, and Sgt. Longmire shook his hand. Longmire and Mustafa hugged each other and Longmire shook the hand of Yusef Bey Sr. As Longmire explained during his DOJ interview, "...let me say that this community had probably never seen a policeman acknowledge those people like that or those people acknowledge the police like that." (Longmire, DOJ interview, 48:12-50:23.)

### E.     Sergeant Longmire Goes To Intelligence In 2002—Learns About Criminal Wrongdoing In The YBMB And Attempts To Get Additional Resources To Investigate.

In 2002, as a Sergeant, Longmire went to the Intelligence Unit. When he got to the unit, he asked individuals in the unit who worked for him to "write out for me what it is you're working on, what your strengths are, what your specialties are. In the event that the Chief calls me, I need to be able to explain to him what we are doing." (Longmire, DOJ interview, 70:9-21.)

Officer André Rachal explained to Sgt. Longmire an ongoing investigation he was conducting concerning the YBMB which is "intense and it's good, but it's big. [The investigation] has to do with fraud, real estate, receiving grants and loans from the City of

Captain Anthony Toribio
**Re: Pre-Disciplinary Response, Police Sergeant Derwin Longmire**
July 9, 2009
Page 29

Oakland. They would get, let's say, a million dollars and say we're going to open a clinic. They'd open a clinic for a little while, put a phone in there, and then, 45 days later, the clinic is gone. They have invested $15,000 or whatever, and then all the rest of the money was just 'poof.'"

When Longmire asked Rachal why nothing had been done with this, Rachal explained that "we don't have the resources in Oakland to do it." Longmire explained to Rachal, "We are going to make this thing go, because this is a good case." At this time, Sgt. Longmire spoke to Police Chief Richard Word, telling him that he should call the FBI to obtain assistance and explaining the fact that Rachal had a nine-year investigation concerning the Bakery. Instead of calling the FBI, Chief Word looked at Sgt. Longmire and said, "Nine years, Derwin? Nine years is too long to investigate anybody."

Sgt. Longmire explained to Chief Word how the investigation by intelligence had gone on for nine years. He then said:

> "Chief, what are you going to do when all hell breaks loose with that Bakery and people are going to come to you and they're going to say that you had a criminal enterprise operating in your city for the last 20 or 25 years and you did nothing about it?"

Sgt. Longmire advised Chief Word that the YBMB criminal activity was on his radar, and again requested that he telephone the FBI so that "we can move on this thing, we can make this happen." (Longmire, DOJ interview, 70:22-73:6.)

One would have thought that the DOJ investigators would have wanted to verify this information with former Chief Richard Word, since it is an indication that Sgt. Longmire had no interest in protecting the YBMB. Since no one from DOJ or the OPD followed up on this information, we did on behalf of Sgt. Longmire. The attached interview of Chief Word by Investigator Leary, which corroborates Sgt. Longmire's statement, is attached to this letter as **Exhibit L**.

Some time after that, a young female FBI agent came into the Intelligence Unit and, after Rachal laid out the "case" against YBMB, "we started to work on it." The unit organized an operation which included airplane surveillances and following members of the Bakery with individuals who "knew what they were doing."

Sgt. Longmire left Intelligence in 2003, the same year Antar Bey was murdered and other acts of violence related to the Bakery were happening. André Rachal remained in the Intelligence Unit after Sgt. Longmire's departure, and continued his ongoing investigation of the YBMB (Longmire, DOJ interview, 74:2-7).