BARBARA J. PARKER, City Attorney, SBN 069722
MARIA BEE, Chief Assistant City Attorney, SBN 167716
DAVID A. PEREDA, Special Counsel, SBN 237982
SELIA M. WARREN, Deputy City Attorney, SBN 233877
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:     (510) 238-6524
Facsimile:      (510) 238-6500
Email:  swarren@oaklandcityattorney.org
X04143/2762737

Attorneys for Defendant
CITY OF OAKLAND

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ALI SALEEM BEY and JOHN MUHAMMAD BEY,<br><br>                   Plaintiffs,<br><br>     v.<br><br>CITY OF OAKLAND and DOES 1-100<br>          Defendants. | Case No. 14-cv-01626-JSC<br><br>**DEFENDANT CITY OF OAKLAND'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial notice and [Proposed] Order filed concurrently herewith]<br><br>Date:      July 25, 2019<br>Time:     9:00 a.m.<br>Location:  San Francisco Courthouse 450 Golden Gate Ave. San Francisco, CA 94102<br>Courtroom:    F, 15th Floor<br><br>Judge: Honorable Jacqueline Scott Corley<br><br>Date Action Filed: April 19, 2014<br>Trial Date: August 26, 2019 |

**TO PLAINTIFFS, ALL PARTIES, AND THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that on Thursday, July 25, 2019, at 9:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom F, 15th Floor, in the San Francisco Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, defendant City of Oakland will, and hereby does, move this Court, the Honorable Jacqueline Scott Corley presiding, for an Order dismissing the Third Amended Complaint of Plaintiffs Ali Saleem Bey and John Muhammad Bey (Plaintiffs) pursuant to Rule 56 of the Federal Rules of Civil Procedure, because no genuine dispute as to any material fact exists and the City is entitled to judgment as a matter of law.

This Motion is brought on the grounds that, *inter alia*, Plaintiffs cannot identify any evidence that 1) that Plaintiffs were similarly situated to the Occupy Oakland complainants; 2) that discriminatory intent was a motivating factor in connection with any aspect of IAD 13-1062; 3) that a pattern of failure to provide police response to Black Muslims exists; or 4) that a practice or custom of discrimination is so widespread or persistent as to justify the imposition of municipal liability against the City.

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Selia M. Warren, John Lois, and Kiona Suttle, the concurrently filed Request for Judicial Notice, the files and records herein, and such further evidence as may be received by the Court.

Dated: June 20, 2019        OFFICE OF THE CITY ATTORNEY, CITY OF OAKLAND
BARBARA J. PARKER, City Attorney


By:   /s/ _____
     Selia M. Warren
     Attorneys for Defendant
     CITY OF OAKLAND

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................... 1

II.    Factual Background ............................................................................................... 3

       A.     CPRB 07-538 .......................................................................................... 3

       B.     2011 CPRB & IAD .................................................................................. 4

       C.     IAD Case 13-1062 .................................................................................. 6

       D.     CPRB Case 13-1062 ............................................................................. 11

       E.     Occupy Oakland .................................................................................... 11

III.   Procedural History .............................................................................................. 13

IV.    Legal Standard .................................................................................................... 14

V.     Argument ............................................................................................................ 14

       A.     Plaintiff's Equal Protection Claims Fail as a Matter of Law Because
              Plaintiffs Cannot Prove the Elements of a Violation. ........................... 14

              1.     Plaintiffs Were Not Similarly Situated to the Occupy Oakland
                     Complainants. ............................................................................. 15

              2.     Plaintiffs Cannot Show that Discriminatory Intent Was a
                     Motivating Factor in Connection with Any Aspect of IAD 13-
                     1062. ........................................................................................... 16

              3.     Plaintiffs Cannot Identify a Pattern of Failure to Provide an
                     Adequate Police Response to Black Muslims. ............................ 18

       B.     Plaintiffs Cannot Establish a Practice or Custom So Widespread or
              Persistent as to Justify the Imposition of City Liability. ...................... 19

       C.     Count Eight Fails For the Additional Reason that No Transcripts
              Were Created in IAD 07-538 or IAD 13-1062 ...................................... 21

       D.     Plaintiffs' 42 U.S.C. § 1985 Conspiracy Claims Fail Because 1) Their
              1983 Claims Fail; 2) They Lack Evidence of an Agreement; and 3)
              Count 6 is Time-Barred. ........................................................................ 21

VI.    Conclusion .......................................................................................................... 23

1

# **TABLE OF AUTHORITIES**

2

**CASES**

3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 14
*Armado v. Port of Seattle Police Dep't*, 2015 WL 2450853 (W.D. Wash. May 21, 2015) ............... 18

4

*Buckheit v. Dennis*, 713 F. Supp. 2d 910 (N.D. Cal. 2010) .......................................................... 22
*Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011) .................................. 14

5

*Carmichael v. City of New York*, 34 F.Suup.3d 252 (2014) ........................................................ 16
*Carroll v. Village of Homewood*, 2001 WL 1467708 (N.D. Ill. Nov. 15, 2001) ....................... 17

6

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) ....................................................................... 19
*Cordova v. State Farm Ins. Companies*, 124 F.3d 1145 (9th Cir. 1997) .................................. 20

7

*Dzung Chu v. Oracle Corp.*, 627 F.3d 376, 387 (9th Cir. 2010) ............................................... 14
*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) ............................................... 22

8

*Grenier v. Stratton*, 44 F.Supp.3d 197 (D. Conn. 2014) .......................................................... 19
*Henderson v. City and County of San Francisco*, 2006 WL 3507944 (N.D. Cal. 2006) ........ 2, 21

9

*Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012) ........................................................ 20
*Lam v. City & Cnty. of San Francisco*, 868 F. Supp. 2d 928 (N.D. Cal. 2012) ..................... 15, 16

10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ......................... 14
*Melendez–Garcia v. Sanchez*, 629 F.3d 25 (1st Cir.2010) ....................................................... 19

11

*Mody v. City of Hoboken*, 959 F2d 461 (3d Cir. 1992) ............................................................. 16
*Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978) ............................................................. 19

12

*Monetti v. City of Seattle*, 875 F. Supp. 2d 1221 (W.D. Wash. 2012) ................................ 15, 17
*Moroney v. City of Long Beach*, 2018 WL 6177956 (C.D. Cal. Jan. 9, 2018) ........................ 17

13

*Moua v. City of Chico*, 324 F.Supp.2d 1132 (E.D. Cal. 2004) ................................................. 16
*Navarro v. Block*, F.3d 712 (9th Cir. 1995) ............................................................................. 16

14

*Okin v. Vill. Of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d. Cir. 2009) ................. 16
*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ........................................... 15, 19

15

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................... 1, 14, 22
*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ................................................................ 14

16

*Taylor v. Regents of the Univ. of Cal.*, 993 F.2d 710 (9th Cir. 1993) ...................................... 23
*Tieman v. City of Newburgh*, 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015) .......................... 21

17

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ...................................................................... 14
*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996) ....................................................................... 19

18

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539 (9th Cir. 1989) .............. 22
*Valdez v. City of San Jose*, 2013 WL 752498 (N.D. Cal. Feb. 27, 2013) ................................. 17

19

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) .. 15
*Walker v. City of New York*, 2014 WL 1259618 (S.D.N.Y. Mar.18, 2014) .............................. 21

20

**STATUTES**

21

Code Civ. Proc. § 335.1 ............................................................................................................ 23

22

Fed. R. Civ. P. 56 ...................................................................................................................... 14

23

24

25

26

27

28

ii

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs Ali Saleem Bey (ASB) and John Muhammad Bey (JMB) (collectively, Plaintiffs) bring this action under 42 U.S.C. § 1983 and 42 U.S.C §1985 against the City of Oakland (City). In their Third Amended Complaint (TAC) Plaintiffs allege, among other things, that OPD failed to investigate the 2004 murder of Waajid Bey (Waajid), and the 2005 attempted murder of JMB because of OPD's alleged animus toward Black Muslims. As a result of Plaintiffs' complaints of inadequate investigations, OPD opened two Internal Affairs Division (IAD) files to look into Plaintiffs' complaints: one in 2007, and a second in 2013, after a referral by the Federal Compliance Director. Plaintiffs allege that these investigations, too, were inadequate as a result of OPD's animus toward Black Muslims. Plaintiffs maintain these allegations in spite of the fact that the 2013 IAD investigation sustained a finding against the entire department.

After granting Defendant's motion for judgment on the pleadings, the Court granted in part, and denied in part, Defendant's motion to dismiss the TAC. As a result, six causes of action relating to IAD Case 13-1062 remain.[1] Defendant brings this motion for summary judgment on all remaining claims.

Summary judgment should be granted. Plaintiffs cannot identify a policy or custom that deprived Plaintiffs' of their right to equal protection or that was the moving force behind such deprivation. Plaintiffs acknowledge there is no written policy. Instead they allege that a custom and practice of hatred against Black Muslims resulted in what they contend was disparate treatment in the resolution of 13-1062. To support their allegations, Plaintiffs identify a number of one-off statements and incidents collected over the years from random officers—all prior to 2007 and none from officers actually involved in the investigation of their cases, or their chain of command. These incidents cannot establish a policy on the part of the entire department such that the City should be held to answer for these individuals.

---

[1] Four claims are for violations of 42 U.S.C. § 1983 (alleging generally that Plaintiff's received an inadequate investigation due to their status as Black Muslims (*see* Counts 2, 5, 7 & 8)); and two claims are for violations of 42 U.S.C. § 1985 (alleging conspiracy claims in connection with the same (*see* Counts 3 & 6). (D.E. 72.)

More importantly, Plaintiffs can provide no evidence suggesting that they received disparate treatment at all, much less that they received such treatment *because* of their status as Black Muslims. Plaintiffs allege that they are similarly situated to the Occupy Oakland complainants, and that Occupy complaints received detailed independent IAD investigations. But the 2011-2012 Occupy Oakland protests resulted in an unprecedented number of IAD complaints that the City simply did not have the resources to handle by itself. Already subject to a Negotiated Settlement Agreement (NSA) in *Allen v. City of Oakland*, Case No. 3:00-cv-4599, then presiding Judge Thelton Henderson ordered the City to present a plan for completing those investigations within the time limits set forth in Government Code section 3304. In addition to reassigning staff to handle IAD investigations, the City's plan included the use of outside investigators.

But the City's triage efforts *did not* result in any uniform treatment of all Occupy IAD cases. OPD handled some cases internally, and others were sent to outside investigators. Still, others were deemed service complaints and, consistent with OPD IAD policy, were administratively closed without investigation.

The nature of the complaints and the circumstances surrounding the Occupy-related IAD cases render them dissimilar to Plaintiffs' case. The Occupy complaints amounted to the largest flood of IAD complaints in the City's history and a court order specifically directing the City to complete all Occupy-related complaints within a specified time period. Unlike the Occupy-related IAD complaints, Plaintiffs were not part of any such unprecedented influx—and despite Plaintiffs' direct request to the *Allen* court—there was no similar order in *Allen* (or any other court) specific to Plaintiffs' complaint. Plaintiffs will contend OPD was obligated to send 13-1062 to an investigator external to OPD, but they can identify no source for that obligation. Plaintiffs have no legal right to an outside investigation of IAD 13-1062.

To survive summary judgment, Plaintiffs must point to evidence that OPD failed to send 13-1062 to an outside investigator, or failed to make findings pursuant to OPD policy and procedure, *because* of OPD's alleged animus toward Black Muslims. They cannot. Accordingly, Defendant respectfully asks this Court to grant its motion for summary judgment.

## II. FACTUAL BACKGROUND

Plaintiffs are members of the Bey family, and formerly part of the leadership of the now defunct Your Black Muslim Bakery. (Warren Decl. Exhs. A-B (ASB Depo.) 303:21-304:11.) The Beys of the Your Black Muslim Bakery represent one of at least two separate but collegial Black Muslim groups in Oakland affiliated with the Nation of Islam. (ASB Depo. 253:6-254:15.) On February 27, 2004, Waajid Bey (Waajid) disappeared. (TAC at 3: 24-25.) Plaintiffs filed a missing person's report with OPD four days later. (*Id.* at 25-26.) Waajid's body was discovered six months later, which converted the matter into a murder investigation. (*Id.* at 3:27.)

On June 17, 2005, four gunmen ambushed Plaintiff JMB. (*Id.* at 3:28.) As a result, OPD initiated an attempted murder investigation. (*Ibid.*)

In or about July 2007, Plaintiffs met with then Oakland Mayor Ronald Dellums's office to provide evidence related to 2004 murder of Waajid and 2005 attempted murder of JMB. (ASB Depo. 137:18-138:6.) The Mayor's Chief of Staff advised Plaintiffs to file a complaint with the District Attorney and also file a complaint with the Citizens' Police Review Board ("CPRB"). (*Id.*) The Mayor also provided a letter of support to the judge presiding over the bankruptcy proceedings of the Your Black Muslim Bakery on behalf of Plaintiffs in an effort to save the Bakery. (ASB Depo. 256: 15-257:15, 285:10-286:2 & Exh. 24.)

On or about July 12, 2007, Plaintiffs sent a letter to the District Attorney about the cases. (ASB Depo. 138:7-25 & Exh. 5.) The District Attorney never responded to Plaintiffs' letter. (*Id.*)

## A.   CPRB 07-538

On July 13, 2007, Plaintiff ASB filed a complaint with the CPRB naming as subject officers Bruce Brock and Todd Crutchfield. (ASB Depo. 138:20-23 & Exh. 6; TAC at 4: 5-7 & TAC, Exh. 5.) The complaint alleges that "[t]heir family is concerned that after 37 mos of intense investigation in Waajid's murder and 24 mos of intense investigation into John's attempted murder there has been no progress even with family members feeding leads." (ASB Depo. Exh. 6 TAC, Exh. 5.) After receiving the complaint and meeting with Plaintiffs, the CPRB notified Plaintiffs that the complaint would not be accepted for investigation as it was a service complaint outside of the jurisdiction of the CPRB. (ASB Depo. 140:11-142:10 & Exh. 7.) In the Notice to Complainant, the CPRB noted:

[Y]ou indicated to [the] Complaint Investigator [] that you did not have a complaint against a specific Oakland police officer but instead your main concern was the general investigation process being slow and not progressing after several years. The Citizen's Police Review Board ordinance, Oakland City council Ordinance number 12454 C.M.S., adopted November 12, 2002, applies to misconduct complaints against Oakland police officers or park rangers. Your complaint as written alleges failure to solve a homicide and attempted homicide and not a specific Manual of Rules violation by a specific officer. As with all service complaints, we are forwarding your complaint to Oakland Police Chief Wayne Tucker and we will maintain your complaint in our database. Should you have any questions regarding this matter or should you desire to amend your complaint, please do not hesitate to contact [the] Complaint Investigator … . (ASB Depo. Exh. 7.)

A service complaint is one in which the complainant has expressed dissatisfaction with a finding or result. (Warren Decl. Exh. C (Griffin Depo.) 14:4-15:7; Exh. D (Caceres Depo.) 23:20-24.) The CPRB does not investigate service complaints, and IAD does not provide findings for service complaints. (Griffin Depo. 14:4-15:7 (confirming no findings given for service complaints); Caceres Depo.20:8 -24:22 (noting that the CPRB does not investigate service complaints, only individual misconduct complaints constituting violations of the Manual of Rules and the general orders.)

The CPRB and IAD typically conduct parallel but separate investigations. (Caceres 19:12-14.) As a result, Plaintiffs' CPRB complaint became OPD IAD Case No. 07-0538. IAD also viewed the complaint as a service complaint.

On September 1, 2007, OPD IAD sent Plaintiff ASB a letter regarding the resolution of his complaint (Case No. 07-0538) and closed the matter. (TAC at 4:8-9 & TAC, Exh. 2 (p. 62 of 75 of the TAC).) The letter reads, in pertinent part:

Dear Mr. Bey:

You initiated a complaint against an officer of the Oakland Police Department. An investigation into the allegation has been completed. The allegation and investigative findings are listed below:

Service Complaint: You initiated a complaint regarding an improper policy, procedure, practice, service level or legal standard of the Department. The Internal Affairs Division has documented and worked toward resolving your complaint. The circumstances will be further reviewed in order to improve our future service to the community. [] The Department apologizes for any inconvenience this incident may have caused you. (TAC, Exh. 2.)

## B.     2011 CPRB & IAD

In or about September 2011, Plaintiffs filed another CPRB complaint. (ASB Depo. 144:20-

145:10.) Per policy, CPRB forwarded a copy of the complaint to IAD to receive and review. (*Id.*; Warren Decl. Exh. E (Figueroa Depo.) 119:1-120:25.) The IAD case was given the same number as the 2007 case, IAD 07-538. (ASB Depo. 144:20-145:1.) The allegations appeared to "reiterate [Plaintiffs'] displeasure about how OPD handled [the 2004 Waajid] kidnap/murder case," and that the 2007 IAD complaint was closed as a service complaint. It also contained new allegations regarding "cases handled by OPD Sergeant Longmire." (Figueroa Depo. 119:1-123:13 & Exh. 9.) IAD treated the complaint as a duplicate complaint, already addressed in prior cases, and the complaint form and related documents were placed into the IAD 07-538 case file. (Figueroa Depo. 101:8-101:11 & Exh. 6.)[2]

The CPRB re-opened the case as CPRB 07-538, but ultimately also administratively closed the case one year later in November 2012. (ASB Depo. 145:24-147:5, 227:8-25 & Exh. 10-11.) However, the CPRB drafted a letter on behalf of Plaintiffs to the United States Department of Justice in November 2012. (*Id.*) The letter stated, in pertinent part:

> The Citizen's Police Review Board had initially closed the Beys' case in 2007 for insufficient information. The Beys provided additional details to their original complaint to reopen the investigation in 2011, but due to statute of limitations, any action on these complaints is no longer timely under California law. Additionally, the complaints are beyond the scope and resources of this Board. Therefore, by request of the complainants and by vote of the Members of the Citizens' Police Review Board, we are forwarding the attached information for further action. (ASB Depo. 147: 3-21 &

---

[2] This was a regular practice for IAD intake. (Lois Decl. ¶6 (among other roles, IAD intake's role is to determine whether a complaint was already investigated, and already on file. If a complaint was already on file, the complaint would typically be incorporated into the existing complaint.) Sergeant Longmire was the subject officer in IAD 07-0553, which started as a complaint made against Longmire by Devandre Broussard or his girlfriend, alleging that Longmire assaulted a suspect during an interrogation about the murder of Chauncey Bailey. (ASB Depo. 165:11-17; Griffin Depo. 19:11-21:3; 22:6-20.) The complaint and other allegations of misconduct against Longmire were ultimately investigated by Wendell "Pete" France, an external investigator engaged by OPD, and the California Department of Justice. (Griffin Depo. 93:7- 97:6 & Exh. 6 (DOJ Report); Figueroa Depo. 102:23-103:11; 237:3-238:23.) Plaintiffs argue this case should have been linked to their IAD 07-0538 complaint about the lack of progress in the investigation into the 2004 murder of Waajid and 2005 attempted murder of JMB. (ASB Depo. 165:11-166:25.) IAD has never linked the cases, and Plaintiffs have never identified a rule that required IAD to do so. It's not clear what benefit or purpose relating the cases would have served, or why IAD should have been expected to re-open a file investigated by Mr. France and the California DOJ. (*See also*, ASB Depo. 213:4-214:7 (describing his understanding of the history of IAD 07-0553).

1    Exh. 11.)

2         The DOJ did not commence an independent investigation into Plaintiffs' allegations. (ASB

3    Depo. 148:14-152:7 & Exh. 12)

4    **C.    IAD Case 13-1062**

5         In 2013, Plaintiffs requested the newly appointed Compliance Director, Thomas Frazier to re-

6    open IAD Case No. 07-0538. (TAC at 4:20-24.) Plaintiffs believed Frazier "independently investigated

7    Occupy" and demanded that Frazier independently investigate their case also.[3] (ASB Depo. 152:8-22.)

8         In July 2013, Richard Cashdollar, a representative for the Office of the Compliance Director,

9    called OPD and then followed up with a letter reporting the contact with Plaintiffs. (ASB Depo.

10   152:23-153:16; Figueroa 131:10-132:24) In a letter dated July 23, 2013, Mr. Cashdollar wrote:

11        Yesterday afternoon Mr. John Bey knocked on the door of our office and lodged a
          verbal complaint against OPD for not aggressively investigating a case that he alleges
12        involves several homicides. He left the following business card. [The business card
          encircles the name "John Bey" and includes a note "IA 07-0538."]
13

14        Per our conversation yesterday, I understand that you process encounters like this as
          complaints. As such I forward this information to you for appropriate action. (ASB
15        Depo. 153:21-154:24, Exh. 13.)

16        The following day, on July 24, 2013, OPD IAD Intake Officer Nguyen reached out by phone

17   and letter to Plaintiffs about their complaint. (ASB Depo. 155:1-8.) Plaintiffs were disappointed that the

18   Office of the Compliance Director rerouted them back to IAD. (ASB Depo. 155:9-11.) The same day,

19   July 24, 2013, they wrote a letter expressing their dissatisfaction with the fact that IAD was going to be

20   "relooking at [IAD] 07-5038." (ASB Depo. 159:9-160:10 & Exh. 15.) Neither the Compliance Director

21   nor anyone from his office ever responded to Plaintiffs. (*Id.*)

22        OPD opened the new case and designated it IAD 13-1062. (ASB Depo. 155:1-8; 160:21-

23   161:8.) The following week, Plaintiffs met with Officer Nguyen twice in person and once by phone for

24   a total of two to three hours to provide facts in support of their complaint. (ASB Depo. 263:3-246:15;

25        [3] Frazier conducted an "independent investigation" into the City's response to Occupy Oakland
     protests on and around October 25, 2011. (RJN, Exh. D) By its own terms, the investigation was
26   "not an investigation of any individual event or complaint"—that is, it was not an investigation of a
     complaint to IAD. (*Id.* at p. 7) The Frazier Group reported that it "made concerted efforts not to
27   interview OPD members who were under any type of investigation related to Occupy Oakland
     events." (*Id.* at p. 8.) The report ultimately contained 68 findings and recommendations to improve
28   OPD's response to future protests. The City publically released the Frazier Report in June 2012.

265:12-24.) Plaintiffs understood that the purpose of these meetings was to collect this information, and that it would ultimately be forwarded to the IAD investigator. (*Id.*) Plaintiffs do not recall Officer Nguyen being disrespectful to them in any way. (ASB Depo. 272:22-273:2.)

In August, Plaintiffs reached out to the office of the Compliance Director to complain that nothing had been done on the case since the intake process. (ASB Depo. 264:20-265:4.)

In September 2013, Plaintiffs met with Captain Oliver Cunningham for about an hour in his office where they provided additional evidence about the case. (ASB Depo. 265:25-268:13.) In or about this time, Captain Cunningham informed Plaintiffs that the scope of investigation into IAD 13-1062 would be limited to their three investigations: 1) the 2004 in the murder of Waajid; 2) the 2005 attempted murder of JMB; and 3) IAD 07-0538, which complained about the lack of progress in the 2004 and 2005 cases. (ASB Depo. 269:10-272:21 & Exh. 22.)[4]

Plaintiffs met with Captain Cunningham a second time, and thereafter met him twice briefly in the halls of OPD when Captain Cunningham would come downstairs from his office to provide updates on the status of their case. (ASB Depo. 267:5-268:13.) ASB believes Captain Cunningham was "disingenuous and dismissive" of some of the things Plaintiffs told him that made him feel like Captain Cunningham viewed them as a nuisance and that their case wasn't a priority. (ASB 273:3-25.)

---

[4] On September 16, 2013, JMB sent an email to the *Allen* case Compliance Director Frazier and Independent Monitor Warshaw ostensibly to provide an update on IAD 13-1062. (ASB Depo. 269:10-272:21 & Exh. 22.) JMB writes:

> OPD violated every tenet of the NSA from 2002 through 2008 with regard to the Bey family and Your Black Muslim Bakery [but,] [w]hat was really done to our family was what is known as a COINTELPRO operation. [] Since there were several murders linked to the actions of OPD during the time above, the entire process needs to be looked into by an independent federal group, but we'll start with OPD for now because we want to be a part of the improvement. What we have experienced so far, however, is very unimpressive and not neutral to say the least. IA has not been welcoming at all. There is the impression that both Saleem and I have that the relationship is adversarial. We have met with [O]fficer Nguyen, talked with Lt. Supriano and met with Capt. Cunningham. It should now be in front of a Lt. to conduct the investigation. According to Capt. Cunningham they will focus on 3 cases involving our family: the murder of Waajid Bey in 2004, the lie in wait ambush attempted murder of me June 2005 (OPD #05-034462) and Saleem's initial IA case complaining about the lack of work on those cases (IA #07-05038.) [] We appreciate the opportunity to be a part of remaking OPD, but our issues must be addressed fully of the entire exercise will be for naught. We should also be allowed to speak with your teams so they can get the full understanding that during the entire Monitoring period of the NSA, OPD was acting against the agreements. (*Id.*)

1   Plaintiffs also met with Lt. Supriano, sometime between July and September 2013 but have no specific

2   recollection of that meeting with him. (ASB Depo. 274:1-24 & Exh. 22.)

3       Sergeant William Griffin received IAD 13-1062 in August or September 2013. (Griffin Depo.

4   77:17-78:1 (noting that despite the complaint coming into the department on July 23, 2013, he would

5   not likely have received it until August or September due to the process by which complaints are

6   received).) As the assigned investigator, Plaintiffs also met with Sergeant Griffin a couple of times

7   during his investigation. (ASB Depo. 276:15-18.) Sergeant Griffin tried his best to stay in touch with

8   Plaintiffs and to never be "unavailable." (Griffin Depo. 189:2-10.) He recalls speaking with JMB

9   "multiple times, and "felt as though if [he] failed to address something with [Plaintiffs], they would

10  have told [him]."

11      Sergeant Griffin was instructed to focus specifically on the following three issues: 1) the quality

12  of the investigation of the 2004 murder of Waajid; 2) the quality of the investigation of the 2005

13  attempted murder of JMB; and 3) whether the 2007 IAD complaint 07-0538 was improperly closed.

14  (Griffin Depo. 52:17-53:6; 196:20-197:6.) During the course of his investigation, Sergeant Griffin

15  made the following determinations:

16       • *Closure of IAD Case 07-538 as a service complaint*. Sergeant Griffin agreed

17         that the case was properly closed as a service complaint. (Griffin Depo. 197:7-199:8.) Plaintiffs

18         alleged concerns with the progress of the criminal investigations after months of "intense

19         investigation." Plaintiffs identified Brock and Crutchfield as subject officers but did not assert

20         specific complaints about either officer's conduct. (*See also*, ASB Depo. 140:20-23 & Exh. 7

21         (CPRB Notice to Complainant re CPRB 07-538 ("[Y]ou indicated to [the] Complaint

22         Investigator [] that you did not have a complaint against a specific Oakland police officer but

23         instead your main concern was the general investigation process being slow and not

24         progressing after several years.")).) Because the allegations, if taken as true, did not amount to a

25         MOR violation, Sergeant Griffin determined that the 2007 IAD complaint was properly closed

26         as a service complaint. A service complaint typically does not result in reviewing the actions of

27         a subject officer. (Griffin Depo. 14:4-15:7.)

28

- *Quality of 2005 investigation into the attempted murder of JMB.* Sergeant Griffin reviewed the investigative file of the 2005 attempted murder of JMB. Specifically, he reviewed the case evidence that was available, reviewed the actions taken by looking at available case notes, considered his own experience and consulted with senior investigators in the Homicide section about what would be considered standard steps in an investigation. (Griffin Depo. 56:19-57:9; 59:6-18.) He documented for the file any steps that appeared to be inconsistent with these standards and anything that appeared to be an issue with the investigation. Griffin observed a lack of follow up regarding a ballistics database, a lack of a photo line-up, and no actual witness line up. (Griffin Depo. 199:12-200:11.) Sergeant Griffin also attempted to reach out to Sergeant Ray Sethna, the assigned investigator in 2005 to better understand Sethna's investigative steps in the case, but he did not respond to Griffith's request for an interview. (Griffin Depo. 107:15-108:12; 103:23-4 & Exh. 7; Declaration of Kiona Suttle ¶ 2c.)[5] Ultimately, Sergeant Griffin compared his findings to the policies and procedures that were in place at the time. (Griffin Depo. 57:7-9.)

- *Quality of 2004 investigation into the murder of Waajid Bey.* Sergeant Griffin searched two OPD databases, but was unable to locate the investigative file for this case during his investigation. (Griffin Depo. 122:23-123:19) Sergeant Griffin attempted to reach out to retired Sergeant Bruce Brock, the assigned investigator in 2004, but he did not respond to his request for an interview. (Griffin Depo. 107:15-108:12, 194:19-195:8; Suttle Decl. ¶ 2a.)[6] Sergeant Griffin later learned that Sergeant Brock brought copies of the case file with him when he retired from OPD and began working in the District Attorney's office. (Griffin Depo. 53:15-54:6.)

---

[5] In 2005, Lieutenant Ken Whitman was Sethna's supervisor. Sergeant Sethna's last day of employment with OPD was October 17, 2011; Lieutenant Whitman's last day of employment with OPD was December 30, 2009. (Suttle Decl. ¶ 2c.) Plaintiffs contend that Todd Crutchfield was the investigator on JMB's 2005 attempted murder investigation. In 2005, Lieutenant Kenneth Parris was Crutchfield's supervisor. Sergeant Crutchfield's last day of employment with OPD was October 17, 2011; Lieutenant Parris's last day of employment with OPD was November 3, 2012.

[6] In 2004, Lieutenant James Every was Brock's supervisor. Sergeant Brock's last day of employment with OPD was December 3, 2006; Lieutenant Every's last day of employment with OPD was June 29, 2006. (Suttle Decl. ¶ 2c.)

As a result of his investigation, Sergeant Griffin determined that there appeared to be missteps in the 2005 investigation based on a lack of documentation.[7] But he could not sustain any findings against any officer because he had no actual evidence of wrongdoing: 1) in 2004 and 2005, when the subject criminal investigations took place, no policies or procedures prescribed necessary investigative steps. Sergeant Griffin could not sustain findings against the officers for violating policies that were not in place at the time of the complained of conduct. 2) The investigatory file for the Waajid case was missing, so Sergeant Griffin could not review it to determine what steps had been taken or not taken in that investigation. (Griffin Depo. 61:9-66: 5 & Exh. 5)

Sergeant Griffin presented his proposed findings to his superiors, including then-Chief Sean Whent. Dissatisfied with not being able to sustain findings where the investigation identified missteps in the underlying criminal investigations, Chief Whent directed Sergeant Griffin to sustain the findings against the entire department, in an effort for OPD to hold itself accountable for those identified missteps—and to take steps to avoid similar missteps in the future..[8] (*Id.* at 61:9-66:15; 129:8-130:19)

On March 18, 2014, Captain Cunningham and Lieutenant Outlaw invited Plaintiffs to an in-person meeting to receive the IAD closeout letter regarding the resolution of their IAD complaint 13-1062. (ASB Depo. 276:18-24.) The letter, which closed the matter, outlines the findings:

> Performance of Duty – The complainants alleged that there was a systematic failure on the part of the Oakland Police Department during the investigation of the murder of Waajid Bey and the attempted murder of John Bey as it relates to the follow up criminal investigation. The investigation disclosed sufficient evidence to determine that the alleged conduct did occur. A finding of "Sustained" has been determined. This finding is applied to the Oakland Police Department as the individual Subject Officers and their immediate supervisor are no longer employed by the O.P.D. The Department apologizes for any inconvenience this incident may have caused you.

(TAC at 5: 23-24 & TAC, Exh. 1 (p. 62 of 75 of the TAC).

During the meeting, which lasted for "40 plus minutes," Plaintiffs aired some of their grievances about what they perceived to be the shortcomings of the closeout letter. (ASB Depo. 276:25-9.) Although

---

[7] Sergeant Griffin's investigation was limited to the documents available in the files, which may not have been complete. He could not definitively say what steps had or had not been taken without speaking to the investigators. (Griffin Depo. 131:24-132:18.)

[8] Sergeant Griffin produced a detailed investigative report documenting his investigation, findings and analysis on each of the issues he was tasked with reviewing. (*See* Griffin Depo. 199:12-16 & Exh. 5.)

Outlaw was responsive to emails after that meeting, acknowledging Plaintiffs' displeasure with the closeout letter; Plaintiffs do not recall speaking with Cunningham again. (ASB Depo. 277:10-16.) Plaintiffs feel that they were treated dismissively:

> We were basically told, here is the letter that you're going to take. [] And I believe they acknowledged that we probably wouldn't be satisfied with this at the time, but this is it. Case is closed. And we refused to accept that the case was closed and continued to email people after that meeting, and that's what kind of led to 13-1062 after closing being relooked at and [] Warshaw the compliance director [] told [us] that he would assign Figueroa to address the shortcomings in the investigation. (ASB Depo. 277:23-278:10.)

Plaintiffs contend that the IAD 13-1062 close out letter was incomplete because, it did not include current employees. (ASB Depo. 279-8-10.) Thereafter Plaintiffs met with Captain Figueroa in person for one hour in 2014, and then again for an hour in 2015, in an effort to address the perceived shortcomings of IAD 13-1062.[9] (ASB Depo. 278: 11-282:6.) Plaintiffs contend that Figueroa promised to fix the letter however, Plaintiffs never received a new closeout letter for IAD 13-1062. (ASB Depo. 208:3-6.)

**D.      CPRB Case 13-1062**

On November 6, 2013, Plaintiffs filed a new CPRB Case complaining about the way IAD 13-1062 was being handled. (ASB Depo. 282:20-285:9.) Plaintiffs specifically named Sean Whent and Oliver Cunningham as the subject officers. As a result, the CPRB also opened a parallel investigation, CPRB Case No. 13-1062 (160:12-17.) On or about July 10, 2014, CPRB closed CPRB 13-1062 without sustaining any findings. (ASB Depo. 171:1-9; 285:6-9 & Exh. 19.)

**E.      Occupy Oakland**

In early October 2011, a group identifying itself as Occupy Oakland set up an encampment on Frank H. Ogawa Plaza in Oakland, directly in front of City Hall. (RJN, Exh. D at 5.) The group remained on the Plaza for weeks and, over time, concerns developed for the health and safety of Occupy Oakland participants, City employees, and others in the community. (*Id.*) Concerned with the encampment's conditions, City officials directed OPD to develop an eviction plan. (*Id.* at 6.)

---

[9] During the first meeting, Plaintiffs contend that Figueroa stormed out of the meeting in response to Plaintiffs' effort to "bond with him" by talking about an internet article that accused Figueroa of lying repeatedly and misrepresenting the truth. (*Id.*)

On October 25, 2011, OPD and other law enforcement agencies attempted to evict Occupy Oakland participants from the Plaza. This resulted in clashes between Occupy Oakland participants and law enforcement, injuries to Occupy Oakland participants and law enforcement officers, and controversy over law enforcement's uses of force. (*Id.* at 6-7.)

Following the events of October 25, the City engaged Frazier Group, LLC to examine OPD's response on October 25, 2011. (*Id.* at 7.) The Frazier Group reviewed, "at a systemic or organizational level," OPD's response to the events of October 25; it expressly *did not* provide "an investigation of any individual event or complaint." (*Id.*) They aimed to identify areas of OPD "policy, procedure, and tactics" related to responding to large-scale protest events for revision or updating. (*See id.* at 7-8)

Separate from the Frazier Group's assessment, a deluge of complaints alleging police misconduct related to Occupy Oakland inundated OPD's IAD. (Declaration of John Lois (Lois Decl.) ¶ 3) The OPD response on October 25 and to subsequent Occupy protests led to more than 1,000 complaints of misconduct—an unprecedented number of complaints in the City of Oakland—almost immediately and in the months that followed. (*Id.* ¶¶ 3, 5)

On May 1, 2012, the *Allen* Court ordered the City to provide a written plan for addressing "all outstanding internal affairs investigations stemming from Occupy Oakland activities prior to December 31, 2011," within the time limits of California Government Code section 3304 (one year) and, where possible, OPD policy (180 days). (*See* RJN Ex. A ) The *Allen* Court noted that, "multiple City officials [had] . . . expressed the view that [OPD] lack[ed] the capacity to complete all of the outstanding investigations without outside assistance, and thus, under the circumstances, it "seem[ed] probable" that the City's plan would need to include "the engagement of . . . outside consultants." (*Id.* at 2)

On June 8, 2012, the City responded to the *Allen* Court's order, both providing the requested plan and further underscoring the challenges posed by the volume of Occupy-related complaints. "The events of 25 Oct 11 generated more complaints from citizens than any other single event in [OPD] history." (RJN Exh. C at 1 "[G]iven their existing caseload, hundreds of hours of video to be reviewed, and serious and complicated nature of the force allegations which occurred during major urban protests," the staff in IAD were "unable to accommodate the significant increase in complaints caused

by the 2011 Occupy Oakland events." (*Id.* at 2). Potential conflicts of interest further exacerbated the capacity issue, as "many of the IAD investigators had been deployed to Occupy demonstrations and could have been subjects or witnesses to the complaints being received." (*Id.*) To address the unprecedented volume of complaints, the City proposed a triage plan: The City would engage qualified external investigators and reassign five investigators from other divisions to IAD. (*Id.* at 3-8; Lois Decl. ¶¶ 5-8) IAD would then allocate the Occupy-related IAD investigations between available investigators—internal and external to OPD—to provide the best opportunity to timely complete all the outstanding investigations. (RJN Exhs. B, C at 3-9; Lois Decl. ¶¶ 5-8.)

### III. PROCEDURAL HISTORY

Plaintiffs commenced this action on April 9, 2014. (D.E. 1.) On September 21, 2015, the City filed a motion for judgment on the pleadings. (D.E. 33.) On December 15, 2015, the Court granted the motion, and dismissed the SAC in its entirety, with leave to amend. (D.E. 54.)

On January 20, 2016, Plaintiffs filed a TAC, with nine causes of action, including a new 42 U.S.C. § 1986 claim, and ten new defendants. (D.E. 60.) Plaintiffs had already previously named six of the ten new defendants in earlier pleadings that the Court dismissed after 28 U.S.C. § 1915 review. (D.E. 1, 11, 12, 14.) Among the new names to the TAC were the current Federal Compliance Director, Robert Warshaw, and Assistant Chief of Police Paul Figueroa. (D.E. 60.) The Court did not authorize Plaintiffs to add new parties, and Plaintiffs did not seek leave to do so. (D.E. 63 at p. 1.) On February 2, 2016, the Court issued an order dismissing without leave to amend, the 42 U.S.C. § 1986 claim and the ten new defendants. (D.E. 63.)

On February 26, 2016, Defendant moved to dismiss the final eight claims of the TAC. (D.E. 65.) The Court dismissed Count One as time-barred, and Count Four as duplicative, but denied dismissal of the remaining six claims. (D.E. 72 (Order 4/26/16).)

Defendant now timely brings this motion for summary judgment as to the remaining six claims. For the reasons set forth below, summary judgment should be granted on all remaining claims.

## IV. LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[I]nferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At the summary judgment stage, a judge's function "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Dzung Chu v. Oracle Corp.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also* FED. R. CIV. P. 56(c)(1)(B). A "summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."). Where record evidence exists that blatantly contradicts the opposing party's version of the story such that no reasonable jury could believe it, "a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380-81 (2007).

## V. ARGUMENT

**A.**   **Plaintiff's Equal Protection Claims Fail as a Matter of Law Because Plaintiffs Cannot Prove the Elements of a Violation.**

Plaintiffs allege that OPD supported an established custom of hatred and discrimination against Black Muslims and that this animus resulted in disparate treatment in the resolution of IAD 13-1062. "To state a claim under section 1983 for a violation of the Equal Protection Clause, a

plaintiff must show that the [D]efendant[] acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class, and that plaintiff was treated differently from persons similarly situated." *Lam v. City & Cnty. of San Francisco*, 868 F. Supp. 2d 928, 951 (N.D. Cal. 2012) *aff'd*, 565 F. App'x 641 (9th Cir. 2014) (citations omitted). The United States Supreme Court has explained:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. [] It implies that the decisionmaker […] selected or reaffirmed a particular course of action at least in part **"because of," not merely "in spite of," its adverse effects upon an identifiable group.** *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (citations omitted) (emphasis added).

Plaintiffs' equal protection claims fail because 1) they are not similarly situated to Occupy Oakland complainants, and 2) they cannot meet their burden to show that the City was motivated by a discriminatory purpose because of Plaintiffs' status as Black Muslims. *Id; Monetti v. City of Seattle*, 875 F. Supp. 2d 1221, 1229-30 (W.D. Wash. 2012) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 271 n.21 (1977).

### 1.  Plaintiffs Were Not Similarly Situated to the Occupy Oakland Complainants.

Plaintiffs contend that they are similarly situated to the Occupy Oakland-related complainants. Not true. The Occupy Oakland protests resulted in an unprecedented number of Internal Affairs complaints for which the IAD staff was ill-equipped to handle. (Lois Decl. ¶ 3.) Although additional reasons also justified the expenditure of City funds for outside investigators, IAD's reason for seeking outside investigators was the sheer volume of complaints. (*Id.*, ¶¶ 4-5.) Contrary to Plaintiffs' allegations, the nature and context of the complaints related to Occupy Oakland varied significantly. Accordingly, there was no uniform treatment of all Occupy Oakland-related IAD complaints. (*Id.*, ¶ 6.) Not all Occupy Oakland-related IAD complaints resulted in outside investigations, nor did all such complaints receive detailed findings. (*Id.*, ¶ 6-7.) In fact, hundreds of cases were administratively closed, which would not result in any findings at all. (*Id.*) Likewise, the overwhelming majority of the complaints did not result in sustained findings. (*Id.*, ¶ 8 (only approximately 50 cases resulted in discipline).) In addition, by May 1, 2012, the court in

*Allen* specifically ordered the City to present a plan for completion of the outstanding Occupy Oakland-related IAD investigations. (RJN, Exh. A (Allen Court Order).)

Moreover, the Occupy Oakland complaints were all still within the one year statute of limitations under Government Code section 3304, and thus still had the potential to result in discipline. By contrast, Plaintiffs' IAD complaint sought review of a 2007 IAD complaint, and the underlying 2004 and 2005 criminal investigations. Typically, Plaintiffs would not have received an investigation at all. (*See* Griffin Depo. Exh. 5 at p. 4 (indicating that the assigned investigators that conducted the inadequate investigations would "normally be the subject officers" and that "under normal circumstances, policy would guide us not to investigate these subject officers and admin close the case because they are no longer employed with the City.").) Plaintiffs' circumstances were thus also vastly different from any Occupy Oakland complainant.

Where, as here, Plaintiffs cannot show they were similarly situated to the Occupy Oakland complaints, Plaintiffs' section 1983 claims therefore fail as a matter of law. *See, e.g. Lam*, 868 F. Supp. 2d at 944.

### 2.    Plaintiffs Cannot Show that Discriminatory Intent Was a Motivating Factor in Connection with Any Aspect of IAD 13-1062.

Even if Plaintiffs are similarly situated to the Occupy Oakland complainants, "[p]roof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause." *Carmichael v. City of New York*, 34 F.Suup.3d 252, 262 (2014) (citing *Okin v. Vill. Of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 438 (2d. Cir. 2009).). In police failure-to-serve cases, "courts have consistently required <u>more</u> evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving minority victims. Rather, the courts have required a showing of a pattern of failure to provide an adequate police response to minority complainants or direct evidence of racial disparagement among police officers." *Moua v. City of Chico*, 324 F.Supp.2d 1132, 1140 (E.D. Cal. 2004) (emphasis added) (citing *Navarro v. Block*, F.3d 712, 715-17 (9th Cir. 1995)); *also Mody v. City of Hoboken*, 959 F2d 461, 465-67 (3d Cir. 1992). "Where the challenged governmental policy is facially neutral, proof of disproportionate impact on an identifiable group, such as evidence of gross statistical disparities, can satisfy the

intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy." *Moroney v. City of Long Beach*, 2018 WL 6177956, at *6 (C.D. Cal. Jan. 9, 2018); *But see Valdez v. City of San Jose*, 2013 WL 752498 at *11-12 (N.D. Cal. Feb. 27, 2013) (noting that "[c]ases where statistical evidence alone is sufficient to establish equal protection liability are rare."). Plaintiffs' equal protection claims fail because they have no direct evidence of racial or religious disparagement against Black Muslims, and cannot establish a pattern of failures to provide an adequate police response to Black Muslims as it relates to the claims at issue in this case.

> a. **Plaintiffs lack direct evidence of racial disparagement.**

Plaintiffs do not identify direct evidence of racial disparagement in support of their claims. *See, e.g. Monetti*, 875 F. Supp. 2d at 1230-31 (racially charged statement, "I'll beat the fucking Mexican piss out of you, homey," made by officer accused of equal protection violation during the incident at issue in the case was direct evidence of discrimination as to that officer, but not to bystander officer; MSJ denied to the former but granted to the latter.). Although Plaintiffs testified that they spent countless hours in person and on the phone with various OPD personnel regarding IAD 13-1062 they do not identify a single derogatory or even off-color remark among them. (ASB Depo. 263:3-282:15.) Plaintiffs testified that the officers with whom they met regarding IAD 13-1062 were "professional" but "not friendly" and "were doing their job" but "there was definitely no customer service. (ASB Depo. 275: 21-25). Accordingly, at worst, Plaintiffs report feeling that Cunningham was "dismissive" and "disingenuous" at times. (ASB Depo. 273:3-25; 277:23-278:10.) This is not direct evidence of racial or religious disparagement against Black Muslims. *Cf. Monetti*, 875 F. Supp. 2d at 1230-31; *Valdez*, 2013 WL 752498, at *7 (N.D. Cal. Feb. 27, 2013) (comment made by officer at time of arrest, for which probable cause was disputed, that "[w]e don't want your kind here" or "[w]e don't like you people," was sufficient to establish discriminatory intent for Fourteenth Amendment liability because "[i]n the space of that brief interaction, [the officer's] isolated comment is potentially quite probative of his underlying motives."); *Carroll v. Village of Homewood,* 2001 WL 1467708, at *14 (N.D. Ill. Nov. 15, 2001) ("If there was no probable cause and [the defendant] indeed called [the plaintiff] a 'loud mouth n[----]r' upon his arrest (a disputed

1    fact), this is sufficient to support an inference of discriminatory intent.").

2        **3.    Plaintiffs Cannot Identify a Pattern of Failure to Provide an Adequate Police Response to Black Muslims.**

3        Plaintiffs identify their own cases: the 2004 and 2005 criminal investigations into the

4    murder of Waajid and attempted murder of JMB, as well as their own IAD cases 07-0538 and 13-

5    1062 as evidence of Defendant's failure to investigate cases on behalf of Black Muslims. (ASB

6    193:4-17.) Assuming, for sake of argument, that all of these cases were improperly investigated—

7    and, the record does not support that for IAD 07-538 or IAD 13-1062[10]—nothing in the record

8    suggests that the purported failings of the individual investigating officers in these cases: Brock,

9

10        [10] No reasonable jury could find that the IAD cases resulted in the provision of inadequate police services. Between IAD and CPRB, multiple investigators reviewed Plaintiffs' 2007 CPRB complaint and agreed that it was a service complaint because it did not constitute a Manual of Rules violation. (ASB Depo. 140:20-142:19; Griffin Depo. 13:23-15:7; 18:8-19:4; 197:7-199:8.)  A service complaint does not typically result in reviewing the actions of a subject officer; it does not result in any findings at all. (Griffin Depo. 14:4-15:7; ASB Depo. Exh. 6.) The CPRB specifically invited Plaintiffs to amend their complaint in the Notice that CPRB 07-538 was not accepted for investigation. (ASB Exh. 7.) Plaintiffs do not allege that they did so.

        Likewise, for IAD 13-1062, after receiving Plaintiffs' broad sweeping allegations, OPD notified Plaintiffs that it would focus on three core issues. (ASB Depo. 269:10-272:21 & Exh. 22.) IAD then opened the investigation even though the officers assigned to the 2004 and 2005 criminal investigations, and their supervisors were no longer employed with OPD, and IAD's customary practice would have been to administratively close the complaint. Even though IAD policy would have supported a not sustained finding, Chief Whent acknowledged that the department as a whole had failed with respect to the 2005 investigation, and had Griffin sustain a finding as to the whole department. Plaintiffs have no competent evidence to dispute these facts. Ultimately, Sergeant Griffin produced a very thorough investigative report, and Plaintiffs received a sustained finding in IAD 13-1062. (Griffin Depo. 199:12-16.) Plaintiffs will likely contend, as they have, that Captain Ersie Joyner was still employed at OPD when the close out letter in March 2014 13-1062 was issued. This is a nonstarter. Joyner was not the supervisor of Brock, Crutchfield or Sethna in 2004 or 2005. (Suttle Decl. ¶ 2.) Indeed, Joyner was not even in Homicide at that time. (Warren Decl. Exh. F (Joyner Depo.) 13:6-14:12; 29:20-30:4.)

        Plaintiffs' conclusory allegations notwithstanding, no reasonable jury could conclude that IAD 13-1062 reflected a failure to provide police services due to Plaintiffs' status as Black Muslims or for any other reason. *See, e.g. Armado v. Port of Seattle Police Dep't*, 2015 WL 2450853, at *1, 3 (W.D. Wash. May 21, 2015) (Plaintiff alleged that officer conducted a biased investigation of several complaints due to his status as Indian and homeless; court found that "the evidence submitted by Defendants demonstrates a fair and thorough investigation. There is nothing that suggests bias by Sergeant Myers against Plaintiff based on race or housing status. [] Further, Plaintiff has failed to come forward with evidence to support his allegation that race or housing status was a factor in the investigation and conclusion that Officer Blackwell had not committed any Department policy violations during the two incidents involving Plaintiff.")

Sethna, Crutchfield, Bolton or Griffin acted for any reasons related to the race or religion of Plaintiffs. *Cf. Grenier v. Stratton*, 44 F.Supp.3d 197, 204 (D. Conn. 2014) (summary judgment to dispatcher where no evidence that dispatcher was aware of plaintiffs' race, "or that his actions were influenced by any such awareness.) Moreover, Plaintiffs have no evidence that these cases reflect a wider pattern of discriminatory treatment in the provision of police services against Black Muslims. Plaintiffs are not entitled to an inference as to this issue. *Trevino v. Gates*, 99 F.3d 911, 919–20 (9th Cir. 1996) ("When one must report to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom."). Discriminatory intent  requires that a defendant's action or inaction was at least in part *because of*, not merely in spite of, its adverse effects upon the disfavored person by reason of illegitimate consideration of that person's race, ethnicity or national origin. *Feeney,* 442 U.S. at 260; *see also Melendez–Garcia v. Sanchez,* 629 F.3d 25, 38 (1st Cir.2010) (same). No evidence in the record supports such a showing.

Even if Plaintiffs' cases can be viewed as a pattern sufficient to support a showing of discriminatory intent, Plaintiffs still Plaintiffs cannot produce evidence sufficient to show that the City had a widespread and persistent practice of failing to provide police services to Black Muslims sufficient to establish liability against the City.

**B.**     **Plaintiffs Cannot Establish a Practice or Custom So Widespread or Persistent as to Justify the Imposition of City Liability.**

A governmental entity is liable only for the actions of "its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Services,* 436 U.S. 658, 694 (1978). Under *Monell*, a municipality is liable for constitutional violations based on: 1) an unconstitutional policy or longstanding practice; 2) an isolated occurrence, where the person causing the violation is someone with final policymaking authority; or 3) ratification of a decision by a final policymaker. *Christie v. Iopa*, 176 F.3d 1231, 1235-39 (9th Cir. 1999). A policy need not be official; it can be a permanent, widespread, well-settled practice or custom that constitutes standard operating procedure. *Trevino*, 99 F.3d at 918. "[L]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient

duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Isolated acts of by low-level municipal employees are not enough to demonstrate a custom or policy or support a finding of liability. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *Cf. Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1149 (9th Cir. 1997) (noting that "[c]alling someone a 'dumb Mexican' is an egregious and bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin.[] [There is nothing ambivalent about [these] alleged remarks.")

Plaintiffs identify the following incidents as evidence of the City's unwritten policy and custom of discrimination against Black Muslims:

1) Officer Ersie Joyner told Longmire to "stop wearing bowties because people in the department believe he's a Muslim. (ASB Depo. 184:16-185:4);

2) Testimony by Joyner that "everything was different" when it came to the Your Black Muslim Bakery. (ASB Depo. 185:7-19);

3) Testimony by Longmire that his partner was guy from Idaho who hates Black people and Black Muslims. (ASB Depo. 186:22-187:9);

4) Testimony from Longmire that they bought cookies from the Your Black Muslim Bakery and tricked his racist partner into eating them by lying about where they were from. (ASB Depo. 187:5-18);

5) Testimony that Joyner replied, "that would be racial profiling, but Yes," in response to the question, if he saw a Black man in a bow tie and a suit in the bakery area, would he assume that he was a bakery member? (ASB Depo. 189:2-8);

6) Testimony from Officer Jeffrey Loman that someone in OPD printed a picture of Minister Farrakhan off of the internet and taped Longmire's face over the face of the person standing next to Farrakhan in the picture. (ASB Depo. 191:15-24); and

7) Testimony that Officer Frank Morrow wore bow ties and was accused of being a Muslim. (ASB Depo. 192:5-15).

Plaintiff also refers to testimony of retired Assistant Chief John Lois who testified that when he was a new officer in 1992 to 1993, he was warned about eating at the Bakery because "they weren't necessarily police friendly." (ASB Depo. 249:7-250:3; *Cf.* Lois Decl. ¶12.)

To the extent that these examples constitute evidence of animus towards Black Muslims, they are ambiguous, none of them were actually directed at Plaintiffs, or can be attributed to any officer involved in IAD 13-1062, they all relate to incidents from 2007 or earlier, and none of these examples appear to be unconstitutional. In all events, these eight examples "fall far short of

establishing a practice [] 'so persistent or widespread' as to justify the imposition of municipal liability." *See, e.g.*, *Henderson v. City and County of San Francisco,* 2006 WL 3507944 at *1, 10-11 (N.D. Cal. 2006) (plaintiffs' six separate incidents of excessive force, plus 18 additional grievances purporting to show a systematic policy of deliberate indifference to constitutional violations did not create a material dispute of fact as to the pervasive custom of excessive force.); *Tieman v. City of Newburgh*, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (13 instances of excessive force during arrests over four or five years, none of which involved findings or admissions of culpability, did not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom.); *Walker v. City of New York,* 2014 WL 1259618, at *1-3 (S.D.N.Y. Mar.18, 2014) (allegation that ten similar complaints were filed against City in the ten preceding years was insufficient to state a claim because the "paltry number of complaints (none resulting in an adjudication of liability), spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim"). Plaintiffs have failed to produce evidence that justifies the imposition of liability on the City.

**C.     Count Eight Fails For the Additional Reason that No Transcripts Were Created in IAD 07-538 or IAD 13-1062.**

Count 8 alleges that OPD failed and refused to provide transcripts of interviews to Plaintiffs "associated with Plaintiffs' complaints IAD07-0538 and IAD13-1062." (TAC at 55; ASB 232:7-24.) This claim fails for the additional reason that no transcripts of interviews exist for either case. For IAD 07-538, the case was administratively closed as a service complaint; no interviews were conducted. (Griffin Depo. 14:4-15:7.) Likewise, for IAD 13-1062, although Sergeant Griffin attempted to interview the former investigators, they did not return his calls so he never had a chance to record an interview. (Griffin Depo. 103:23-24; 107:15-108:12; 194:19-195:8.)

**D.     Plaintiffs' 42 U.S.C. § 1985 Conspiracy Claims Fail Because 1) Their 1983 Claims Fail; 2) They Lack Evidence of an Agreement; and 3) Count 6 is Time-Barred.**

Since Plaintiffs' section 1983 claims fail, their section 1985 claims cannot stand. "[T]o state a claim for conspiracy under [section] 1985, a plaintiff must first have a cognizable claim under

[section] 1983." *Buckheit v. Dennis*, 713 F. Supp. 2d 910, 930 (N.D. Cal. 2010).

However, even if Plaintiffs' section 1983 claims survive, Plaintiffs' conspiracy claims fail because Plaintiffs lack any evidence of an agreement. To bring a cause of action under § 1985(3) a plaintiff must prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 828–29, (1983). To prove a conspiracy Plaintiffs must provide evidence that shows "an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989). They must show that Defendants, "by some concerted action intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).

Plaintiffs lack any evidence of an agreement in support of Count Three or Count Six. Count Three alleges that OPD officers Derwin Longmire, Ersie Joyner, Oliver Cunningham, Danielle Outlaw, David Downing, and Paul Figueroa, former OPD Chief Sean Whent, and federal monitor Robert Warshaw conspired together to treat Plaintiff's IAD complaint 13-1062 "deliberately different" due to their status as Black Muslims, in violation of 42 U.S.C. § 1985. (TAC at 41-43; ASB Depo. 235:8-11; 235:13-245:1 (describing conspiracy).) However, in testifying about the nature of the conspiracy, Plaintiffs do not allege a single agreement. (ASB Depo. 235:13-245:1.) As a practical matter, Plaintiffs can cite to no evidence in the record that would show that Longmire, Joyner, Cunningham, Outlaw, Downing, or Figueroa had anything to do with the 13-1062 investigation prior to the March 2014 close out letter.

Similarly, to the extent that Count Six is different than Count Three, it alleges a conspiracy to "conceal a secret "off the books," illegal operation that specifically targeted plaintiffs using illegally 'gun walked' weapons." (TAC at 50; ASB 260:5-261:18.) However, Plaintiffs can point to

1  no evidence in the record that supports that an agreement was made between the identified

2  employees . (*Id.*) Moreover, the "gun walking" Plaintiffs' allege took place between 2005 and

3  2007. (TAC at 10 ("Said 'gun-walked' illegal shotgun was known to be in the control of Yusuf Bey

4  4th on 11.28.05 and 08/02/07.").) The statute of limitations for a 42 U.S.C. § 1985 claim is two

5  years. *Taylor v. Regents of the Univ. of Cal.,* 993 F.2d 710, 711-12 (9th Cir. 1993) (recognizing that

6  California's limitations period for personal injury governs 42 U.S.C. §§ 1981, 1983, and 1985

7  claims); CODE CIV. PROC. § 335.1 (statute of limitations for personal injury actions in California is

8  two years). As set forth in the Court's Order dismissing the SAC, "any claims related to OPD's

9  conduct regarding the 2004, 2005, and 2007 investigations are time-barred and must be dismissed."

10  (D.E. 54 at 16-17.) Here, Count Six is duplicative of Count Three except for its allegations about

11  the conspiracy to conceal the "off the books" illegal operation of "gun walked weapons." (ASB

12  Depo. 260:5-261:18; TAC at 50 (Count Six).) Count Six should thus be dismissed as duplicative of

13  Count Three, and to the extent that it is not duplicative, dismissed as time-barred.

14

## VI. CONCLUSION

15

16      For the foregoing reasons Defendant respectfully asks the Court to grant the motion for

17  summary judgment.

18

19  Dated: June 20, 2019

20                                         BARBARA J. PARKER, City Attorney
                                          MARIA BEE, Chief Assistant City Attorney
                                          DAVID A. PEREDA, Supervising Trial Attorney
21                                         SELIA M. WARREN, Deputy City Attorney

22                                         By:   /s/
23                                             Selia M. Warren
                                               Attorneys for Defendant
24                                             CITY OF OAKLAND

25

26

27

28