1  BARBARA J. PARKER, City Attorney, SBN 069722
   MARIA BEE, Chief Assistant City Attorney, SBN 167716
2  DAVID A. PEREDA, Special Counsel, SBN 237982
   SELIA M. WARREN, Deputy City Attorney, SBN 233877
3  One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California 94612
4  Telephone:     (510) 238-6524
   Facsimile:      (510) 238-6500
5  Email:  swarren@oaklandcityattorney.org
   X04143/2785196
6
   Attorneys for Defendant
7  CITY OF OAKLAND

8

9                       UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

12

13 | ALI SALEEM BEY and JOHN MUHAMMAD BEY, | Case No. 14-cv-01626-JSC |
|---|---|
14 | | **DEFENDANT CITY OF OAKLAND'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT CITY OF OAKLAND'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs,

15        v.

16

17 CITY OF OAKLAND and DOES 1-100
              Defendants.

[FED. R. EVIDENCE 201]

Date:        July 25, 2019
18 Time:        9:00 a.m.
Location:  San Francisco Courthouse 450
19 Golden Gate Ave. San Francisco, CA 94102
Courtroom:        F, 15th Floor
20

21 Judge: Honorable Jacqueline Scott Corley

22 Date Action Filed: April 19, 2014
Trial Date: August 26, 2019

23

24

25

26

27

28

Pursuant to Rule 201(b) of the Federal Rules of Evidence, Defendant City of Oakland ("Defendant") hereby respectfully requests that the Court take judicial notice of the following documents in support of Defendant's Motion for Summary Judgment, copies of which are attached hereto and described herein as **Exhibits A - D**:

1. **Exhibit A**: May 1, 2012 Order Requiring Plan Re: Occupy Oakland Internal Affairs Investigations, ECF Dkt. No. 691, United States District Court for the Northern District of California, Case No. 00-cv-04599-TEH (*Allen v. City of Oakland, et al.*);

2. **Exhibit B**: June 8, 2012 City of Oakland Occupy Investigation Plan, ECF Dkt. No. 695-2, United States District Court for the Northern District of California, Case No. 00-cv-04599-TEH (*Allen v. City of Oakland, et al.*);

3. **Exhibit C**: May 10, 2012 City of Oakland Response to "Order Requiring Plan Re: Occupy Oakland Internal Affairs Investigations" [Master Case File No C00-4599-TEH], ECF Dkt. No. 695-1, United States District Court for the Northern District of California, Case No. 00-cv-04599-TEH (*Allen v. City of Oakland, et al.*);

4. **Exhibit D**: June 14, 2012 "Independent Investigation Occupy Oakland Response October 25, 2011," bated stamped "BEY000131-BEY000251."

Pursuant to Federal Rule of Evidence 201, the Court may judicially notice a fact that is (1) generally known within the trial court's territorial jurisdiction or (2) not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(1) -(2). Moreover, a Court "shall take judicial notice if requested by a party and supplied with the necessary information." FED. R. EVID. 201(d). "Judicially noticed facts often consist of matters of public record…." *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1232-33 (E.D. Cal. 2003) (citing cases with examples such as prior court proceedings, administrative materials, city ordinances, official maps, and other court documents).

**Exhibits A** is a court orders in United States District Court for the Northern District of California, Case No. 00-cv-04599-TEH (*Allen v. City of Oakland, et al.*). **Exhibits B and C** are publically available court records in United States District Court for the Northern District of California, Case No. 00-cv-04599-TEH (*Allen v. City of Oakland, et al.*) that were filed by the parties

in response to court orders. **Exhibit D** is a publicly available report prepared by an independent contractor for the City of Oakland.

The Court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (*citing St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)). Official acts and public records of state agencies are proper subjects for judicial notice. *Tollis, Inc. v. Cty. of San Diego*, 505 F.3d 935, 938 (9th Cir. 2007) (taking judicial notice of municipal ordinance); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (approving judicial notice of records and reports of administrative bodies); *Zephyr v. Saxon Mortgage Servs., Inc.*, 873 F. Supp. 2d 1223, 1226 (E.D. Cal. 2012) (taking judicial notice of legislative history); *W. All. Bank v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 15-CV-03429-PSG, 2016 WL 641648, at *2 (N.D. Cal. Feb. 18, 2016) (taking judicial notice of documents from secretary of state website because, *inter alia*, they are public records of government entities).

All of the exhibits are relevant to and have a direct relation to the matters at issue in Defendant's Motion for Summary Judgment. For the foregoing reasons, Defendant respectfully requests that the Court grant the Request for Judicial Notice as to **Exhibits A - D**.

Dated: June 20, 2019

BARBARA J. PARKER, City Attorney
MARIA BEE, Chief Assistant City Attorney
DAVID A. PEREDA, Special Counsel
SELIA M. WARREN, Deputy City Attorney

By:___/s/_____
Selia M. Warren
Attorneys for Defendant
CITY OF OAKLAND

# EXHIBIT A

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

                Plaintiffs,

       v.

CITY OF OAKLAND, et al.,

                Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER REQUIRING PLAN RE:
OCCUPY OAKLAND INTERNAL
AFFAIRS INVESTIGATIONS

Based on the Monitor's most recent quarterly report, filed on April 30, 2012, it is apparent that Defendants will be unable to comply with the 180-day investigation deadline, mandated by both the Negotiated Settlement Agreement ("NSA") and Department policy, as to many of the complaints that have been filed arising out of Occupy Oakland activities, including large-scale events on October 25 and November 2, 2011. Given the magnitude and scope of the investigations that had yet to be completed at the time of the Monitor's review, it is also not clear whether Defendants will be able to complete all investigations in time for discipline, if any is found to be appropriate, to be imposed in compliance with California Government Code section 3304.

This is far from the first time the Court has expressed concern with the manner in which Defendants have handled – or failed to handle, as the case has been – the investigation of complaints. Seven years ago, the Court was forced to order Defendants to address 775 citizen contacts entered into the Internal Affairs Division ("IAD") database that the former Independent Monitoring Team discovered had not been assigned IAD case numbers. Several months later, it came to light that Defendants had placed numerous complaints, including 26 cases of allegations of Class I misconduct – the most serious level – in a so-called "tickler file," a correspondence file where the complaints languished without investigation either as a result of incompetence or bad faith. At multiple status conferences since then, the Court has

BEY000128

United States District Court
For the Northern District of California

1  underscored the importance of correcting the serious deficiencies in the operations of IAD –

2  one of the linchpins of the NSA, as well as of any effective police department.

3      It would be problematic enough if, as seems inevitable, Defendants' compliance levels

4  were to backslide as a result of their failure to address the Occupy Oakland complaints in a

5  timely fashion.  It would be an even greater injustice if the investigations were to reveal

6  serious misconduct for which discipline is warranted but cannot be imposed because the

7  investigations were delayed beyond the time frame allowed by California statute.  Such

8  failures would be further indication that, despite the changed leadership at the City of

9  Oakland and its police department, Defendants might still lack the will, capacity, or both to

10 complete the reforms to which they so long ago agreed.

11     The Monitor has informed the Court that multiple City officials have themselves

12 expressed the view that the Department lacks capacity to complete all of the outstanding

13 investigations without outside assistance.  The Monitor has further informed the Court that

14 the City originally intended to expand its contract with an outside consultant to conduct

15 internal affairs investigations related to Occupy Oakland, but that this decision has been

16 plagued by a series of delays.  It appears that timely action on this extremely critical issue

17 will not be taken without further intervention by this Court.

18     Accordingly, with good cause appearing, IT IS HEREBY ORDERED that:

19     1.  On or before **May 7, 2012,** Defendants shall provide to the Monitor in writing a

20 specific plan, including timelines, as to how they will address all outstanding internal affairs

21 investigations stemming from Occupy Oakland activities prior to December 31, 2011, while

22 maintaining compliance with the NSA and Department policy on all other internal

23 investigations.  If, as seems probable, the plan includes the engagement of any outside

24 consultants, the names and qualifications of the proposed consultants must be fully identified

25 in the plan for approval by the Monitor.  The plan must provide for completion of all

26 investigations within the time frame required for discipline by California Government Code

27 section 3304.  The plan shall also provide for completion of all investigations within the 180-

28 day deadline required by the NSA and Department policy to the extent possible.

BEY000129

1  Unfortunately, the Court does not expect Defendants to meet this deadline in all cases

2  because it has likely passed or is soon to pass for some of the earlier-filed complaints.

3      2.  Subject to the restrictions included in the NSA, Defendants shall make available all

4  information requested by the Monitor so that he may make an informed decision on whether

5  to approve the plan.

6      3.  Unless otherwise ordered, the plan shall be approved by the Monitor and shall be

7  implemented no later than **May 14, 2012.**

8      4.  If the Monitor informs the Court that Defendants have failed to comply with either

9  of the above deadlines or have failed to cooperate with the Monitor in his requests for

10  information, the Court will consider appropriate sanctions, including the imposition of daily

11  or weekly monetary sanctions, until compliance is achieved.

12

13  **IT IS SO ORDERED.**

14

15  Dated:   05/01/12

16  THELTON E. HENDERSON, JUDGE
    UNITED STATES DISTRICT COURT

17

18

19

20

21

22

23

24

25

26

27

28

3

BEY000130

# EXHIBIT B

# C I T Y O F O A K L A N D

## Occupy Investigation Plan

### June 8, 2012

This document is in response to the court order dated May 31, 2012 Re Officer-Involved Shootings and Occupy Oakland Investigations [Master Case File No C00-4599 TEH], in which the court required the City to submit a detailed plan of how it is conducting Occupy Oakland Internal Affairs investigations. This document covers how the investigations are currently assigned and the deadlines for each investigation. The City and the Department recognize the importance of an effective complaint system and have taken many steps to ensure that each complaint filed with the Department is properly investigated and that officers are held accountable for policy violations.

Previously the Department was required to provide the Monitor a plan for how the Occupy investigations would be assigned. That plan is attached as Exhibit A. After the approval of the Monitor, the plan was implemented and continues forward. Pursuant to the City's plan five contractors have been retained to investigate Occupy complaints and additional city personnel have been assigned to complete the investigations.

To ensure timely completion of investigations, the City has assigned supervisors to oversee the investigations.  The Internal Investigators are supervised by Acting Lieutenant John Lois and are in the Internal Affairs Investigations Section. Lt. Lois reports to Acting Captain Danielle Outlaw. The Internal Affairs Division is part of the Bureau of Risk Management that is commanded by Deputy Chief Sean Whent. Deputy Chief Whent has scheduled a recurring weekly meeting with each investigator so that he can personally monitor the progress of their investigations. Deputy Chief Whent reports regularly to Chief Jordan on the progress of investigations.

Most of the investigations assigned to contractors relate to events occurring in October and November of 2011. The contracts have internal deadlines for completion and are intended to provide the Department minimally sufficient time for review and consideration. Sgt. G. Dutton is assigned as the liaison for the outside contractors and will assist them by obtaining necessary documents and scheduling interviews of officers as necessary.

The Department considers the current staffing to be sufficient to ensure the investigations that have not already exceeded the 180 day requirement will meet that requirement.  It is possible that due to unforeseen circumstances, such as an officer's unavailability, that some investigations may exceed the 180 day requirement.  Investigators have been directed to notify Acting Lt. John Lois immediately if additional resources, (i.e. time, personnel, etc.) are needed in order to complete each investigation in accordance with the established timelines.   All

1

BEY000106

investigations will meet the 3304 deadline.  Our goal is to complete more cases on time than the 85% required to meet compliance for Task 2.

The Table below shows the individuals and firms assigned to investigate the Occupy investigations, the case numbers and the due dates for tracking compliance with OPD's policy deadline of 180 days and the 1 year deadline required under the California Government Code Section3304. [1]

The following investigations have been assigned to outside investigators as follows:

| Contractor | Case number(s) | 180 day date | 3304 date |
|---|---|---|---|
| Belcher and Associates | 11-1179 | 2 May 12 | Tolling |
| | 11-1160 | 28 Apr 12 | 24 Oct 12 |
| | 12-0220 | 4 Aug 12 | 26 Jan 13 |
| | 12-0033 | 7 Jul 12 | 5 Jan 13 |
| | 12-0051 | 1 Jul 12 | 28 Dec 12 |
| Renne Holtzman Sakai | 11-1135 | 23 Apr 12 | Tolling |
| | 12-0281 | 15 Aug 12 | 15 Feb 13 |
| Michael Glenn Investigations | 12-0162 | 27 Jul 12 | 26 Jan 13 |
| | 12-0165 | 27 Jul 12 | 26 Jan 13 |
| | 12-0166 | 27 Jul 12 | 26 Jan 13 |
| | 12-0167 | 27 Jul 12 | 26 Jan 13 |
| | 12-0159 | 27 Jul 12 | 26 Jan 13 |
| | 12-0226 | 5 Aug 12 | 26 Feb 13 |
| | 12-0064 | 11 Jul 12 | 2 Jan 13 |
| | 12-0138 | 24 Jul 12 | 24 Jan 13 |
| Burke William Sorenson | 11-1173 | 1 May 12 | 1 Nov 12 |
| | 11-1425 | 23 Apr 12 | 24 Oct 12 |
| | 12-0493 | 23 Apr 12 | 23 Oct 12 |
| | 11-1441 | 23 Apr 12 | 23 Oct 12 |
| | 11-1440 | 23 Apr 12 | 23 Oct 12 |
| | 11-1439 | 23 Apr 12 | 23 Oct 12 |
| | 11-1438 | 23 Apr 12 | 23 Oct 12 |
| | 11-1437 | 9 Jul 12 | 9 Jan 13 |
| | 11-1435 | 23 Apr 12 | 23 Oct 12 |
| | 11-1426 | 23 Apr 12 | 23 Oct 12 |

---

[1] Although not subject to or required by the court's orders Defendants have included 2012 Occupy IA cases for the purpose of tracking and internal accountability.

2

BEY000107

| DR Associates | 11-1127 | 22 Apr 12 | 23 Oct 12 |
| | 11-1131 | 22 Apr 12 | 23 Oct 12 |
| | 11-1416 | 9 Jun 12 | 10 Dec 12 |
| | 11-1130 | 22 Apr 12 | 23 Oct 12 |

The City has also assigned an attorney in the City Administrator's Office to some investigations. Vicki Laden has the following cases assigned to her.

| Investigator | Case number | 180 Day date | 3304 date |
|---|---|---|---|
| Vicki Laden | 12-0168 | 27 Jul 12 | Tolling |
| | 12-0039 | 7 Jul 12 | 5 Jan 13 |
| | 12-0158 | 26 Jul 12 | 26 Jan 13 |
| | 11-1304 | 29 May 12 | 1 Nov 12 |

The Department also has assigned five additional investigators to Internal Affairs and has two regular Internal Affairs investigators all assigned to Occupy Investigations. Their cases are assigned as follows:

| Investigator | Case number | 180 Day date | 3304 date |
|---|---|---|---|
| Sgt. H. Joshi | 12-0191 | 30 Jul 12 | 26 Jan 13 |
| | 12-0264 | 13 Aug 12 | 26 Jan 13 |
| | 12-0156 | 30 Jul 12 | 26 Jan 13 |
| | 12-0188 | 30 Jul 12 | 26 Jan 13 |
| | 12-0302 | 19 Aug 12 | 19 Feb 13 |
| | 12-0164 | 27 Jul 12 | 26 Jan 13 |
| Sgt. W. Bacon | 12-0178 | 27 Jul 12 | 26 Jan 13 |
| | 12-0196 | 31 Jul 12 | 26 Jan 13 |
| | 12-0150 | 26 Jul 12 | 26 Jan 13 |
| | 12-0184 | 29 Jul 12 | 26 Jan 13 |
| | 12-0229 | 6 Aug 12 | 26 Jan 13 |
| Sgt. J. Doolittle | 12-0222 | 28 Jul 12 | 26 Jan 13 |
| | 12-0161 | 26 Jul 12 | 26 Jan 13 |
| | 12-0182 | 29 Jul 12 | 26 Jan 13 |
| | 12-0252 | 12 Aug 12 | 5 Jan 13 |
| Sgt. S. Paich | 12-0157 | 27 Jul 12 | 26 Jan 13 |
| | 12-0155 | 26 Jul 12 | 26 Jan 13 |
| | 12-0153 | 26 Jul 12 | 26 Jan 13 |
| | 12-0163 | 27 Jul 12 | 26 Jan 13 |
| Sgt. R. Supriano | 12-0160 | 27 Jul 12 | 26 Jan 13 |
| | 12-0154 | 26 Jul 12 | 26 Jan 13 |
| | 11-1434 | 22 Apr 12 | 23 Oct 12 |
| | 11-1140 | 22 Apr 12 | 23 Oct 12 |

3

BEY000108

| | 12-0079 | 9 Jul 12 | 2 Jan 13 |
|---|---|---|---|
| Sgt. W. Bardsley | 11-1245 | 13 May 12 | 13 Nov 12 |
| | 12-0002 | 30 Jun 12 | 29 Dec 12 |
| | 12-0038 | 5 Jul 12 | 5 Jan 13 |
| | 12-0202 | 1 Aug 12 | 1 Feb 13 |
| | 12-0180 | 28 Jul 12 | 28 Jan 13 |
| Sgt. G. Dutton | 11-1193 | 6 May 12 | Tolling |

The court's order of May 31, 2012 requires that we identify specific actions that specific individuals must take by certain deadlines in connection with investigations of Occupy incidents that occurred prior to December 31, 2011. The following individuals are responsible for meeting the following investigative deadlines.

**Internal Timelines and Persons Responsible**

1. Investigative Level

The above-listed cases will be completed by no later than 45 days prior to the corresponding 3304 deadlines. The cases will be investigated to completion and include recommended findings – sustained, not sustained, exonerated, unfounded, or administratively closed.

2. First Level of Review

The completed investigations will then follow a review process that includes:

Within five (5) calendar days of receiving the investigation, Acting Lieutenant John Lois will be responsible for reviewing the investigation and taking the following actions, as appropriate:

- Return the investigation to the investigator for additional work or
- Approve the investigation and forward to Acting Captain Danielle Outlaw for review.

3. Second Level of Review

Within five (5) calendar days of receiving the investigation, Acting Captain Outlaw will be responsible for reviewing the investigation and taking the following actions, as appropriate:

- Return the investigation to the investigator, via Acting Lieutenant Lois, for additional work, or
- Approve the investigation and forward to Deputy Chief Sean Whent for review.

4. Third Level of Review and Approval of Findings

4

BEY000109

Within five (5) calendar days of receiving the investigation, Deputy Chief Whent will be responsible for reviewing the investigation and taking the following actions, as appropriate:

- Return the investigation to the investigator, via Acting Captain Outlaw, for additional work, if necessary
- Approve investigations resulting in Unfounded, Not Sustained or Exonerated finding
- Forward investigations resulting in Sustained Findings to Chief Howard Jordan for approval.

5. <u>Chief's Review and Approval of Findings</u>

Within five (5) calendar days of a completed review, each investigation, along with proposed findings, will be presented to Chief Howard Jordan.  Chief Jordan or his designee is responsible for approving all Sustained findings.

Ultimately, City Administrator Deanna Santana is responsible for ensuring these investigations, and any corresponding disciplinary actions, are completed according to required standards for quality and timeliness

The Court's January 24, 2012 order requires that the Chief of Police consult with the Monitor on Level 1 Misconduct cases and the Chief will comply with the order and follow the protocol provided.  Under the City Charter Section 503 -Powers of Appointment and Removal, the City Administrator is authorized and delegates the authority to discipline to the Chief of Police.  To ensure that the City Administrator has the opportunity to exercise her authority and attendant responsibilities, the Chief of Police will ensure that the City Administrator is briefed on all Level 1 Misconduct cases and all other cases that involve allegations of serious misconduct, or as directed by the City Administrator.  The Chief of Police will ensure that the required briefings and consultations with the Monitor and the City Administrator occur with sufficient time to ensure their meaningful participation.

BEY000110

# EXHIBIT C

# CITY OF OAKLAND

## Memorandum

TO:      Police Performance Solutions
ATTN:    Chief R. Warshaw
FROM:   City Administrator D. Santana and Police Chief H. Jordan
DATE:   10 May 12

RE:             RESPONSE TO "ORDER REQUIRING PLAN RE: OCCUPY OAKLAND INTERNAL AFFAIRS INVESTIGATION" [MASTER CASE FILE NO C00-4599 THE]

## INTRODUCTION

On May 1, 2012, the Court issued an Order Requiring Plan Re: Occupy Oakland Internal Affairs Investigations. This Order requires that the City submit an Investigation Plan to the Monitor by May 7, 2012, addressing how the City will resolve all outstanding internal affairs investigations stemming from Occupy Oakland activities prior to December 31, 2011, while maintaining compliance with the NSA and Department policy on all other internal affairs (IA) investigations, including Occupy Oakland complaints received after January 1, 2012.

There were five Occupy protest activities prior to December 31, 2011 which generated hundreds of complaints. Most of these complaints resulted from the Occupy Oakland events of October 25 and November 2, 2011. The great majority of these complaints were resolved administratively within the time limits set by the NSA. Approximately 38 individual IA complaints concerning protests in 2011 remain open as of today. There are also approximately 23 separate IA complaints still open concerning Occupy Oakland protests which occurred after January 1, 2012. All of these 2012 Occupy IA investigations are being conducted by Internal Affairs investigators. Because the department does not have the internal capacity to timely complete all outstanding 2011 IA Occupy Oakland complaints, the City Administrator and Chief of Police have developed the following Plan to timely complete all of these pending 2011 IA complaints, as well as all other internal investigations, consistent with the NSA, Department Policy, and California Law.

## BACKGROUND AND THE DECISION TO RETAIN OUTSIDE CONSULTANTS

The events of 25 Oct 11 generated more complaints from citizens than any other single event in the Oakland Police Department's (OPD) history. Complaints came not just from involved protestors and activists but from people around the world that watched the police response on television. The volume of complaints forced Internal Affairs to modify existing intake protocol to accommodate them all. It was also apparent that some of the police use of force response to disperse protesters resulted in significant injury to several persons. Additionally, video evidence showed what appeared to be potentially unreasonable uses of force by law enforcement personnel. Chief Jordan has pledged that all allegations of misconduct by OPD personnel would be fully investigated and that he would hold accountable any and all of those officers that acted inappropriately.

BEY000097

**CHIEF WARSHAW**
**RE:** Response to ôOrder Requiring Plan re: Occupy Oakland Internal Affairs Investigationö
May 7, 2012

In developing our work plan, we have considered that the current staffing in IA Division (IAD) is unable to accommodate the significant increase in complaints caused by the 2011 Occupy Oakland events given their existing caseload, hundreds of hours of video to be reviewed, and serious and complicated nature of the force allegations which occurred during major urban protests. These complaints take significantly more time to investigate. There was also a possible conflict of interest because many of the IAD investigators had been deployed to Occupy demonstrations and could have been subjects or witnesses to the complaints being received. For these reasons and, in the interest of transparency and fairness, we decided t it would be more productive to have an independent investigator look into the remaining 2011 Occupy Oakland allegations of misconduct. To that end, the Department began exploring options to contract out many of those pending 2011 investigations. We also had to review what internal administrative, procedural, and legal procurement rules applied to ensure full compliance with the City's procurement process. This internal review of the applicable procurement rules and regulations has been completed.

In early November 2011, the Department contacted several possible contractors to review the police response to Occupy Oakland. The City entered into a contract with the Frazier Group to look at many issues surrounding the Departmentøs overall response to the protest to assess what worked and areas that we can improve. At the same time, Internal Affairs began to triage complaints and determine which ones needed to be investigated and which ones could be closed by the administrative closure process.

Recognizing that a contract was also needed for the large number of individual Internal Affairs cases, the City Administrator exercised her administrative authority to put a contract in place for the individual cases, as well as to have the Frazier Group provide some training to OPD commanders and supervisors based on the lessons learned in their broad review. It was the Cityøs intent to get the IA investigations started with a smaller contract that the City Administrator could approve and amend the existing contract by increasing the scope of services, extending the time of performance, and increasing compensation commensurate with the needed deliverables. This approach required City Council approval which we sought in April as the most expedient procurement strategy to ensure that a contract was in place in a timely manner to complete the 2011 IA complaints. During this contracting process, the Department worked with the Frazier Group to identify 20 IAD cases from 25 Oct or 2 Nov 11 that the Frazier Group would investigate. The Frazier Group subsequently asked that those cases be broken down into 38 cases because some of the original 20 cases contained multiple complainants. The majority of the 38 cases now contain a single complainant. As the City prepared to go to City Council in late April to request the additional funds the City learned that the Frazier Group was not qualified under Business and Professions Code Section 7520 et seq., to investigate Internal Affairs cases because Tom Frazier himself is neither a lawyer nor a licensed private investigator. It should be made clear that the Frazier Groupøs proposed sub-contractor was properly licensed to complete the work; however, the lack of Mr. Frazierøs proper qualifications required that the City seek a new solution to comply with existing law.

We still believe there is benefit to an independent investigation of some of these high profile cases because the staffing issues outlined above are still very critical in the Department. We also

2

BEY000098

believe another solution to the staffing issue is for us to temporarily assign additional sergeants to IA. This re-assignment of sergeants may impact span of control. However, while there are many competing requests for Sergeants, none is more critical than these administrative IA investigations. Chief Jordan understands the Court's concern about the Department's history regarding the competency of internal investigations; however, as shown in the 9th Quarterly Report, nearly every IAD related task was in compliance and most IAD tasks have remained compliant for some time now. The Department's progress to date must not be compromised because of the extraordinary Occupy Oakland events. We believe our efforts demonstrate that we recognize the supreme importance of completing these IA investigations and thus have taken major administrative actions on short notice to address this matter.

We assumed, and had prepared accordingly, that we would have an outside investigator under contract by this time to complete the 2011 Occupy complaints. Because of the problems we discovered hiring the Frazier Group this has not occurred. Given the staffing and other issues discussed above we still conclude the most efficient way to complete the 2011 OO complaints is to retain outside contractors to finish the investigations begun by OPD.

As for those 2012 Occupy Oakland complaints, those cases are presently being investigated, by additional Occupy investigators that have already been loaned to Internal Affairs to handle the influx of caseload. Many of them are on pace to be completed within the 180 day limit. Chief Jordan plans to authorize the use of overtime to supplement the investigative time devoted to these investigations so that all investigations will be completed on time.

## WORK COMPLETED

The Department has already closed approximately ten Occupy investigations, compassing hundreds of complainants, from October and November 2011. Those investigations that found misconduct have resulted in discipline being imposed upon Department members by Chief Jordan. Additionally, contrary to media reports, for many of the key investigations, interviews have already been completed and critical evidence obtained. It is simply not true that the Department has done no investigative work on all of these complaints.

In fact, the Department has for the last several months had several members assigned on a full time basis reviewing all PDRD video captured by OPD during the operations. This team has also scoured the internet and retrieved a great deal of video footage. They have carefully logged all of this video captured so that investigators can quickly locate the video relevant to their particular investigation without having to watch hundreds of hours of video. This process will save both internal and outside investigators a significant amount of time in the investigative process.

## INVESTIGATIVE PLAN

The City has developed a comprehensive, multiple-prong investigative plan to ensure that all investigations are completed within the one year statutory requirement and to provide the Department with a variety of resources options to act expeditiously to complete these investigations. This plan also puts in place a structural solution for the long-term, e.g., as-needed

BEY000099

**CHIEF WARSHAW**
**RE:** Response to "Order Requiring Plan re: Occupy Oakland Internal Affairs Investigation"
May 7, 2012

contracts, so that the Department can permanently have immediate access to independent investigators or law firms to complete IAD investigations should there ever be such a need. This is key moving forward and in direct response to the expressed history of events relative to IA investigations referenced in the Order. Additionally, the investigations from later Occupy events, primarily in January 2012, will meet the required 180 day timeline. There are up to four elements to this plan.

1. **Outside Investigators & Law Firms**

   - The City will solicit, and retain by contract, outside investigators and/or law firms to perform and complete some of the most high profile and complex investigations. The consultant's qualifications will be compliant with the law: Investigators will be licensed and experienced in investigation police misconduct cases and/or hold the requisite legal qualifications.
   - The City's contract procurement process requires a competitive solicitation process for vendors to submit a proposal to the City's Request for Proposals/Qualifications. This process is being expedited within the limits of the law; the RFP/Q was issued on May 3, 2012 and responses will be due on May 11, 2012. This should allow the City to select qualified consultants, private investigators, or law firms for the Occupy complaints by the middle of the month. At that point we can quickly complete the contract process and have these investigators working on cases before the end of the month. This leaves a little over four months for those investigations to be completed.
   - As already noted, this approach will result in a structural solution, e.g., as-needed contracts, so that the Department can permanently have immediate access to independent investigators or law firms to complete IAD investigations should there ever be such need. When sufficient qualified proposers respond to the RFP, the City Administrator will issue multiple contracts to qualified proposers so that the Department can potentially increase its cadre of contract private investigators or law firms to do IAD work, as needed. This will allow the Department to get existing investigations done faster and will be a resource if another proliferation of investigations should occur.
   - While the RFP process is entirely open to any vendor that chooses to propose a response, the City has reached out to a select group of possible investigators and law firms that it knows are readily qualified to complete this work, specifically as follows:

     i. **Belcher and Associates**- Belcher and Associates is the firm that the Frazier Group was going to retain for these investigations and are already familiar with the main cases. They have experience investigating administrative investigations, including ones alleging excessive force.
     ii. **Michael Glenn Investigations**- Michael Glenn Investigations consists of a former OPD command officer that, until recently, worked as an annuitant for OPD doing Occupy investigations. However, the Department was forced to lay him off as an employee due to a clarification in state law

4

BEY000100

regarding the hiring of retired employees.

iii. **Merrick Bobb** - Merrick Bobb is the president of the Police Assessment Resource Center and has done several complex investigations for the Oakland Police Department before.

iv. **Michael Gennaco**- Michael Gennaco is an attorney and member of the Office of Independent Review, which does auditing for the Los Angeles County Sheriffʹs Office. The OPD has contracted with Michael Gennaco in the past as well.

v. **Renee Sloan Holtzman Sakai, Public Law Group, LLP--** This firm is skilled in handling all aspects of labor relations and employment dispute resolutions and, particularly, specializes in conducting effective workplace investigations as one of its key practice areas.  The Firm is able to provide employers with a thorough, independent, and objective investigation using the experience and expertise of their attorneys together with in-house, licensed private investigators. This Firm is often called to investigate especially sensitive issues such as complaints involving elected officials, public safety personnel or matters headed toward litigation. The Firm's attorneys and in-house investigators are highly skilled in all facets of conducting investigations. In addition, a partner of this Firm, authored a manual titled Conducting Effective Personnel Investigations, which serves as an investigations guide to public sector employers.

vi. **Nossaman, LLP--**Nossaman is a mid-sized law firm working from seven U.S. offices. The Firm has been an industry leader in California for more than six decades. Nossaman touts itself as helping to solve many of the complex challenges public agencies in California face today. Nossaman's Employment Practice Group provides support to employers regarding their employment-related needs. Nossaman Employment Practice Group lists investigations as one of their Key Areas of Focus. Nossaman's Employment Practice Group has experience representing employers throughout California.  Nossaman offers investigation and assessment services.

vii. **Hanson Bridgett, LLP--**Hanson Bridgett is a law firm with more than 150 attorneys in offices in San Francisco, Sacramento, the North Bay, Silicon Valley, and the East Bay. Serving clients since 1958, its diverse client list includes many governmental entities, regional businesses, and individuals. It has one of the leading labor and employment law practices in Northern and Central California with a reputation for strategic thinking and problem solving. The Firm represents prominent national clients and serves many of the major employers in the Bay Area. In addition to businesses in the private sector, it also serves numerous public-sector clients and nonprofit organizations. Hanson Bridgett, LLP provides a comprehensive range of employment law services to its clients and has performed investigative work for the City of Oakland.

viii. **Meyers Nave, A Professional Law Corporation--**Meyers Nave is on the forefront of numerous emerging legal matters facing local governments in California. This Firm has over 80 attorneys in six offices statewide, and

5

**CHIEF WARSHAW**
**RE:** Response to "Order Requiring Plan re: Occupy Oakland Internal Affairs Investigation"
May 7, 2012

its attorneys advise and manage a wide-range of critical issues impacting public agencies. Its Workplace Investigations Team conducts professional, independent investigations to minimize the damaging effects of unresolved allegations. Its attorney investigators have exceptional experience in labor and employment law.

ix. **Burke, Williams and Sorensen--**For more than eighty years, Burke, Williams & Sorensen, LLP has served the public agencies and private business entities of California. Throughout its growth over the years, Burke has retained its roots in real estate and business law and litigation, and as one of the preeminent firms in the fields of labor and employment law.

x. **Mr. David Reubin--**David Reuben and DR Associates (DRA) conduct personnel investigations for Police Departments. Mr. Reuben has specialized in personnel investigations for government agencies for over 20 years. He is currently investigating personnel matters for virtually every department within the City of Oakland. These investigations are run through the City Attorney's Office, giving Mr. Reuben expertise regarding the legal ramifications of personnel decisions. Mr. Reuben has conducted Internal Affairs investigation for other police departments in Northern California. Accordingly, he is experienced with I.A. type interviews/investigations. When he formed the Oakland Citizen's Complaint Board in the early 1980's, Mr. Reuben worked hand-in-hand with OPD, OPOA, and the community. DR Associates has investigated the following types of cases:

- Excessive Force
- Sexual Harassment
- Official Corruption
- Wrongful Termination

- Conflict of Interest
- Financial Malfeasance
- Racial Discrimination
- Procedural Issues

Other clients have included the following agencies: City of Berkeley, City of Stockton, California Department of Justice, Chico Police Department, San Francisco City Attorney, Modesto Police Department, Alameda County Counsel, City College of San Francisco, and the U.S. Attorney's Office on behalf of various public safety agencies.

- Successful proposers (investigators or law firms) will be assisted by a full time IAD investigator, Sgt. Gregg Dutton. This investigator will help with all of the scheduling of interviews and other assistance as needed to quicken the pace of the investigations.
- The Department has already selected the cases that it intends to assign to outside investigators. If additional contractors are identified it may be possible to assign additional investigations to them. The following is the list of cases the Department intends to assign to the outside investigators:

6

BEY000102

CHIEF WARSHAW
**RE:** Response to ōOrder Requiring Plan re: Occupy Oakland Internal Affairs Investigationö
May 7, 2012

| Case # | Complainant | Synopsis |
|--------|-------------|----------|
| 11-1135 | Scott Olsen | The complainant was shot in the head with a beanbag round and then a chemical munition was thrown into a group of people attempting to render aid to him. All of the tango team members have been interviewed and extensive video analysis has already been completed. It is likely that interviews of additional officers, as well as a re-interview of the subject will need to be completed. |
| 11-1160 | Sgt. D. Carman | Complainant alleges command did not take proper action to support him and his officers. This will involve a couple of interviews of commanders that were in charge at the time a squad was surrounded and attacked by a crowd. |
| 11-1173 | ACLU and individuals | Complainants allege crowd control policy not followed with respect to munitions and chemical agents and the providing of medical care. This investigation will require interviews of several OPD members involved in crowd control efforts on 25 Oct 11. |
| 12-0281 | OPD | It is alleged an OPD investigator compromised the Scott Olson criminal investigation. This will require interviews of several members of CID and Tango Teams but will not require any extensive analysis of video or other evidence. |
| 11-1179 | Kayvan Sabeghi | Complainant alleges he is the victim of excessive force. Incident was captured on video. Interviews have been done on this case. It is possible a couple of interviews will need to be completed but this investigation is nearly complete. |

These five investigations represent 14 of the 38 investigations initially intended to be assigned to the Frazier Group. Because some of these are very large investigations, they will take the most time and effort and be the most expensive to contract out. The contracts will contain timelines to ensure that legal time requirements are met.

2. **Internal Affairs Investigators (Contingency Plan)**

- The Department may also consider increasing capacity for the Occupy Investigations team by assigning up to five more investigators on a short term loan to the Internal Affairs Division. The five investigators would be Sergeants Erin Mausz, Jack Doolittle, Scott Wong, Steve Paich, and Robert Supriano. Three of the sergeants have experience working in Internal Affairs and all of them have experience doing administrative investigations. These investigators can be in place on 20 May 12, if insufficient proposals are submitted to the RFP process. This delay would be due to the 14 day minimum notice that needs to be provided to involuntarily loan a member to another Department function.
- If needed, these five investigators will supplement the three investigators already working full time on Occupy complaints. Two of those investigators were added to Internal Affairs in recent months due to the proliferation of complaints resulting from the January 28, 2012 Occupy action.
- If needed, the five additional investigators will be assigned the twenty four cases

7

BEY000103

**CHIEF WARSHAW**
**RE:** Response to "Order Requiring Plan re: Occupy Oakland Internal Affairs Investigation"
May 7, 2012

that were initially intended to be assigned to the Frazier Group. If there are insufficient contractual resources, then up to five additional Department investigators would absorb the work not able to be completed by hiring outside investigators or a law firm. This approach offers a contingency plan and ensures that the cases are completed by the one year statutory requirement.

- **NOTE:** The assignment of these five sergeants will likely delay compliance with Task 20.2 of the NSA regarding consistency of supervision. However, an effective IAD process is at the very core of what prompted the Negotiated Settlement Agreement in the first place and I believe this is a higher priority. This is not a preferable solution, but a Contingency Plan must be put in place in the event that the preferred options do not offer sufficient resources. If the City needs to implement this Contingency Plan, we will work very closely with Chief Warshaw to seek guidance in implementing this approach. However, our preferred and primary solution is to obtain contractual services and deploy other in-house resources from throughout the City organization.

3. **Equal Opportunity Program Division**

- The City maintains an Equal Opportunity Program Division (EOPD) to support, as one of its primary duties, workplace investigations City-wide. The City Administrator will add capacity to the Department by temporarily assigning one staff member, who is qualified to perform this work because she is a licensed attorney, to assist with completing these investigations. The City will ensure that the staff member's work is performed strictly with respect in her capacity of an EOPD staff member and that it not conflict with any legal advice that only the City Attorney's Office can provide.
- Vicki Laden is an attorney temporarily assigned to the City Administrator's Office and conducts personnel investigations already. She has handled many labor related cases and arbitrations. She has provided a tremendous amount of assistance to Internal Affairs staff for years and is both familiar with IAD work and qualified to do these investigations. She has already been assigned four investigations, primarily from incidents in January of 2012. It is believed she will be able to complete these cases prior to the 180 day requirement in late July 2012.
- Additionally, the City has entered into a contract with Renee Sloan Holtzman Sakai, Public Law Group, LLP to back-fill for traditional EOPD capacity needs while recruitment of existing vacancies occurs. This existing contract offers yet additional capacity to obtain investigative services needed to respond to the Order" in addition to the RFP solicitation that the City directly solicits for the Department-specific investigations. At the time that this report is drafted, the City is exploring up to two individuals that may avail themselves to support this specific task.

4. **Overtime**

- In order to ensure that the October and November cases meet the one year statutory requirements and the January and later cases meet the 180 day deadline, Chief Jordan intends to authorize the use of overtime for the investigators. This

BEY000104

overtime use will be well managed but approved as necessary to meet critical deadlines. The City Administrator agrees with this increase expenditure and is committed to providing funds to support this solution.

## CONCLUSION

The Court issued an Order Requiring a Plan Re: Occupy Oakland Internal Affairs Investigations that requires that the City submit an Investigation Plan to the Monitor for approval by May 7, 2012, addressing how the City will resolve all outstanding internal affairs investigations stemming from Occupy Oakland activities prior to December 31, 2011, while maintaining compliance with the NSA and Department policy on all other internal investigations. The City has developed a multi-prong solution to resolve the lack of internal capacity to effectively complete the investigations resulting from Occupy Oakland complaints. We believe that the City can proceed with the submitted plan and sufficiently provide the capacity needed to complete these investigations. In the event that they are not sufficient, a Contingency Plan is also provided to safeguard against further delay or disruption. We look forward to discussing with you this proposal and implementing it on or before the required May 14, 2012 date, as required in the Order.

Respectfully Submitted,

/s/                                                    /s/

Deanna J. Santana                          Howard A. Jordan
City Administrator                           Chief of Police

9

**BEY000105**

# EXHIBIT D



# Independent Investigation

# Occupy Oakland Response

# October 25, 2011

**Prepared by Frazier Group, LLC**
**June 14, 2012**

**BEY000131**

# <u>TABLE OF CONTENTS</u>

## INTRODUCTION.................................................................... 5

## EXECUTIVE SUMMARY.......................................................9

## CHRONOLOGY OF EVENTS

1.   **The Occupy Movement Comes to Oakland**.............................20
2.   **The Decision to Remove the Tents**......................................21
3.   **Summary of Events – October 25, 2011**...................................22

## FINDINGS AND RECOMMENDATIONS

A. **Policies**..............................................................................28
   **Findings**
   **Recommendations**

B. **Planning**..........................................................................29
   **Findings**
   **Recommendations**

C. **Command and Control**....................................................32
   **Findings**
   **Recommendations**

D. **Liaison**...........................................................................34
   **Findings**
   **Recommendations**

E. **Crowd Control**.................................................................34
   **Findings**
   **Recommendations**

BEY000132

**F. Tactics, Chemical Agents and Less-Lethal Munitions**...........35
    **Findings**
    **Recommendations**

**G. Mutual Aid**....................................................................39
    **Findings**
    **Recommendations**

**H. Use of Force and Reporting**.........................................42
    **Findings**
    **Recommendations**

**I.  Arrests**.....................................................................50
    **Findings**
    **Recommendations**

**J. Investigations (General)**..............................................52
    **Findings**
    **Recommendations**

**K. Investigations (Criminal)**............................................52
    **Findings**
    **Recommendations**

**L. Investigations (Internal Affairs/Administrative)**.................62
    **Findings**
    **Recommendations**

**M. Media and Public Image**..............................................76
    **Findings**
    **Recommendations**

**N. Training**..................................................................77
    **Findings**
    **Recommendations**

# CONCLUDING THOUGHTS..............................................80

**BEY000133**

# **APPENDICIES**

**Appendix 1 – Statement of Work**……………………………………………84

**Appendix 2 – Materials and Information Requested by Frazier Group**
**For this Investigation**………………………………………...………88

**Appendix 3 – List of Meetings and Interviews Conducted**……………...…99

**Appendix 4 – Law Enforcement Organization Patches of those organizations**
**involved in Occupy Oakland events on 10/25/11.**
**NOTE: These images provided as an identification aid for**
**readers who may also view video of the events**……………104

**Appendix 5 – Oakland PD Comparative Data**…………………………………112

**Appendix 6 - Frazier Group Investigative Team Members:**
**Biographical Information**…………………………………...……114

4

**BEY000134**

# INTRODUCTION

The Occupy movement has been described as an international protest movement directed toward social and economic inequality.  The first Occupy protest was Occupy Wall Street in New York City's Zuccotti Park, which began on September 17, 2011. By October 9, Occupy protests had taken place or were ongoing in over 95 cities across 82 countries, and over 600 communities in the United States. "The 99%" is a political slogan used by protesters of the Occupy movement that was originally developed in late August 2011.  It refers to the concentration of wealth among the top 1% of income earners compared to the other 99 percent. The top 1 percent of income earners nearly tripled their after-tax income over the last thirty years according to a Congressional Budget Office (CBO) report.

According to an Occupy - affiliated website, the movement promotes "methods, techniques and knowledge about peaceful occupation of public spaces while developing sustainable ways of living based on participatory democracy."  The Occupy movement is widely understood to be leaderless, with Occupations organized using a "non-binding consensus based collective decision making" known as a 'General Assembly.'

On October 10, 2011, a group identifying itself as Occupy Oakland set up an encampment in front of Oakland City Hall in Frank Ogawa Plaza Park (FOP Park).  The group erected approximately 147 tents, kitchen and restroom facilities, child care areas, posted dozens of banners, and claimed the park as their own.

At that time, the City of Oakland sought to accommodate the group in the exercise of their First Amendment rights of expression. However, as time progressed, there were legitimate concerns - mostly supported by evidence - on behalf of city officials for the health, safety and welfare of people in the FOP Park, city employees, and community members.  One official who had detailed knowledge of devolving conditions stated "The totality of circumstances was untenable." In short, these concerns included but were not limited to:

- Health and Welfare - trash and debris were excessive, human and animal waste was observed in excavated holes and buckets, portable bathrooms were too few and un-serviced, rodents were populating the Park, and food preparation and provision were occurring in unsanitary conditions.

- Safety - illegal and non-permitted electrical hookups were made and structures indicating permanence were erected.  Fire inspectors voiced concerns regarding the presence of propane tanks, open-flame cooking, plus cooking and smoking inside tents.  A victim who fell from a structure was carried away from the Park for treatment because occupants would not allow fire/medical personnel access. Police officers who attempted to walk through the Park were confronted and told

BEY000135

to leave.  Attitudes graduated toward aggression and violence. City employees[1] were complaining about harassment and concerns for their personal safety. Media reported that a teacher who had occupied the camp was attacked and choked, and a reporter was attacked by a dog and then confronted and told to leave.  There were concerns about an alleged sexual assault within the Park, a homeless individual who was beaten with a board, and obvious use of drugs and alcohol.  Individuals in the Park felt threatened when they were confronted by groups and told to not communicate with government officials.  One government official who attempted to liaison with members of Occupy during a march was told by the marchers he was lucky they did not beat him or spin on him.  During the later afternoon hours, the population of the Park increased to the degree where clustering was problematic, tempers flared, arguments ensued, and people within the Park had to intervene to prevent escalation.

An effort to identify leadership of Occupy, and then establish a working, collaborative relationship between Occupy and City officials, was a priority of the City from the very early stages of the movement in the Park. A city representative feels that Occupy never allowed this relationship to develop, and in fact Occupy members ensured that it deteriorated over time.

City of Oakland Officials became increasingly concerned about conditions within the encampment, and the OPD was directed to develop an eviction plan. For several days prior to taking action to evict, City officials distributed flyers and feel they made exceptional efforts to hold conversations with Occupy members, advising them of the intent of the City to revoke permission to camp in FOP.  Occupy members were informed that anyone who refused to leave when directed would be violating the California Penal Code.

On October 25, 2011 beginning at approximately 5:00 AM, 392 OPD and 202 mutual aid personnel responded to 14th and Broadway Streets. Their purpose was execution of the OPD plan to evict the Occupy movement from both FOP Park and from Snow Park. By 10:00 AM most of the tents in FOP Park had been dismantled, with Public Works personnel conducting inventories of personal property removed from the park and the tents therein.

Later that day many Occupy members and supporters reassembled and held a "General Assembly" (around 3:00 PM to 4:00 PM) where they voted to march to FOP Park for "reoccupation of the park."  In the early evening, Occupy Oakland clashed with the Oakland Police Department resulting in controversial uses of force, including an incident involving a protestor who was critically injured by a police officer after he was allegedly struck in the head by a specialty impact munition and/or a tear gas canister. Since that time Occupy Oakland protests, as well as Occupy groups in other cities, have continued to engage in violent protests.  Beginning October 25, 2011 and continuing through the present, Occupy Oakland has been joined by other direct action groups,

---

[1] Frank Ogawa Plaza Park is located at one of the primary entrances to Oakland City Hall.

BEY000136

including the Black Bloc.[2]   These groups have confronted police with the intent to provoke physical contact and seek notoriety.  Additionally, prompted by these "direct actions" groups, participating protesters have engaged in significant property destruction and vandalism.

Since the January 28, 2012 Occupy incident in Oakland, citizens in the Bay Area have criticized Occupy tactics of vandalism and destruction.  In a survey conducted shortly after the incident, of the 500 people surveyed, 26% said they once supported the Occupy movement and now did not.  When added to 31% who said they always opposed the movement, the poll suggests a majority of public opinion currently opposes the group.

The Aftermath of October 25th

In the wake of these events, serious concerns were raised by both City Officials and by the community at large concerning use of unreasonable force, overall police performance, and OPD's ability to manage future events in an acceptable manner. The ability of OPD to effectively and impartially investigate the widely reported allegations of police use of force and other misconduct was also questioned.

In response to this need for an impartial review of the events of October 25th, the City of Oakland contracted Frazier Group, LLC on December 19, 2011. We are pleased to present the following report, completed under the terms of that contract.

Segments of this Frazier Group Report are written at a systemic or organizational level, i.e. an overview of the event and the associated departmental response.  It is not an investigation of any individual event or complaint. This is done intentionally. The initial tasking from the City of Oakland was to focus on the events of October 25, 2011. However, as our review and analysis of OPD's performance prior to, during, and subsequent to the October 25, 2011 Occupy Oakland event progressed, systemic shortcomings became alarmingly clear. Policy and practice deficiencies surrounding leadership, accountability, communication and collaboration, technical expertise, and organizational development were not unique to October 25, 2011, or to subsequent Occupy Oakland events. They are systemic within the department and often historical and legacy influenced. Thus, the altitude of the Findings and Recommendations will often rise to the organizational and systems level of both OPD policies and practices. In many instances, examples or references are provided in the Recommendations sections. Providing an even more detailed and comprehensive review and recommendations document would be an immense undertaking, and far beyond the scope of work that this review was intended to address.

It is important to highlight that as Frazier Group commenced work on this review we immediately began identifying areas of policy, procedure, and tactics within OPD that needed immediate revision or updating. As we identified pressing issues – some of which were considered to be urgent - we began working closely with OPD and City

---

[2] Black Bloc groups detest organization and wish to take away tools of empowerment through anarchy.

BEY000137

leadership to provide technical assistance and training well before the completion and release of this report. We are pleased to report that we received excellent cooperation and support in these efforts. Some of the "Findings" and "Recommendations" documented in the following sections will be well underway by the time this report is published

Frazier Group's approach to this review was to research issues and interview stakeholders not only within the police department, but also individuals and community institutions and organizations that would provide a broader perspective. For example, our 360 degree approach consisted of interviews, conversations, and review of materials from officials, police command-supervisory-tactical-investigative personnel of all ranks, civil rights advocates and organizations, former OPD members and leaders, public safety communications personnel, members of the Oakland Civilian Police Review Board, and Federal authorities. Additionally, with the exception of one command officer, Frazier Group made concerted efforts <u>not</u> to interview OPD members who were under any type of investigation related to Occupy Oakland events. Virtually all OPD personnel who were interviewed were read a preamble stating that they were not compelled under our authority to speak with us, that they could decline to answer any question that made them uncomfortable, and that they could terminate the interview at any time. Frazier Group is confident that all statements and documents provided by interviewees were given voluntarily. The interview team was impressed by the forthrightness and willingness of virtually all of the interviewees to share their experiences and insights in an honest and constructive way. We have been careful to capture the essence of the information provided without revealing the individual source of the information. The Frazier Group remains particularly sensitive to confidential matters, guided by California state law. Nevertheless, information obtained by Frazier Group which was deemed to be confidential for purposes of this report was appropriately provided to OPD and City executive staff. In essence, anonymity was protected – confidentiality was not.

<u>Acknowledgements</u>

Frazier Group would like to extend thanks and appreciation to Federal Monitor Robert Warshaw and his team, Oakland City Administrator Deanna Santana and her staff, and Chief of Police Howard Jordan and his staff for their considerable assistance during the course of developing this report. Their knowledge, insight, facilitation, and cooperation were extraordinarily valuable.

BEY000138

# __EXECUTIVE SUMMARY__

## __INTRODUCTION__

On October 10, 2011, a group identifying itself as Occupy Oakland set up an encampment in front of Oakland City Hall in Frank Ogawa Plaza Park (FOP Park).  The group erected approximately 147 tents, kitchen and restroom facilities, child care areas, posted dozens of banners, and claimed the park as their own.

At that time, the City of Oakland sought to accommodate the group in the exercise of their First Amendment rights of expression. However, as time progressed, there were legitimate concerns - mostly supported by evidence - on behalf of city officials for the health, safety and welfare of people in the FOP Park, city employees, and community members.  One official who had detailed knowledge of devolving conditions stated "The totality of circumstances was untenable." In short, these concerns included but were not limited to:

- Health and Welfare - trash and debris were excessive, human and animal waste was observed in excavated holes and buckets, portable bathrooms were too few and un-serviced, rodents were populating the Park, and food preparation and provision were occurring in unsanitary conditions.

- Safety - illegal and non-permitted electrical hookups were made and structures indicating permanence were erected.  Fire inspectors voiced concerns regarding the presence of propane tanks, open-flame cooking, plus cooking and smoking inside tents.  A victim who fell from a structure was carried away from the Park for treatment because occupants would not allow fire/medical personnel access. Police officers who attempted to walk through the Park were confronted and told to leave.  Attitudes graduated toward aggression and violence. City employees[3] were complaining about harassment and concerns for their personal safety. Media reported that a teacher who had occupied the camp was attacked and choked, and a reporter was attacked by a dog and then confronted and told to leave.  There were concerns about an alleged sexual assault within the Park, a homeless individual who was beaten with a board, and obvious use of drugs and alcohol.  Individuals in the Park felt threatened when they were confronted by groups and told to not communicate with government officials.  One government official who attempted to liaison with members of Occupy during a march was told by the marchers he was lucky they did not beat him or spit on him.  During the later afternoon hours, the population of the Park increased to the degree where clustering was problematic, tempers flared, arguments ensued, and people within the Park had to intervene to prevent escalation.

---

[3] Frank Ogawa Plaza Park is located at one of the primary entrances to Oakland City Hall.

BEY000139

An effort to identify leadership of Occupy, and then establish a working, collaborative relationship between Occupy and City officials, was a priority of the City from the very early stages of the movement in the Park. A city representative feels that Occupy never allowed this relationship to develop, and in fact Occupy members ensured that it deteriorated over time.

City of Oakland Officials became increasingly concerned about conditions within the encampment, and the OPD was directed to develop an eviction plan. On October 25, 2011 beginning at approximately 5:00 AM, 392 OPD and 202 mutual aid personnel responded to 14th and Broadway Streets. Their purpose was execution of the OPD plan to evict the Occupy movement from both FOP Park and from Snow Park.

In the early evening, Occupy Oakland clashed with the Oakland Police Department resulting in controversial uses of force, including an incident involving a protestor who was critically injured by a police officer after allegedly being struck in the head by a specialty impact munition and/or a tear gas canister.

The Aftermath of October 25th

In the wake of these events, serious concerns were raised by both City Officials and by the community at large concerning use of unnecessary force, overall police performance, and OPD's ability to manage future events in an acceptable manner. The ability of OPD to effectively and impartially investigate the widely reported allegations of police use of force and other misconduct was also questioned.

In response to this need for an impartial review of the events of October 25th, the City of Oakland contracted Frazier Group, LLC on December 19, 2011. We are pleased to present the following report, completed under the terms of this contract.

# FINDINGS AND RECOMMENDATIONS

## A.  POLICIES

The Frazier Group review of policies found that several need to be updated or rewritten. Among these are Crowd Control III-G, Departmental General Order (DGO) K-3, and DGO L-3.  DGO L-3 should be updated and should follow the California Mutual Aid Plan (2011) and the Law Enforcement Guide for Emergency Operations (2009).

## B. PLANNING

A "Single Use Plan" for Frank Ogawa Plaza Park must be developed, along with similar plans for other frequently targeted protest sites.  A large majority of line personnel and experienced supervisory and command officers were assigned to and expended on the "A" Watch. Little foresight was evident as to potential repercussions stemming from

BEY000140

clearing the FOP Park. Lack of joint planning sessions between "A" and "B"-Watch Incident Commanders, and late selection of the "B"-Watch Operations Section Chief are indicators of a premature decision to clear the park before adequate planning and staffing could be organized.

## C. <u>COMMAND AND CONTROL</u>

The City Emergency Operations Center functioned as the Incident Command Post. The operation was understaffed on "B" watch (28 OPD officers), as well as requesting insufficient mutual aid. Once the protestor crowd reached the barricades where the officers were located, the order to deploy chemical munitions was given. This was not followed by dynamic tactical action to move the protestors away from FOP Park. This allowed time for the protestors to regroup once the gas cleared, and continue the conflict.

## D. <u>LIAISON</u>

In the course of the Frazier Group review, the Oakland City Attorney's Office was contacted. The consensus of the City Attorney's Office was that OPD is attempting to gain compliance with the Negotiated Settlement Agreement and was collaborative with the City Attorney in training and risk management-related operations.

The City Attorney should be more involved in "legal update reviews" to provide "implications for OPD" as a training model. The City Attorney also requested greater involvement in development of the Crowd Control Policy (III-G), and OPD First Amendment training at all levels. While OPD policy is the responsibility of OPD, greater levels of coordination/consultation with the City Attorney's Office would likewise provide valuable guidance.

## E. <u>CROWD CONTROL</u>

A review of the current OPD Crowd Control Policy, and actions conducted throughout October 25, 2011, revealed that OPD did not satisfactorily exercise preferred practices.

A designated Department "Crowd Management Coordinator" should be established and given responsibility for crowd management policy updates, and crowd management and control (basic and recurrent) training for the Department. This "Coordinator" should consider the 2012 California POST Crowd Management, Intervention and Control Guidelines as a roadmap for revising the current Policy and updating Department-wide training.

The abilities of OPD to conduct crowd management and unusual occurrence response have been significantly challenged due to decreased staffing and budget shortages.

Due to the frequency of crowd management and crowd control incidents that occur in the City of Oakland, it is critical for OPD to develop a trained cadre of OPD professional

BEY000141

staff, mid-level leadership, command and executive level personnel who are trained and qualified as Incident Management Team (IMT) leaders.

# F. TACTICS, CHEMCIAL AGENTS AND LESS-LETHAL MUNITIONS

During the evening deployment (B-Watch) at FOP Park, following the decision authorizing less-lethal munitions and chemical agents, officers from OPD and allied agencies deployed chemical agents from behind bicycle fence barriers.  It was during this exchange that xxxx was struck in the head with a DSFB ("beanbag") round or chemical munition and critically injured. Immediately following xxxx's injury, and while he was lying on the ground, at least one chemical agent canister was deployed by an identified OPD officer into a crowd that had surrounded xxxx to render aid.

We should note that the review team has serious concerns regarding the quality and breadth of the OPD criminal investigation involving this situation.  The review team has received information that the criminal investigation has been closed.  However, it is our belief that OPD should consider a re-examination of the quality of this investigation. This recommendation has been shared with OPD command for their consideration and has received a favorable response. Specifics regarding OPD CID and IAD are documented later in this report.

The use of force involving less-lethal impact munitions and chemical agents was not synchronized with on-the-ground tactics to achieve public order. The utilization of less-lethal impact munitions and chemical munitions needs to be combined with the strategy and deployment of Rapid Response Teams and simultaneous dynamic movement of squad sized crowd control units resulting in dispersal and arrest for unlawful activity.

The 12 gauge shotgun less-lethal, specialty impact munitions utilized by OPD for crowd control should be eliminated and replaced by 40mm launchers and selected munitions. Any 12 gauge less-lethal shotgun that is retained in inventory should be painted with clearly distinguishing markings to prevent unintentional usage or tragic consequences due to lack of recognition.

All existing OPD chemical agents and less-lethal impact munitions should be replaced with state of the art munitions that will reduce injuries, help prevent property damage, and minimize canister "throw-backs:"

Less-lethal munitions and chemical agent issuance/usage records for Tango Team members and supervisors for October 25, 2011 do not exist. OPD should develop a detailed accountability system for issuance, recovery and re-supply of any and all less-lethal munitions (specialty impact and chemical agents) to any Tango Team officer or supervisor.

# G.  MUTUAL AID

12

BEY000142

Review of mutual aid records of the October 25, 2011 incident reveals that most allied mutual aid agencies demobilized and returned home prior to proper accounting for arrests, injuries, use of force applications, and less lethal/chemical usage. OPD must develop policies and practices that require assertive post-event follow-up to ensure information important to criminal or administrative investigations is acquired as soon as possible.

Review of the IAP and Operations Plan Annex for the B Watch reveals that Mutual Aid resources were utilized to defend FOP Park primarily due to the shortage of OPD personnel. Mutual Aid resources were inter-mixed with OPD tactical resources at locations where multiple use of force applications occurred. Mutual Aid resources should not be deployed, even under extreme conditions, to missions where comingling with OPD tactical resources could occur.  Mutual aid resources are best utilized with department and unit integrity. They should be assigned specific missions under the direction of OPD. Mutual Aid is best used for infrastructure protection, custody and control of arrestees, perimeter security, and fixed post positions.

The circumstances that precipitate a request for, and the deployment of mutual aid resources need to be clearly defined within the OPD Mutual Aid Policy.  This policy should include, and clearly articulate, both OPD responsibilities and responding agency responsibilities.

# H. <u>USE OF FORCE AND REPORTING</u>

The entire number and types of force applied during the October 25, 2011 incident have not yet been individually evaluated by an OPD Use of Force Review Board for their reasonableness and adherence to policy. OPD policy requires that Level 1 and 2 use of force applications are to be reviewed by the department Force Review Board.

Within 72 hours following any "critical incident" (significant use of force, officer involved shooting, unusual occurrence, etc.) the Chief of Police and appropriate subordinate staff should conduct an immediate review of the preliminary facts ("Hot Wash"). This commonly-used practice prevents mistakes from recurring, and permits needed tactical, policy, procedure, and training modifications to be implemented immediately.  OPD should institute a practice of rapid review of any critical incident.

A number of OPD Use of Force and participant-officer reports written post-Occupy Oakland October 25, 2011, were inadequate.  Training, mutual aid advisories and collection of the reports from OPD and mutual aid personnel were deficient. OPD must research and establish a comprehensive Use of Force reporting policy at both the departmental and the individual levels.

OPD policies and practices regarding Personal Digital Recording Devices (PDRD) must be significantly modified to address routine usage issues as well as use which is unique to long-term crowd management & control events.

BEY000143

OPD must revise department policy as it pertains to writing supplemental Use of Force reports as well as their collection, review, and approval by supervisors. Likewise the policy of one person being assigned overall responsibility for the Use of Force report-investigation-findings must be revised.

OPD practices regarding "group reporting" or collaboration following use-of-force events do not meet current standards or preferred practices. OPD policies regarding "group reporting," when various levels of force are used, are clear. However, as a result of interviews and report review, it appears opportunities for group reporting existed, and may have occurred, following the possible use of Level 1 and Level 2 force during the Occupy Oakland event on October 25, 2011.

# I. <u>ARRESTS</u>

During crowd control and crowd management efforts on Oct. 25, 2011, there were a number of incidents where less-lethal force was used by OPD. However, it appeared that little effort was made to take the suspects into custody when it would have been reasonable to do so. The decision to use force against individuals who violate the law needs to be done in concert with a strategy of deploying Quick Response Teams and/or simultaneous dynamic movement of squad-sized crowd control elements. Under the law, "reasonable" force may be used to affect an arrest, overcome resistance, and/or prevent escape.

Supplemental Report Forms (ICS 214) documenting arrests, injuries, use of force incidents (not involving hospitalization), and munitions expended by any involved law enforcement agency should be submitted to the OPD Planning Section, Documentation Unit prior to being released from duty or mutual aid. These requirements were not met the evening of October 25, 2011, and some have not yet been turned in at all. Prior to demobilization, OPD and all participating mutual aid agencies should complete ICS-214 Forms and/or Supplemental Reports detailing arrests, injuries, force applications, and locations where applied. Supervisors involved should also review and approve these forms while still on site.

Review of the Supplemental Reports provided by OPD indicated the arrest/ charging section for most arrestees in the early morning was 647e PC (Penal Code, Disorderly Conduct e.g., Lodging), following the declaration of an unlawful assembly order and failure to disperse.  While OPD did consult with the City Attorney's Office, which advised the use of "lodging" as the arrest authority section, Frazier Group feels that there are legal issues involving the selected OPD predicate arrest authority of Penal Code Section 647e, "Disorderly Conduct, e.g., "lodging. Specifically, arrest authority should focus on encampments and Time, Place, and Manner issues.

# <u>INVESTIGATIONS (GENERAL)</u>

BEY000144

During the interviews and review of video footage it became apparent that the OPD investigations, including investigative status, accountability of munitions deployed, injuries, mutual aid resources and activities, and so forth required the services of experienced, unbiased investigators not available to OPD. Both internal criminal and administrative investigations should be monitored or conducted by an outside entity.

# INVESTIGATIONS (CRIMINAL)

OPD policy regarding the investigation of felony and "serious" misdemeanor allegations against OPD officers is general in nature and inconsistent in practice.  On October 25, 2011 (and in subsequent Occupy Oakland events), actions by some OPD members provided reasonable suspicion that an officer-involved criminal act may have occurred.

Cases currently under investigation by OPD stemming from the Occupy Oakland incidents require a more in - depth and aggressive review.  If there were belated decisions to investigate an officer-involved allegation criminally, a review of the decision-making process should determine why there was a delay, and what can be done to prevent similar delays in the future. If appropriate, policy revision and/or training curricula should be developed to prevent any similar future delays or oversights regarding both the investigative process and the results of the investigations. The OPD must obligate itself to review and update current policies and practices used when allegations of criminal misconduct are made against OPD members. It is vital that top executives are notified without delay in any such allegation, and that subsequent direction be provided immediately.

Interviews and case review reveal a necessity for some CID supervisors and command officers to be more proximate to important investigations assigned to their personnel. It is vitally important that high-profile, sensitive, confidential, and major investigations, are closely monitored by supervisors and command officers. OPD must review policies, training, and the actual practice of CID commanders and supervisors as they relate to ongoing investigations. The OPD would benefit from a robust policy and practice that ensures that investigations in both CID and IAD are diligently reviewed and audited by OPD's Office of the Inspector General.

Declaring a Level I Use of Force creates an immediate response requirement for both IAD and CID investigators to commence investigations. Lack of availability of investigative personnel during an Occupy Oakland incident provided reasons for concern. In anticipation of future events, and recognizing the tremendous value in immediate investigative response, policy and practice must be enacted to ensure CID personnel are appropriately available.

Assigning OPD CID/IAD personnel to uniformed positions of responsibility during a protest event likely to result in confrontation and force has the potential to "conflict out" the CID/IAD member from conducting, or managing investigations related to the event.

BEY000145

The investigator may be a witness to an alleged misconduct incident, or the investigator may themselves become the subject officer in an alleged criminal complaint. The IAD member may find themselves scrutinized for the possibility of bias as a result of being on-site at the time of the incident. OPD should develop policy whereby certain IAD and CID personnel are not assigned to uniformed field assignments when a reasonable possibility of confrontation, force, or subsequent alleged misconduct or officer – involved criminal complaints may occur.

IAD and CID investigators do not consistently coordinate their investigations when criminal allegations are made against a department member   In California law enforcement it is quite common, when a criminal allegation is made against an officer and a CID criminal investigation commences, for the organization's Internal Affairs Division to also open (or will already have opened) an administrative investigation. It is important to recognize these are two entirely different investigations; the CID investigation is to explore any criminal culpability on the part of an officer and then forward the complete investigation and all evidence to a prosecutor. This is normally the county District Attorney (or in some instances the State Attorney General or U.S. Department of Justice) for consideration of criminal prosecution.  The IAD investigation explores the officer's alleged misconduct--often referred to as a violation of the department Manual of Rules or Duty Manual.  OPD must establish policy requiring CID to make timely notification to IAD investigators regarding significant CID investigative tasks.  The direction should come from the authority of the Office of the Chief of Police.

Current OPD policy and practices regarding the release and communication of information obtained from an Internal Affairs (administrative) investigation to criminal investigators (and other members who do not have a need or right to know) do not meet current standards and preferred practices. Information that is obtained during IAD investigations is often confidential and should not be shared, accessed, or communicated in any manner with department members who do not have a need and a right to know.  OPD must establish explicit policy and accountability which safeguards against broadcast of confidential IAD information outside of the IAD purview, in settings where multiple components of the department are gathered.

Taken as a snapshot-in-time, the Intake and Investigative case load in OPD IAD is immense, and requires a professional reassessment of the systems, policies and practices that are currently in place.  This should be done with a focus toward improving the day-to-day efficiencies of the division. A statistical study of IAD workload was not necessary to establish this finding.  Nor was comparison of IAD caseload to other law enforcement when the situation is obvious. The OPD leadership should commission a vigorous, empirical needs-assessment of the IAD, both for the complaint Intake and the Investigation units.  The needs-assessment should also identify IAD industry preferred practices from other law enforcement agencies.  High priority should be attached to the study, and it should be done collaboratively to embrace many stakeholders.

## J.  <u>MEDIA AND PUBLIC IMAGE</u>

BEY000146

The OPD Public Information Officer (PIO) is a police officer assigned to the office of the Chief of Police who has responded to numerous public and media inquiries regarding the actions of OPD during various protests initiated by the "Occupy Oakland" groups. It is recommended that the current PIO position be elevated to a command level individual (sworn or civilian). This person would preferably be a public relations professional retained to develop an overarching messaging campaign which includes the use of electronic media.  The City and OPD must position themselves in front of the continued negative media reports regarding crowd management and use of force and begin to control the information released about the department with an organized and focused message.

## K.  TRAINING

Review of Occupy Oakland event video and departmental personnel interviews have revealed that the crowd control tactics used by OPD are outdated, dangerous, and ineffective. OPD should immediately adopt current preferred practice crowd management and crowd control tactics, and train all personnel in these concepts and tactics. An integral part of this recommendation is to replace existing obsolete and dangerous equipment and munitions with state of the art equipment. Concurrently it is necessary to train officers on the proper use of these strategies, tactics, and options.

Careful review of existing investigations stemming from Occupy Oakland events shows that many assigned investigators and supervisors lack the technical proficiency, and in many cases, the experience to conduct comprehensive, aggressive, and unbiased investigations. OPD should immediately implement an intensive training program for all CID and IAD investigators and supervisors designed to raise their skill levels to the point where outside contract support will no longer be necessary. Organized rotation of departmental members through units involved in crowd management and crowd control activities (SWAT, Tango Teams, and Hostage Negotiations) will expand the knowledge base of investigator candidates as well.

After considerable interaction with the command and executive leadership levels of OPD, we find that the general level of experience, and the accompanying formal training in leadership, management, and specialized skills requires emphasis and improvement. Current Departmental leadership recognizes this shortfall, and steps are underway to improve this deficiency area. Formal training, not just on-the-job training, is an absolute necessity for senior leaders responsible for decisions with profound community impact. Furthermore, OPD should establish a formalized career development program of rotational assignments and temporary detail assignments for developing leaders to expose them to the many facets of modern policing and prepare them for effective leadership.

Mid-level management critical incident and leadership training should be provided for all Lieutenants.  Training should focus on clarity of OPD command expectations of Lieutenants during crisis, an understanding of tactical implementations and the

BEY000147

associated limitations, leadership and team building.   Additionally, formalized First Amendment, use of force, and force reporting training should be addressed.

# <u>CONCLUDING THOUGHTS</u>

Aircraft accident investigations frequently reveal that airplane crashes are caused by a series of cascading events, not a singular problem. We at Frazier Group feel that this analogy appropriately describes our observations within the Oakland Police Department. Years of diminishing resources, increasing workload and failure to keep pace with national current standards and preferred practices led to the cascading elements resulting in the flawed responses noted during the events of October 25, 2011. The most important of these multiple causal factors that we observed are as follows:

1. <u>COMMAND TURNOVER: The Department's executive leadership team has been unstable for years</u>. Turnover at the senior levels of Chief, Assistant Chief, and the Deputy Chiefs and Captains has been frequent. While bright and dedicated personnel have recently been appointed to fill these important positions, many do not have the formal training, and the breadth of experience that most departments exhibit at this level of organizational leadership.

2. <u>BENCH STRENGTH: We did not see OPD historically as a "learning organization"</u> – one which senior leadership has placed a high value on succession planning, career development, formal training, and post-incident reviews designed to provide departmental members the opportunity to learn from, and to improve from, recent experiences. To the credit of the current administration, these training deficiencies have been recognized and a focused effort to close the training gap is ongoing.

3. <u>STAFFING CUTS: Substantial and  cumulative budget cuts and personnel losses have seriously weakened the Department.</u> According to the published FBI Uniform Crime Reports, in 2000 OPD had a total of 1131 law enforcement personnel (sworn and civilian). In 2010 this number had been reduced to 935 ( - 17%). This has caused significant morale issues and "brain drain" within the Department. Given the operational challenges of high crime, repeated civil disorder events, and community distrust, the Department is struggling to handle a workload demand that far outstrips its current staffing level. (See Appendix 5 for more statistical analysis of this issue.) OPD is so busy trying to keep pace with the operational requirements of daily events that they have little time or resources for strategic long-term improvement. The resulting problems play out in the media on a routine basis, further undermining the community's confidence in its police department.

While OPD faces daunting problems, we at Frazier Group noted many positive elements within the organization. The most important of these are as follows:

BEY000148

1. <u>In almost all cases</u> OPD personnel we interviewed and interacted with at all levels were open, forthright, professional, and positive in their comments about their work and their department. The aggregate of these impressions leads us to believe that the Department is open to change, and clearly recognizes the many needs for improvement that we discussed.

2. Training delivered by Frazier Group was well received by all OPD participants, again signaling overall receptiveness to change.

3. Newly appointed Chief Howard Jordan has set the tone for his organization, making Departmental improvement his highest strategic priority. His cadre of bright young leaders bodes well for the future as they mature in their professional careers.

We at Frazier Group wish the Oakland Police Department and the City of Oakland well as they jointly address the significant challenges that lay before them.

# <u>CHRONOLOGY OF EVENTS</u>

## THE OCCUPY MOVEMENT COMES TO OAKLAND

19

BEY000149

The following summary details the chronology of events that led up to the October 25, 2011, Occupy Oakland actions that occurred in or near FOP Park:

- October 10, 2011
  Approximately two dozen Occupy Oakland protesters erected tents in FOP Park. They began at approximately 4:00 PM with a rally attended by hundreds of supporters.  According to interviews, at least one Oakland City Council member spent the first two nights camped in FOP Park, in solidarity with the Occupy group.

- October 14, 2011
  Protesters participated in a short march from FOP Park to the Oakland Police headquarters and back.

- October 16, 2011
  At approximately 10:20 PM, Oakland Fire Department (OFD) paramedics responded to the FOP Park in response to an injured person who had fallen from a tree. OFD personnel were met with resistance from the Occupy movement, though they were eventually able to treat the victim.

- October 18, 2011
  The Snow Park encampment was established with tents and about two dozen people because FOP Park was full.

- October 19, 2011
  The Alameda County Health Department inspected the plaza to evaluate sanitary conditions and to determine whether rodents living in or under nearby bushes in the park had infested the encampment.

- October 20, 2011
  The City of Oakland issued an official notice to the FOP Park encampment citing "violence, assaults, threats, and intimidation" among other complaints and advised those present of the illegality of overnight lodging (647e PC).

- October 22, 2011
  Protesters marched from FOP Park to Snow Park. Some protesters entered a Chase Bank branch and ripped up hundreds of deposit slips and threw them in the air. Some protesters stayed to help clean up the deposit slips. After leaving Chase, they protested outside of a Wells Fargo branch before returning to FOP Park.

**THE DECISION TO REMOVE THE TENTS**

In an article written in <u>The San Jose Mercury News</u>, posted February 25, 2012, *In their own words: Occupy Oakland According to City Officials – Part I,* numerous email exchanges amongst city officials beginning October 10, 2011 were published.  These

20

BEY000150

emails articulated discussions amongst city officials on how to deal with the Occupy encampment in FOP Park.

Occupy Oakland first appeared in the city October 10, 2011.   Initial discussions amongst City officials, including OPD, included strategies to facilitate continuation of First Amendment activities balanced with preventing public safety hazards from becoming entrenched or escalating in FOP Park.  Arturo Sanchez, Special Advisor on Public Safety in the City Administrator's Office, stated on October 12, 2011 that *"The Occupy Wall Street group has no centralized leadership. As a result it will be difficult to communicate with them about policies and rules."[4]*

On October 17, 2011 the Chief of Police and his staff were provided information and recommendations regarding a confrontation that occurred the previous evening. An Occupy Oakland protester fell from a tree, requiring Oakland Fire Department to respond.  OPD personnel attempted to provide protection to OFD and were confronted by protesters at FOP Park.  The assessment was that "this was a very dangerous situation and one that exposes the City to liability."[5]  Furthermore, it was recommended that planning begin for the removal of the campers from FOP Park.  On that same date Arturo Sanchez indicated the group in the plaza was becoming "more aggressive."[6] Based on this evaluation of an escalating public safety crisis, a joint decision to remove the tents was made by the Chief of Police and the City Administrator.

### SUMMARY OF EVENTS – OCTOBER 25, 2011

---

[4] Email sent :From: Arturo Sanchez, To: Deanna Santana, Alexandra Orologas, CC: Brooke Levin, OPD, Christopher Bolton, Sent: Wed 10/12/2011 9:04 AM, Subject: Occupy Wall Street
[5] Email sent:  To: Howard Jordan, Sent: Mon 10/17/2011 8:23 AM, Subject: FOP protesters challenged OPD and prevented us from responding to a medical call in the plaza.
[6] Email sent: From: Arturo Sanchez, To: Howard Jordan, Deanna Santana Sent: Mon 10/17/2011 11:19 AM, Subject: FOP protesters challenged OPD and prevented us from responding to a medical call in the plaza.

BEY000151

On October 25, 2011 beginning at approximately 4:50 AM, 392 OPD and 202 mutual aid personnel from the California Highway Patrol (CHP), Berkeley Police Department, UC Berkeley Police Department, Alameda County Sheriff's Department, Emeryville Police Department, Fremont Police Department, Hayward Police Department, Newark Police Department, Pleasanton Police Department, San Francisco Police Department, San Jose Police Department, Santa Clara Police Department, Solano County Sheriff's Department, and San Francisco Sheriff's Department were present. OPD personnel staffed the City of Oakland Emergency Operations Center (EOC). OPD and the mutual aid agencies responded to FOP Park (14th and Broadway Streets). The purpose was to execute the OPD plan to evict the Occupy movement from the park. Subsequent to the FOP Park eviction, OPD personnel relocated to Snow Park to evict the small contingent of Occupy protesters at that location as well. Simultaneously, the California Highway Patrol (CHP) provided numerous platoons[7] (approximately 40 officers each) to assist in traffic management and security of the freeways.[8]



Preceding this action (October 20-24), Mr. Sanchez distributed flyers and liaised with Occupy members. He advised them of the intent of the City to revoke permission to camp in FOP Plaza. He further advised that those who wished to remain in the park would be in violation of 647e[9] of the California Penal Code (lodging).

By approximately 10:00 AM most of the tents in FOP Park had been dismantled and Public Works personnel had inventoried the personal property confiscated from the campers. By direction from XXXX, FOP Park was closed to the public for renovation, but opened for free speech from 6:00 AM to 10:00 PM.

As protesters were dispersed from FOP Park in the morning up through approximately 3:00 PM, several hundred

---

[7] A Platoon as defined by OPD, consists of three, eight person squads, one lieutenant and three supervisors
[8] The CHP did not become involved in any contacts with Occupy
[9] "Every person…who lodges in any building structure, vehicle or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it."

BEY000152

(600 to 700 estimated) regrouped at the Oakland Public Library at 14th and Madison Streets.

By 10:00 AM several tents had reappeared in Snow Park.

Between 3:00 PM and 4:00 PM, upon meeting and conferring in a "General Assembly," the Occupy movement began to march to FOP Park for "reoccupation of the park." The OPD plan for facilitation of the group's march was to be led by mutual aid resources (San Jose PD motorcycle officers) westbound on 14th street. However, the group ignored SJPD's directions and marched southbound on Madison Street at 5:00 PM. The group was described as extremely hostile toward any law enforcement participation, support, and/or requests for cooperation.

The group followed a circuitous route while proceeding to FOP Park. At one point they attempted to pass the North County/Glen Dyer Jail and OPD Headquarters, on 7th and Broadway Streets.



At approximately 5:45 PM, OPD Mobile Field Force (MFF) A-3[10] deployed in a "rolling street closure"[11] (a straight line), on 8th Street and attempted to block the marchers from proceeding southbound on Washington Street towards the OPD headquarters building.

As this occurred, the marchers began pelting the OPD MFF with bottles, unknown liquids and round wax vessels containing blue paint. At this time, MFF A-3 was surrounded, made an arrest, and were fighting multiple protesters who were attempting to lynch the prisoner from A-3's custody (NOTE: the term "lynch" in this context means that the protesters were attempting to forcibly free their arrested comrade from police custody). There were numerous simultaneous conversations occurring on the OPD radio, and a great deal of confusion existed as to the status and location of MFF A-3.

---

[10] One Sergeant and nine OPD officers
[11] A line of officers deployed across the street to block access and redirect marchers.

BEY000153

This was particularly troublesome as the conversations were regarding their multiple requests for emergency assistance. OPD helicopter ARGUS (Aerial Reconnaissance Ground Unit Support) eventually observed MFF A-3 engaged in a major confrontation with a large group of protesters and directed OPD Tango Team #2 (Tango Teams are equipped with less-lethal and chemical munitions) to their location. A brief confrontation occurred where less-lethal impact and chemical agent munitions were deployed. This fully involved "street fight" lasted approximately seven minutes until the Tango Team could reach the exhausted A-3 officers and provide assistance.

At approximately 7:30 PM, approximately 1500 marchers proceeded northbound on Broadway to 14th Street and attempted to enter FOP Park. According to OPD resources and mutual aid deployment logs, OPD deployed a total of 28 personnel to FOP Park. Other officers were assigned to the EOC. There were originally 103 mutual aid personnel from three allied agencies. At this same time, the Oakland Chief of Police requested additional mutual aid from allied law enforcement agencies[12]. . At approximately 8:39 PM the EOC reported an additional **100** mutual aid officers had arrived at the staging area at 14th and Clay Streets.

At 7:00 PM there were approximately 1500 to 2000 protesters in the vicinity of 14th and Broadway Streets. The objective of this protest following the early morning closure of the Occupy encampment was to "re-occupy FOP Park." Interviews determined that the number of protesters in attendance and the level of ensuing violence was completely unanticipated by OPD.[13]

During this time period a protestor was standing in the closed intersection at 14th and Broadway Streets near the FOP Park. He was approximately 15 - 25 feet from a multi-departmental perimeter (Palo Alto Police Department, Oakland Police Department, Santa Clara County Sheriff's Department, San Francisco City and County Sheriff's Department and Alameda County Sheriff's Department). The perimeter was delineated by metal bike rack barricades. A second protestor was standing shoulder to shoulder with him holding a "Veterans for Peace" flag. Their presence was in direct support of the Occupy Oakland Protest that evening.

Following the arrival of mutual aid resources there were approximately five law enforcement agencies, including OPD, behind the barricades denying protester access to FOP Park. During the closure of FOP Park, the law enforcement agencies behind the barricades became the targets of a variety of projectiles thrown by protesters. These missiles included rocks, glass, lengths of pipe, and hand launched tear gas canisters. Subsequent to this, the OPD Operations Section Chief had assembled OPD Fire Department paramedics West of Broadway on 14th Street behind the barricades. According to interviews, the Operations Section Chief's objective was to deny protester access to FOP Park as it had been declared closed earlier in the day while the Department of Public Works disassembled the Occupy encampment.

[12] At approximately 8:39 PM the EOC reported an additional 100 mutual aid officers had arrived at the staging area at 14th and Clay Streets.
[13] Social media was utilized to rally protesters to the civic enter.

BEY000154

At this time the intensity of the assaults on the law enforcement perimeter increased in terms of number and types of projectiles being thrown at the police.  The Operations Section Chief directed an Unlawful Assembly Announcement be made (407 PC) by OPD, via the Long Range Acoustic Device (LRAD) positioned west of Broadway on 14th Street.  According to the Operations Section Chief, numerous announcements were made to disperse the crowd westbound on 14th and/or southbound on Broadway (NOTE: review of publically accessible video confirms these numerous announcements). Additionally, according to the Operations Section Chief, the dispersal announcement included the admonition that less-lethal and/or chemical munitions would be deployed if the crowd did not disperse.[14] The Operations Section Chief monitored the crowd's reaction for several minutes. Increased numbers of projectiles were being thrown and there was no movement by the crowd indicating that they were dispersing as per Section 409 of the Penal Code (Failure to Disperse).

According to the Operations Section Chief's interview, due to the crowd's continued failure to disperse and the increasing number of projectiles being directed at law enforcement by the protesters, less-lethal impact munitions  (Drag Stabilized Flexible Baton Rounds - DSRDs - commonly referred to as "beanbag" rounds) and chemical agents were authorized for use by the Operations Section Chief. However, during the course of this review it was determined that OPD Tango Team members may have had access to "non-marking," DSRD less-lethal munitions. These are normally issued for day-to-day patrol functions. Only Tango Team personnel were authorized to use the DSRD during the protests, and Tango Team personnel had access to both marking and non-marking munitions.  Due to the lack of accountability measures for assigned munitions (at that point in time time), it is not possible to specifically determine what type and with what frequency less-lethal impact munitions and gas were deployed by Tango Team personnel.

In the numerous hours of video footage provided by YouTube, commercial video, officer-worn Personal Digital Recording Devices (PDRDs), and internet sources, the events involving the two protestors were captured in detail. It was clear that burning chemical agent canisters deployed by law enforcement were being thrown back at the police by protesters as well as other projectiles. According to interviews, OPD deployed 11 Tango Team personnel under the supervision of two Tango Sergeants and one Platoon Leader Lieutenant, to the 14th and Broadway Streets location behind the bicycle rack barricades. Seven of the Tango Team personnel had less-lethal 12-gauge shotguns, and four of these personnel deployed less-lethal specialty impact munitions. According to reports, seven hand-launched chemical munitions were deployed

---

[14] "I am (rank and name), a peace officer for the city of Oakland.  I hereby declare this to be an unlawful assembly, and in the name of the people of the State of California, command all those assembled at _____, to immediately leave.  If you do not do so, you may be arrested or subject to removal by force if necessary which may result in serious injury.  Section 409 of the Penal Code prohibits remaining present at an unlawful assembly.  If you remain in the area just described, regardless of your purpose, you will be in violation of Penal code Section 490.  The following routes of dispersal are available _____.  You have _____minutes to leave.  If you refuse to move you will be arrested.  If you refuse to move chemical agents will be used (provide the chemical warning only if use is anticipated)."

BEY000155

throughout the evening.  NOTE: These numbers do not include any chemical and/or less-lethal munitions deployed by allied agencies.

At least one chemical agent device was deployed into the small crowd around a downed protestor. Immediately, upon activation, the crowd moved back from this person.  Law enforcement personnel remained behind the barricades.  Subsequently, a small group of protesters reassembled and removed the prostrate victim from the scene.

It appeared that several less-lethal impact munitions were directed at individuals in the crowd by law enforcement.  During this time, the second protestor was no longer standing with the first, who was seen lying on the ground.  In the smoke and haze present, numerous protesters responded to the aid of the injured party.  It is estimated that the small group rendering aid to this person was approximately 15 to 25 feet from the metal barricades and the police line.

An analysis of police operations that evening revealed that there were a total of six arrests (Failure to Disperse, 490PC). There were a total of 43 use of force incidents (1-Level-1, 22-Level-2, 19-Level-3 and 1-level-4) reported.  Eight 12 gauge, FBRD rounds were fired, and 16 chemical munitions were discharged. During the analysis of the type and amount of munitions deployed October 25, 2011, the review team heard reports of "Flash-Bang" type grenades being utilized.  The CS Blast Rubber Ball Grenades, when deployed, emits a bright flash, a loud sound, and CS chemical agent.  Once activated, the device is similar in nature to the flash-sound distraction type devices utilized for barricaded subject incidents; however, the actual effects are dissimilar. We do not believe that any flash-sound (Flash-Bang) devices were either carried or deployed that evening.

According to interviews, there are conflicting reports as to one 37mm launched Defense Technologies, CS SKAT shell being deployed. These shells are deployed from a 37mm gas launcher.  Interviews indicated that one round was deployed.

Following the October 25, 2011 Occupy incidents, the Office of the Mayor and Office of the City Administrator created a *"City of Oakland Establishes Ground Rules for Peaceful and Safe Demonstrations"* flyer dated October 27, 2011.  This flyer was posted and distributed by city officials.  The flyer included a statement from the Mayor asking demonstrators to have direct communications between the City staff and Occupy Oakland representatives; maintain healthy and safe conditions wherever gathered; allow safety to City employees, and to not camp overnight.

In addition, the City Administrator outlined minimum requirements for the City to maintain adaquate public health and safety conditions.  These were: access for first responders, maintainance of  acceptable sanitation standards, respect for public space, absolutely no fire hazards, and maintainance of public safety.  Additionally, local merchants complained that Occupy movement protesters were intimidating their employees and having a chilling effect on commerce.

BEY000156

# FINDINGS AND RECOMMENDATIONS

### A. POLICIES

BEY000157

## FINDING #1

Training Bulletin III-G - OPD Crowd Control and Crowd Management Policy, 28, October 2005.[15]   This policy is the result of an agreed upon settlement from a 2003 incident at the Port of Oakland, *re: Coles, et al. v. City of Oakland and Local 10, International Longshore and Warehouse Union, et al v. City of Oakland Nos. C03-2961 and 2962 TEH.* This policy is outdated.

## RECOMMENDATION #1

In March of 2012, California Peace Officers Standards and Training (POST) produced the 2012 Crowd Management, Intervention and Control Guidelines.  The OPD III-G Policy should be rewritten following these guidelines in terms of concepts, strategies, definitions, and current crowd management principles.

## FINDING #2

Department General Order K-3, 1 August 2007 - Use of Force.  This policy is outdated and should be updated.  A recent 9th Circuit Appellate case *Young v. County of Los Angeles*[16] (9th Cir. - August 26, 2011) has stated "the use of pepper spray and a baton on a non-combative, albeit uncooperative, citizen is excessive force."  Analysis of this case should be included in an updated version of Department General Order    (DGO) K-3.

## RECOMMENDATION #2

It is recommended that OPD review the current DGO K-3 Policy and consider inclusion of a use of force continuum.  Furthermore, recent case decisions regarding the use of Oleoresin Capsicum spray (OC) and the baton should be legally analyzed and recommendations made for field application. The results of this analysis must be taught

---

[15] A negotiated settlement agreement resulting in a crowd control and crowd management policy was crafted by members of the ACLU and the National Lawyers Guild and the OPD to include revising OPD's Crowd Control Policies and agreed to by Federal Judge Thelton Henderson on December 24, 2004.  The OPD Crowd Control and Crowd Management Policy, Training Bulletin III-G (October 28, 2005) resulted from that policy revision.  Generally, the policy includes the following : The adoption of a new Crowd Management Policy that strictly limits the use of force and mandates the protection of the right to assemble and demonstrate must be a primary goal of the OPD in their planning for the management of demonstrations;  Crowd dispersal methods that create risk of injury to crowd members and bystanders are prohibited, including skip-fired wooden bullets, stinger grenades, TASERS, stun guns, motorcycle bumps and dogs; Indiscriminate use of bean bags, aerosol pepper spray and batons against crowds or passive resisters is prohibited; When crowd members break the law, OPD will attempt to negotiate with leaders and will give clear and audible orders to the crowd, allowing time for the individuals to comply before taking enforcement action; OPD will arrest individuals who refuse to follow valid police orders, rather than using weapons or other force to move them.
[16] *Young v. COLA cite - MARK ANTHONY YOUNG, v. Plaintiff-Appellant, No. 09-56372, D.C. No. COUNTY OF LOS ANGELES and 2:08-cv-05438-R-RZ RICHARD WELLS, Deputy, OPINION, Defendants-Appellees; Filed August 26, 2011*

BEY000158

to all Department personnel by a command officer in all future in-service crowd management and crowd control training programs.

## FINDING #3

Department General Order, L-3 – Assistance to Outside Jurisdictions and Mutual Aid, Revised 30 December 1997.  This order was last revised 30 December 1997 and needs to be updated.

## RECOMMENDATION #3

The L-3 Policy should be updated and should follow the 2011 Edition of the California Law Enforcement Mutual Aid Plan and 2009 Edition of the Law Enforcement Guide for Emergency Operations.  This updated policy should include specific recommendations addressed under the Mutual Aid section of this Frazier Group Report, as well as Frazier Group Findings and Recommendations dealing with the responsibilities of OPD and responding agencies during mutual aid situations. It is particularly important that this revised policy address pre-deployment briefings and after action reporting requirements prior to demobilization.

# B. PLANNING

## FINDING #4

Oakland Police Department throughout the years has been challenged with numerous protests, most of which have been centered in the civic center area and FOP Park.  A "Single Use Plan,"[17] for OPD and mutual aid partners which includes personnel staffing, traffic management, fixed posts, observation posts, infrastructure protection, communications, staging areas, munitions, force reporting, etc., for this area has not been developed.

## RECOMMENDATION #4

Single Use Standing Plans should be developed for the most frequently targeted sites, e.g., FOP Park, Civic Center, etc.  Standing Plans should include minimum and maximum staffing requirements, specific missions regarding infrastructure protection,

---

[17] A Single-Use-Plan is a plan developed for a specific or special event and shall contain procedures and operational concepts -LAPD Emergency Operations Policies and Procedures.

BEY000159

traffic control, chain of command, communications, and OPD and/or mutual aid responsibilities.  These Standing Plans should be jointly developed by, and shared with, potential mutual aid partners, specifically the Alameda County Sheriff's Department and the California Highway Patrol. This will help ensure that in the event of an emergency requiring mutual aid, rapid and accurate deployment of allied agencies is facilitated.

## OPD RESPONSE UPDATE

As of the date of this report, OPD reports that they are nearly finished with the Single Use Plan for the FOP Park area, absent only a traffic control plan.

## FINDING #5

Interviews of both A and B-Watch Incident Commanders indicated one of the two OPD Incident Commanders was unavailable over the weekend prior to October 25, 2011, and was not involved in development of the Event Action Plan (EAP).  The A-Watch Incident Commander was the primary Planning Section Chief. The focus of planning efforts, and most available resources, was expended on the A-Watch.

## RECOMMENDATION #5

The A-Watch Incident Commander had significant input into the selection of the date and time of the Occupy Oakland eviction and staffing assignments.  Adjustments should have been made to include B-Watch command in the planning process, and to reschedule the eviction date in order to balance both staffing and command personnel resources to provide experienced leadership on both watches.

## FINDING #6

During interviews of personnel assisting with planning, it was apparent that the October 25, 2011 event required civilian professional staff to assist with preparation of Incident Command System documentation, staffing the Emergency Operations Center (EOC), and the Incident Command Post (ICP).  One such key civilian staff member indicated that during the B-Watch that person was inundated with managing calls for logistical support, keeping pace with reporting of events, and being looked upon as a decision maker.  These responsibilities were thrust upon an untrained person who was placed in a position of decision making, lacked situational awareness of events on the street, and violated unity of command.

## RECOMMENDATION #6

Civilian support staff provides very valuable assistance during crises. However, they should not be tasked to fill tactical decision-making roles that are beyond their training

BEY000160

and experience. Future plans should include additional sworn personnel of command rank to the EOC to fulfill these functions.

**FINDING #7**

The fact the Commanding Officer of Internal Affairs Division was selected as the B-Watch Operations Section Chief shortly before to the event is indicative of a lack of executive oversight of the plan.

**RECOMMENDATION #7**

The Commanding Officer of Internal Affairs should not have been utilized as Operations Chief of a plan with such a high likelihood of use of force, personnel complaints and civil liability. Policies should be implemented to ensure that the Commanding Officer of Internal Affairs is not placed in an operational command that will create these conflicts of interest.

**FINDING #8**

The Incident Action Plan (IAP) and/or Event Action Plan (EAP) for both A and B Watches were well structured and comported with the Standardized Emergency Management System (SEMS).  The IAPs included Operations Plan annexes that detailed the specifics of the encampment removal.  However, there was no indication that the Planning Section considered intelligence and/or previous incident experiences suggesting that strong repercussions could occur the night of October 25, 2011.

**RECOMMENDATION #8**

IAP/EAPS from prior operational incidents should be retained so that future incident/event planners can review lessons learned, intelligence assessments and sources, previous command priorities, objectives, strategies and tactics.  Having these types of source documents available will help prevent future planning gaps and recurring mistakes.

# C. COMMAND AND CONTROL

**FINDING #9**

BEY000161

On October 25, 2011, OPD activated what was described as the City Emergency Operations Center (EOC)[18] to manage the incident.  In this configuration, it is unclear as to the function of the EOC, e.g., was it functioning as a City-wide coordination center or as an Incident Command Post (ICP)?[19]

## RECOMMENDATION #9

The Incident Command Post (ICP) should be separated from the Emergency Operations Center (EOC). The EOC should serve as a physical location where the coordination of information and resources to support incident management (on-scene operations) activities normally takes place. The ICP is the field location where tactical command and control functions are performed.

## FINDING #10

At approximately 8:00 PM on October 25, 2011 the B-Watch Incident Commander was located inside the City EOC and did not have adequate situational awareness regarding activities occurring at 14th and Broadway Streets.  His position inside the EOC did not allow the IC to adequately assess the situation, interact with the Operations Section Chief, and provide command direction.

## RECOMMENDATION #10

The B-Watch Incident Commander should have responded to the field, met with the Operations Section Chief, assessed the situation, provided leadership, established a tactical plan to disperse and/or arrest demonstrators for unlawful conduct, and solicit or give consideration to other options. The crowd should have been dispersed following the Unlawful Assembly Announcement, and arrests made.

## FINDING #11

The B-Watch Operations Section Chief did not have adequate OPD resources to police the FOP Park.  These resources should have included an adequate number of officers,

---

[18] FEMA definition - The EOC is the physical location at which the coordination of information and resources to support incident management (on-scene operations) activities normally takes place.  An EOC may be a temporary facility or may be located in a more central or permanently established facility, perhaps at a higher level of organization within a jurisdiction. EOCs may be organized by major functional disciplines (e.g., fire, law enforcement, medical services), by jurisdiction (e.g., Federal, State, regional, tribal, city, county), or by some combination thereof.

[19] Incident Command Post – is the field location where the primary functions are performed. The ICP may be co-located with the Incident Base or other incident facilities.

BEY000162

and "experienced" OPD commanders and supervisors to monitor deployment of chemical agents and to dynamically utilize law enforcement forces to disperse the crowd.

## RECOMMENDATION #11

There were too few OPD (reportedly 28 officers) resources on scene to adequately control the crowd. It would have been preferable once the Operations Section Chief became aware of Occupy protesters marching from 14th and Madison, to have requested reallocation of additional OPD personnel. Other options included adjusting existing OPD and mutual aid resources, and earlier requests for additional mutual aid support in preparation for potential arrests and/or crowd dispersal later in the evening.

## FINDING #12

The confrontation that took place during the evening at FOP Park was the result of an aggressive plan by some of the protesters to "re-take" the Park.  The Operations Section Chief was faced with a decision to either allow 1500 to 2000 protesters to retake FOP Park, or hold ground.  At one point the Operations Section Chief related he was repeatedly informed by allied agencies that their officers were being pelted by rocks and missiles.  The Operations Section Chief chose to hold ground and attempted to disperse the crowd from a stationary position, primarily utilizing allied agencies and deployment of less-lethal munitions and chemical agents.   The deployed law enforcement resources remained behind the bicycle rack barricades during the deployment of less-lethal munitions and chemical agents.  There was no plan or effort to dynamically move forward, disperse the crowd, and make arrests after the dispersal orders were given and chemical agents were deployed.

## RECOMMENDATION #12

Once the decision was made to disperse the crowd and appropriate orders given, immediate dynamic movement of the control forces should have been utilized to move the crowd in the direction indicated in the dispersal order.  Following such movement, arrests should have been made of those remaining present at the unlawful assembly, or otherwise violating the law.

# D. LIAISON

## FINDING #13

BEY000163

In the course of the Frazier Group review, the Oakland City Attorney's Office was contacted.  A general discussion was held with the City Attorney, the Assistant City Attorney and the Supervising Deputy City Attorney regarding OPD operations and the activities of October 25, 2011.  The consensus of the City Attorney's Office was that OPD is diligently attempting to gain compliance with the Negotiated Settlement Agreement and was collaborative with the City Attorney in training and risk management-related operations.

**RECOMMENDATION #13**

It would be beneficial to the OPD if the City Attorney could be more involved in "legal update reviews" to provide "implications for OPD" as a training model. The City Attorney also requested greater involvement in development of the Crowd Control Policy (III-G), and OPD First Amendment training at all levels (Basic Academy, In-service - Continuing Professional Training, Supervisory, and Command level) of training.  These closer ties between OPD and the City Attorney's Office are critical to the further improvement of OPD.

# E. <u>CROWD CONTROL</u>

**FINDING #14**

In review of the current OPD Crowd Control Policy (III-G), and actions conducted throughout October 25, 2011, the OPD did not satisfactorily exercise current strategies that should have included: cultivating stronger relationships with Occupy, providing experienced leadership on scene, using intervention strategies during the B-Watch to include Quick Response Teams to identify and remove individuals involved in unlawful activities, conducting coordinated and dynamic crowd control tactics to facilitate dispersal and arrests, provide for immediate medical assistance for injured parties, and consideration of strategies to minimize the deployment of chemical agents and less-lethal impact munitions.

**RECOMMENDATION #14**

A designated Department "Crowd Management Coordinator" should be established and given responsibility for crowd management policy updates, and crowd management and control (basic and recurrent) training for the Department. Maintenance of after action reports, coordination and training of Incident Management Teams, review of crowd management equipment (safety and operations), less-lethal and chemical agent

BEY000164

emerging technologies, participation in crowd management preferred practices symposiums, use of force legal reviews, media policies and facilitation protocols, arrest and prosecution protocols, implementation of Quick Response Team methodologies, mutual aid protocols, and development of Single Use Plans (standing plans) for specific sites, e.g., civic center, would also be in this purview.  This "Coordinator" should utilize the 2012 California POST Crowd Management, Intervention and Control Guidelines as a roadmap for revising the current III-G Policy and updating Department-wide training.

## FINDING #15

The abilities of OPD to conduct crowd management and unusual occurrence response have been significantly challenged due to current decreased staffing and budget shortages

The fact that OPD has reduced its operating force from 837 sworn to approximately 650 sworn by 2011 has significantly diminished its ability to deploy sufficient numbers of resources to major events.  Recently, due to necessary command and executive promotions, there is also a lack of experienced mid and upper-level leadership within OPD that is knowledgeable in all facets of emergency response.

## RECOMMENDATION #15

Due to the frequency of crowd management and crowd control incidents that occur in the City of Oakland, it is critical for OPD to develop a trained cadre of OPD professional staff, mid-level leadership, command and executive level personnel who are trained and qualified as Incident Management Team (IMT) leaders.  The IMT concept utilizes trained Incident Command Staff and General Staff personnel who are subject matter experts to plan, supervise and manage an unusual occurrence.  IMT specialized training and leadership experience will minimize planning, operational, and tactical response errors.[20]

# F.  TACTICS, CHEMCIAL AGENTS AND LESS-LETHAL MUNITIONS

## FINDING #16

---

[20] This recommendation was discussed during the OPD Critical Incident Management Training conducted March 24, 2012 where it was mentioned that selected personnel from OPD already performed the IMT function.  This recommendation should include codifying the IMT concept

BEY000165

During the evening deployment (B-Watch) at FOP Park, following the decision authorizing less-lethal munitions and chemical agents, officers from OPD and allied agencies deployed chemical agents from behind bicycle fence barriers.  Protesters retrieved and threw several of these canisters back at the police.  It was during this exchange that the victim of the Level 1 Use of Force was most likely struck in the head with a DSFB ("beanbag") round and critically injured. Immediately following this injury, and while he was lying on the ground, at least one chemical agent canister was deployed by an identified OPD officer into a small crowd that had surrounded the victim to render aid.

We should note that the review team has serious concerns regarding the quality and breadth of the OPD criminal investigation of this event. The review team has received information that the criminal investigation has been closed. It is our belief that OPD should consider a re-examination of the quality of these investigations.

## RECOMMENDATION #16

This is a matter for the OPD Criminal Investigation Division and the OPD Internal Affairs Division to investigate, and for the Chief of Police to resolve.

## UPDATE

Frazier Group's concerns regarding the quality and breadth of the investigations of the two primary Use-of-Force incidents were brought to the attention of the Chief of Police. This information was received favorably, and the investigations have been re-opened.

## FINDING #17

The use of force involving less-lethal impact munitions and chemical agents was not synchronized with on-the-ground tactics to achieve crowd control. Once the dispersal order was given, chemical agents were deployed but there was no dynamic movement by control forces to ensure dispersal of the hostile crowd and to make arrests when appropriate.

## RECOMMENDATION #17

The utilization of less-lethal impact munitions and chemical munitions needs to be combined with the strategy and deployment of Shadow/Extraction Teams and simultaneous dynamic movement of squad sized crowd control units resulting in dispersal and arrest for unlawful activity. Appropriate training in both of these strategies should be completed as soon as possible. NOTE: This training (dynamic movement coordinated with chemical munitions) has begun, and new chemical agent delivery systems have been purchased.

## FINDING #18

36

BEY000166

The unmarked color of the less-lethal Remington Model 870 shotguns used by OPD, and the downloading procedures practiced by OPD, do not comply with contemporary standards and are unnecessarily dangerous.



**RECOMMENDATION #18**

The 12 gauge shotgun less-lethal, specialty impact munitions utilized by OPD for crowd control should be immediately eliminated and replaced by 40mm launchers and selected munitions. Any 12 gauge less-lethal shotgun that is retained in inventory should be painted with clearly distinguishing markings to prevent unintentional usage or tragic consequences due to lack of recognition.

**OPD RESPONSE UPDATE**

As of the date of this report, OPD has purchased new launchers. However, during the April 2012 Frazier Group's on-site assessment it did not appear that the multi-launchers functioned properly, and they have been returned to the manufacturer for modifications. OPD also reports that all less-lethal shotguns in inventory have been color coded.

**FINDING #19**

Current less-lethal munitions and crowd control tactics allow protesters to "throw back" chemical agents dispersed against them. The types of chemical agents, deployment methods, as well as types of less-lethal impact munitions utilized by OPD Tango Team personnel during crowd control situations are obsolete.

**RECOMMENDATION #19**

We recommend that further research should be conducted to identify and evaluate other munitions that are less prone to cause injuries, but are still effective as crowd control devices.

**FINDING #20**

Based on existing policy, deployment and approval of "Specialty Impact Less-Lethal Weapons" on the night of October 25, 2011 may or may not have been reasonable. In any event, each usage within an incident is required to be reported and analyzed separately to ensure compliance with OPD policy.  This policy was not followed the evening of October 25, 2011.

**RECOMMENDATION #20**

BEY000167

This is a matter for the Criminal Investigation Division and the Internal Affairs Division to investigate, and for the Chief of Police to resolve.


## FINDING #21

Less-lethal munitions and chemical agent issuance/usage records for Tango Team members and supervisors do not exist for October 25, 2011.

## RECOMMENDATION #21

OPD should develop a detailed accountability system for issuance, recovery and re-supply of any and all less-lethal munitions (specialty impact and chemical agents) to any Tango Team officer or supervisor. All accounting of less-lethal munitions and chemical agents acquired and/or expended should be available immediately after the conclusion of any incident/event involving their use.  Immediate reporting requirements for specialty impact and chemical agent munitions must also apply to supporting mutual aid responders.

## OPD RESPONSE UPDATE

As of the date of this report, OPD reports that a detailed accountability system has been instituted.


## FINDING #22

According to the B-Watch Operations Section Chief, the Level 1 Use of Force incident was not reported to him until later in the evening (approximately 10:00 PM) by the EOC. The incident occurred at approximately 7:40 PM at the intersection of 14th and Broadway Streets.  After review of hours of video footage involving the injured party (who appears to be approximately 15-25 feet in front of the police skirmish line when he was struck and fell to the ground), the fact that no law enforcement officer, supervisor, or commander observed the person falling down or prostrate in the street during the confrontation was unsettling and not believable. Thus, the mandatory reporting requirement (which would have accelerated both criminal and internal affairs investigations) and the requirement to provide immediate medical attention were ignored.


## RECOMMENDATION #22

This is a matter for the Criminal Investigation Division and the Internal Affairs Division to investigate, and for the Chief of Police to resolve.

BEY000168

# G.  <u>MUTUAL AID</u>

<u>**FINDING #23**</u>

Current OPD policies and practices governing mutual aid assistance within the City of Oakland[21] and protocols ensuring post-event collection of documentation from all participating agencies do not meet current standards and preferred practices.

Review of mutual aid records of the October 25, 2011 incident reveals that most allied mutual aid agencies were allowed to demobilize and return home prior to proper accounting for arrests, injuries, use of force applications, and less lethal/chemical applications.

Advance discussions regarding approved munitions, and timely completion and collection of after–action reporting documentation from all participating law enforcement agencies are critical elements necessary for post event review and analysis.

This information is used for post-event:

- Alleged Criminal or Administrative Investigations (civilian and officer-involved)[22] conducted by the OPD Criminal Investigation Division (CID) and the Internal Affairs Division (IAD)
- Arrest, use-of-force, injury, and property/equipment information
- Inventory use, accountability, and replenishment of munitions.

Examples of documents, information, and evidence the host agency(s) should collect from all MA departments[23] include, but are not limited to:

- Personnel rosters
- Areas of assignment
- Arrest logs and reports
- Use of force incidents
- Injury reports of civilian participants (protesters) and law enforcement personnel[24]
- Command and supervisory structure/chain of command
- Hours and location of arrival and hours of departure

---

[21] *California Government Code 8615.*  OPD is part of Region II in the State of California Mutual Aid structure.  Mutual aid is typically response and assistance for the management and control of large-scale events, provided by law enforcement agencies in the region.
[22] An officer-involved criminal allegation regards CID investigations of sworn department members from mutual aid and Oakland law enforcement that may have occurred in OPD jurisdiction.
[23] Much of the information should be collected by the host agency before enforcement activity commences, e.g. less lethal inventory and descriptions, uniform appearance, command structure, etc.
[24] Within the confidentiality guidelines of *California and Federal law.*

BEY000169

- Inventory and descriptions of less-lethal weapons and munitions pre and post-event
- Documentation chronicling the authority under which less-lethal munitions were used
- Signed acknowledgment of the host agency's use-of-force and other related policies[25]
- Receipt of any administrative or criminal allegations involving mutual aid personnel[26]

## RECOMMENDATION #23

OPD must develop policies and practices that require assertive post-event follow-up to ensure that material that may contain information important to criminal or administrative investigations[27] is acquired as soon as possible. Prior to demobilization, mutual aid agencies should be urged to complete ICS-214 Forms and/or Supplemental Reports detailing force applications, locations applied, officer injuries, and supervisor approval.

If data and information are not collected immediately after a mutual aid event and pre-departure, assignment of an OPD member to oversee and ensure collection, including establishment of a timely deadline, must be made.

## FINDING #24

Review of the IAP and Operations Plan Annex for the B-Watch reveals that Mutual Aid resources were utilized to defend FOP Park primarily due to the shortage of OPD personnel. Mutual Aid resources were inter-mixed with OPD tactical resources at locations where multiple use of force applications occurred. Allied agencies should not be comingled with OPD personnel when they have not trained together previously. Allied agencies should function under the mission concept and be responsible to OPD. As depicted on video, several agencies were interspersed with OPD in defending FOP Park, causing accountability for inflicting injury to protesters to be severely hampered.

## RECOMMENDATION #24

Mutual Aid resources should not be deployed, even under extreme conditions, to positions where comingling with OPD tactical resources will occur. Mutual aid resources are normally best utilized with department and unit integrity, and used for infrastructure protection, custody and control of arrestees, perimeter security, and fixed post positions, etc.

---

[25] *California Government Code* §8618: Unless otherwise expressly provided by the parties, the responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident, including the direction of personnel and equipment provided him through mutual aid.
[26] Within the confidentiality guidelines of *California and Federal Law.*
[27] Officer-involved and civilian allegations.

BEY000170

## FINDING #25

The circumstances that precipitate a request for and the deployment of mutual aid resources need to be clearly defined within the OPD Mutual Aid Policy. This policy should include, and clearly articulate, both OPD responsibilities and responding agency responsibilities. A review of the A-Watch (day) briefings for October 25, 2011 provided by OPD showed that PowerPoint slides were utilized to prepare the mutual aid agencies for their roles in the operation.

During the "Force and Arrest" presentation, the briefing included specific direction to outside agencies regarding:

- Outside LE agencies should only deploy chemical agents at the direction of OPD
- Outside LE agencies should not use electronic weapons on crowds
- Outside LE agencies should not use weapon launched less-lethal impact munitions unless directly threatened by an individual who is an imminent threat to their safety

During October 25, 2011, at 14th and Broadway Streets it was unclear if outside agencies followed the guidance described above.

OPD's Mutual Aid Policy includes responsibilities that exceed those described in the 2009 Edition of the Law Enforcement Mutual Aid Plan, by Cal E-M-A as they relate to reporting use of force incidents, injuries and arrests prior to demobilization. Based on review, it is important that the requesting agency, in this case OPD, has accurate information as to the actions of allied agencies that assisted during an emergency incident.

## RECOMMENDATION #25

OPD's Mutual Aid Policy should include sections that clearly define the following responsibilities:

Oakland Police Department responsibilities:

- Identifying numbers and types of mutual aid resources requested
- Identifying specific "missions" for mutual aid responders (Missions should include facilities protection, traffic control, perimeter management etc. Mutual Aid agencies should be deployed as support to host agency)
- Advising mutual aid responders what equipment is preferable
- Establishing an assembly area for responding resources
- Identifying communications channels compatible with command and control of field resources
- Designating an OPD liaison officer (or pathfinder) to guide and to facilitate a coordinated assimilation of responding mutual aid resources

BEY000171

- Preparing a situation briefing including local maps for mutual aid responders
- Providing logistical support such as food, lodging, rest intervals and equipment maintenance as appropriate, for mutual aid personnel
- Briefing responding agencies regarding any "settlement agreement" issues required by OPD
- Requiring the responding agency to provide OPD with documentation of any/all use of force incidents, locations of occurrence, injuries, arrests, discharges of less-lethal munitions (chemical agents and/or specialty impact munitions) prior to being released from mutual aid or as soon as possible

Responding agency responsibilities:

- Equipping its personnel
- When possible, assigning the appropriate level of supervision to maintain unit integrity and accountability
- Completing response rosters (ICS-214 Forms – Unit Log)
- Dispatching personnel to the staging area
- Providing relief for assigned personnel at protracted events
- Record keeping as to dates and times of arrival and departure, rank, timekeeping, mileage, damage and expended resources
- Accounting for arrests, injuries, and use of force applications

# H. <u>USE OF FORCE AND REPORTING</u>

## FINDING #26

The number and types of force applied during the October 25, 2011 incident have not yet been individually evaluated by an OPD Use of Force Review Board for their reasonableness and adherence to policy.

## RECOMMENDATION #26

The number and types of Level 1 and Level 2 use of force applied during the October 25, 2011 incident should be individually evaluated by an OPD Use of Force Review Board for reasonableness and adherence to policy in a timely manner. In addition, Use of Force incidents should be reviewed for potential criminal misconduct both prior to submission to the Use of Force Review Board and by the Use of Force Board membership.  If determined there is reasonable suspicion criminal misconduct occurred, this matter should be assigned to the Criminal Investigation Division and the Internal Affairs Division to investigate, and for the Chief of Police to resolve

## FINDING #27

BEY000172

OPD policy requires that Level 1 and 2 use of force applications are to be reviewed by the department Force Review Board.  The Level 1 and 2 use of force incidents during the October 25, 2011 - an event six months ago - have yet to be individually evaluated for policy compliance by the OPD Use of Force Review Board.

## RECOMMENDATION #27

OPD policy requires when a Level 1 force event occurs, both the Criminal Investigations Division (CID) and the Internal Affairs Division (IAD) conduct investigations.  Ultimately, the OPD Force Review Board will review the incident for policy compliance.  Level 2 use of force incidents require a written supplemental report from the officer(s) who used force, and a subsequent over-arching Use of Force Report by a supervisor or command officer.  The purpose of the report is to evaluate all relevant information and make a determination regarding compliance with policy.  If it appears as some stage of the review by the supervisor that the use of force may have been out of policy or criminal, IAD and/or CID are notified.

Regardless whether a use of force event is considered a Level 1 or 2, the use of force is eventually reviewed by the Use of Force Review Board to determine compliance with policy, possible training issues, necessity for policy revision, chain of command accountability, etc.

The organizational advantages that result from *timely review* are substantial.  The OPD must develop policy and practices which facilitate evaluation of force circumstances more proximate to the date of the event.

## FINDING #28

Within 72 hours following any "critical incident" (significant use of force, officer involved shooting, unusual occurrence, etc.) the Chief of Police and appropriate subordinate staff should conduct an immediate review of the preliminary facts ("Hot Wash"). This is designed to determine if immediate changes in policies, tactics, or training need to be implemented.  This commonly-used practice prevents mistakes from recurring, and permits needed tactical, policy, procedure, and training modifications to be implemented immediately.  This initial critical incident review is not a complete compilation of facts. Its purpose is to provide preliminary insight into what occurred, and allows immediate course corrections for future actions that are similar in nature, whether related to the original incident or not. This critical process was not in place within OPD at the time of the Occupy Oakland incidents on October 25, 2011, and several subsequent events.

## RECOMMENDATION #28

OPD should institute a practice of rapid (within 72 hours) review of any critical incident with a view to real time or long term adjustment (if necessary) to tactics, policies, procedures, logistics, and training.  This Finding and Recommendation has been

BEY000173

communicated to OPD, and efforts are underway to structure a formalized debriefing and/or Hot Wash process.

## FINDING #29

OPD policies and practices regarding completion and content of Use-of-Force reports do not meet current standards or preferred practices.

OPD personnel are guided by policy when using force.[28] OPD personnel are required to document their Use of Force or their individual presence during a Use of Force incident, in an appropriate form when it is an "investigated Use of Force."[29]  Additionally, OPD members and outside agency personnel are required to complete supplemental reports regarding their observations and activities during "a major crowd disturbance"[30] such as the Occupy Oakland activities on October 25, 2011.  This mandate, in the Operational Plan, would likewise include many of the peace officers on-site under mutual aid. Members who use force during a major crowd disturbance are also required to document each Use of Force.[31]  OPD field supervisors (typically sergeants) are required to collect the supplemental reports, review them for content and accuracy, and submit the reports to their commanding officer as a package.[32]  The field commanders are to transmit the supplemental reports to department members assigned responsibility to complete crime and Use of Force reports.[33]

An unacceptable number of OPD Use of Force and participant-officer reports written post-Occupy Oakland October 25, 2011, were inadequate.  Training, mutual aid advisories and collection of the reports from OPD and mutual aid personnel were deficient.

## RECOMMENDATION #29

OPD must research and establish a comprehensive Use of Force reporting policy at both the departmental and the individual levels. In addition, the authors of the reports, supervisors, and command personnel should be held accountable for their individual

---

[28] Department General Order K-03, and OPD Training Bulletin III-G Crowd Control and Crowd Management Policy.
[29] Negotiated Settlement Agreement with Stipulations, RE: Pattern and Practice Claims, Revised Dec. 2008, and OPD Department General Order K-4, and OPD Training Bulletin III-G Crowd Control and Crowd Management Policy.
[30] OPD  Operations Plan 25 Oct 11 by M. Poirier
[31] Ibid.
[32] Ibid.
[33] Ibid.  Typically, once all supplemental USE OF FORCE reports are collected, at least one department member is designated to complete an over-arching USE OF FORCE Report (TF-967) which documents their USE OF FORCE investigation and their recommendation regarding the appropriateness of the USE OF FORCE when measured against policy and law. A variety of procedures follow the submission of the completed USE OF FORCE Report package. See OPD Department General Order K-4.

44

BEY000174

reviews and approvals.  Minimum requirements for Use of Force and participant-officer reports should incorporate, among other elements, the following:

- Date and ending time of the report (preferably on each page of the report)
- Legible signatures, ID/badge numbers, and helmet numbers
- Name of supervisor and commander
- Identity of team, squad, unit, or platoon
- Primary assignment during the event, and subsequent changes thereto
- Identification, possession and time/location use of a PDRD, and if not in possession or not used, the reasons why
- Personal injuries, or likely injuries to civilian personnel, and related circumstances and whether any evidence (photos, witness accounts, medical reports, etc.) are available
- Personal Use of Force, type, circumstances, authority and reasons, percipient activity, and similar information
- Observation, knowledge or possession of evidence
- Chain of custody of any/all prisoners
- Any observations of injury or complaints of pain to the officer or from an arrested or detained person

NOTE: Some of these elements are already required, but compliance has been inconsistent at best.


**FINDING #30**

OPD inventory reports of less-lethal ammunition and chemical munitions, and requirements and auditing of same, do not meet current standards or preferred practices.  In addition, the documenting of equipment, less-lethal ammunition and chemical munitions, and less-lethal weaponry in possession and used by mutual aid departments, was insufficient.

During our effort to identify less-lethal ammunition and munitions in possession of individual members of OPD, immediately prior and subsequent to the Occupy Oakland events of October 25, 2011, it was determined the inventory, reporting, and assignment process was flawed or non-existent. This includes both OPD personnel and OPD's systems to identify and account for the same on-scene information from Mutual Aid. This inattention prohibited accountability of ammunition and chemical munitions deployed at the Occupy Oakland event.

In the IAD and CID chapters of this report, the necessity to reconcile information for purposes of veracity, accountability, and quality assurance is highlighted.  Accountability for less-lethal weapons, ammunition and munitions facilitates a critical audit trail.

**RECOMMENDATION #30**

45

OPD must research and develop policy, and institute practices, which ensure the following:

- Accurate pre-event inventory of less-lethal weapons, ammunition, and chemical munitions
- Quarterly audits of inventory that are independently and objectively performed by a third party.  Inventory reconciliation should also occur immediately following the assignment/possession of the equipment for actual or use (e.g. training, re-location, demonstrations, hostage-barricade, etc.)
- Accounting for weapons, ammunition and chemical munitions in possession of each OPD member authorized to possess and use, prior to and immediately after an event
- Account for weapons, ammunition and chemical munitions in possession of each MA member authorized to possess and use, prior to and immediately after an event

## FINDING #31

OPD policies and practices regarding Personal Digital Recording Devices (PDRD)[34] must be significantly modified to address routine usage issues as well as use which is unique to long-term crowd management & control events.

The OPD Operations Plan for Phase 1 - the morning or A-Watch - directed that officers assigned PDRD's shall activate the camera per department policy.[35]  The Operations Plan for Phase 2--the evening or "B" shift--was more precise; directing that personnel who had been issued a PDRD were required to wear it and to activate it if directly engaged with the crowd.  This was an astute and forward-thinking enhancement to standard policy.

## RECOMMENDATION #31

As a result of document review and interviews, concerns regarding the use of PDRD equipment during Occupy Oakland (and in day-to-day operations), particularly on October 25, 2011, the following issues have been identified and must be corrected:

- OPD needs to clarify the purpose, policy, capacity, and limitations of the PDRD to the community
- An absence of standing OPD policy addressing use during crowd management and control events
- Physical retention and loss of the PDRD,[36] and the number of PDRDs lost during Occupy Oakland events

---

[34] An audible and video recording device attached to an officers uniform, powered by a permanent battery.
[35] OPD Department General Order I-15.1, March 2011.
[36] The device does not secure well to the uniform during intense physical encounters.

BEY000176

- Number of PDRD devices which were not operable, yet had not been submitted for repair or replacement
- Timelines for retention[37] of PDRD recordings

## OPD RESPONSE UPDATE

As of the date of this report, OPD reports that they are in the process of working through a number of technical issues with the PDRDs (capacity, download time, and better attaching clips). They also report that the recommended policy revision is being developed.

## FINDING #32

OPD policies and practices regarding responsibility for the Operation Use of Force reports,[38] and the collection and submission of individual supplemental Use of Force reports, do not meet contemporary standards or preferred practices.

OPD policy[39] requires that supervisors of members who use Level 2 or Level 3 force must investigate and complete a Use of Force report (TF-967). Included in the report is a recommendation from the supervisor that finds the Use of Force within or outside of policy. The Operations Plan for both "A" and "B" Watches on October 25, 2011, directed that a report writing team of one sergeant and two officers would be designated by the Incident Commander. Their responsibility, in part, was to complete a Mass Use of Force Report. In essence, this would require collecting individual officers' reports and review, investigate, document, and make a finding for each individual Use of Force. This is an *immense* responsibility, given the volume of reports, and requires reconciliation of many different forms of documentation. Additionally, department policy dictates Use of Force reports must be completed within 15 days.[40]

Collecting and indexing reports was problematic. Original supplemental reports[41] were provided to the designated Use of Force report writer. However, many original supplemental reports were not submitted for indexing and archiving after provision to the Use of Force Report writer. One department executive said that many original supplemental reports were retained by the Use of Force author (rather than copies made), and ultimately sent to the Internal Affairs Division along with the Use of Force report. Some concerns arise: Timely crime data may not be entered into appropriate-- often mandated--data bases, statistical information may be difficult to establish, and

---

[37] Current policy is to retain for five years, however, as real evidence the video & audio recording should be retained for a period far exceeding five years in significant investigations, anticipated appeals, extended civil suits, 3 Strikes convictions, unsolved felonies, etc.

[38] OPD TF-967

[39] OPD Department General Order K-4.

[40] This time period was extended when realized it was not possible to meet the 15 days for the OCCUPY OAKLAND event.

[41] Reports written by officers who used force, witnessed force, or were otherwise involved in a USE OF FORCE situation.

BEY000177

reports may not be available for follow-up criminal investigation nor forwarded to the Office of the District Attorney for consideration of a criminal complaint.  California Public Records Act requests may be frustrated.  Some reports were not completed, submitted, or located.

The designated Use of Force writer for two complex, high-profile Use of Force events (not IA investigations) on the October 25, 2011, B Watch was an Internal Affairs sergeant.  The sergeant was *also* assigned a very intense administrative investigation (IA) which allegedly occurred during the *same* shift.  Both the Use of Force report and the administrative investigation could reasonably have involved the same OPD personnel.  Additionally, the Internal Affairs sergeant had been assigned a uniformed position during the "A" shift and participated in an arrest earlier the same day.  Since department policy directs that Use of Force reports must be completed in 15 days, while Use of Force IA investigations must be completed within 180 days, the decision was made by the sergeant to complete the Use of Force report first in order to remain compliant with policy.  This left very serious IA investigations to languish. The crossover of information between the Use of Force report and the IA investigations, the volume of responsibility assigned to the sergeant, timelines, and a potential conflict of interest due to the sergeant's participation in the same event earlier in the day, are all problematic.

While the Use of Force reports on B-Watch were not completed within policy deadlines, they were eventually submitted through the chain of command for review.  However, the reports were deficient[42] and had to be returned for additional work.  This may occur in part because the author of some Use of Force reports may not possess requisite expertise as it relates to the issues reviewed; in this case, the strategies, tactics, weapons, and munitions used on October 25, 2011.

## RECOMMENDATION #32

OPD must revise department policy as it pertains to writing supplemental Use of Force reports as well as their collection, review, and approval by supervisors. Likewise the policy of one person being assigned overall responsibility for the Use of Force report-investigation-findings must be revised. One OPD executive stated that the assignment of Use of Force reports resulting from an event such as Occupy Oakland, can remove a member from their primary responsibilities for *months*. It should be noted this issue has been brought to the attention of OPD command, and efforts are in progress to address the issue of excessive volume of force-review assigned to one person.

## FINDING #33

OPD practices regarding "group reporting"[43] or collaboration following use-of-force events do not meet current standards or preferred practices.

---

[42] In large measure a re-iteration of the supplemental Use of Force reports.
[43] OPD Department General Order K-4.

BEY000178

## RECOMMENDATION #33

OPD policies regarding "group reporting," when various levels of force are used, are clear.[44]   However, as a result of interviews and report review, it appears opportunities for group reporting existed, and may have occurred, following the possible use of Level 1 and Level 2 force during the Occupy Oakland event on October 25, 2011.   OPD executive staff is aware of the concerns, and are encouraged to review events and establish factual information regarding policy compliance. The Finding is, at a minimum, an appropriate topic for review by the Office of the Inspector General, and for policy modification if necessary. Ultimately the matter must be resolved by the Chief of Police.

## FINDING #34

OPD policies regarding the reporting and investigating of Level 2, 3 and 4 Use of Force do not meet current standards or preferred practices.

OPD policy[45] directs that if any Use of Force investigation (involving patrol personnel) indicates misconduct (administrative or criminal), the supervisor or command officer shall complete, at a minimum, a Level 2 Use of Force investigation.  This would require, in part, collecting reports and interviewing involved personnel. The policy requires ensuring compliance with all provisions of the Peace Officers Bill of Rights.[46]

Issues associated with policies and practices surrounding OPD's investigations of criminal allegations involving a department member are highlighted in the IAD and CID chapters of this report.   In essence, the report recommends OPD consider more assertive use of CID when criminal allegations are possible.

Potential conflicts arise when an indication of criminal or administrative misconduct is identified by the on-scene supervisor or commander, and their investigation, as required by policy, continues when CID and IAD should be (or may have been) notified and involved.   Completing many of the requirements as outlined in DGO K-4, when performed by patrol supervisors or command officers, may not ensure a robust, thorough, and legally conducted investigation, and may conflict with the efforts of CID and IAD.

## RECOMMENDATION #34

OPD must review policy regarding Use of Force reporting, and make revisions as they relate to Use of Force investigations[55] that indicate possible criminal and or administrative misconduct.

---

[44] Ibid.
[45] Ibid.
[46] California Government Code sections 3300-3313.

BEY000179

# I. <u>ARRESTS</u>

## <u>FINDING #35</u>

In review of the Operations Plan for October 25, 2011 (dated 14, October, 2011, Section E, page 4) reference is made to "Use of Force in Major Crowd Situations."  It reads "Officers shall make an effort to arrest suspects when force is used to gain compliance." During crowd control and crowd management efforts on Oct. 25, 2011, there were a number of incidents where less-lethal force was used by OPD. However, virtually no effort was made to take the suspects into custody when it would have been reasonable to do so.  This was particularly evident between the hours of 7:30 PM and 11:30 PM in the vicinity of 14th and Broadway.  Early physical arrest efforts against protesters who chose to violate law - notably those individuals who assaulted peace officers - would have diminished the protracted use of less lethal force, likely compressed the time span of violent activity, and helped to facilitate the legitimate intent of 1st Amendment protesters.

## <u>RECOMMENDATION #35</u>

The decision to use force against individuals who violate the law needs to be done in concert with a strategy of deploying Quick Response Teams and/or simultaneous dynamic movement of squad-sized crowd control elements.  P.O.S.T. certified training curriculum must be developed and implemented as soon as possible, incorporating focus on all rank structures in OPD.  Modern equipment with commensurate training must be considered.  Finally, policy must be revised to represent current standards and preferred practices when managing crowds.  The Incident Management Team (IMT) and Crowd Control Coordinator[47] must be appointed and held accountable for prompt action on this recommendation.

## <u>OPD RESPONSE UPDATE</u>

As of the date of this report, OPD reports that they are in the process of developing the recommended curriculum.

## <u>FINDING #36</u>

The Operations Order for October 25, 2011, "Report Writing". Page15c.  states that "All personnel involved in the operations shall complete a supplemental report along with a Suspect's Page in cases where officers arrest suspects." Supplemental Report Forms (ICS 214) documenting arrests, injuries, use of force incidents (not involving hospitalization), and munitions expended by any involved law enforcement agency

---

[47] See Findings and Recommendations 13 and 14.

BEY000180

should be submitted to the OPD Planning Section, Documentation Unit prior to being released from duty or mutual aid. These requirements were not met the evening of October 25, 2011, and most have not yet been turned in at all.

## RECOMMENDATION #36

Prior to demobilization, OPD and all participating mutual aid agencies should complete ICS-214 Forms and/or Supplemental Reports detailing arrests, injuries, force applications, and locations where applied. Supervisors involved should also review and approve these forms while still on site.  These reports should be turned in to the OPD Planning Section Chief prior to demobilization.


## FINDING #37

Review of the Supplemental Reports provided by OPD indicated the arrest/ charging section for most arrestees in the early morning was 647e PC (Penal Code, Disorderly Conduct e.g., Lodging), following the declaration of an unlawful assembly order and failure to disperse.  While OPD did consult with the City Attorney's Office, which advised the use of "lodging" as the arrest authority section, Frazier Group feels that there are legal issues involving the selected OPD predicate arrest authority of Penal Code Section 647e, "Disorderly Conduct, e.g., "lodging. At the time of the eviction (approximately 5:00 AM), and with advance knowledge by Occupy Oakland protesters (who were awaiting the arrival of OPD), many persons present were not inside structures indicative of "lodging."   Furthermore, the definition interplay between sleeping, camping, lodging etc. is not new.   There is potential conflict with such predicate actions as cited in Supreme Court case: *Clark v. Community for Creative Non-violence, (1984) 468 U.S, 288.*

## RECOMMENDATION #37

In consideration of predicate arrest authority sections when involved in crowd control and mass arrest situations, consultation with the District and/or City Attorney specifically focusing on Time, Place, and Manner issues should occur.



# INVESTIGATIONS (GENERAL)



## FINDING #38

BEY000181

During the Frazier Group investigation of the October 25, 2011 events of the Occupy movement, 27 interviews were conducted, hundreds of documents were reviewed, and hours of video evidence from OPD personal digital video recorders, media, and internet footage were analyzed.  During the interviews and review of video footage it became apparent that the OPD investigations, including investigative status, accountability of munitions deployed, injuries, mutual aid resources and activities, and so forth required the services of experienced, unbiased investigators not available to OPD.  Additionally, Frazier Group uncovered apparent conflicts between what was reported by OPD personnel and what the video imagery showed.  Additionally, it was abundantly clear that not all necessary investigative steps were taken.

**RECOMMENDATION #38**

Currently, the Chief of Police has directed a bifurcated investigation of both criminal and internal aspects of this event involving use of force incidents.  Both internal criminal and administrative investigations should be monitored or conducted by an outside entity.


## J.  **INVESTIGATIONS (CRIMINAL)**


**FINDING #39**

Current OPD policies and practices to evaluate and identify potential officer-involved criminal activity[48] do not meet current standards or preferred practices.

**RECOMMENDATION #39**

Cases currently under investigation by OPD stemming from the Occupy Oakland incidents require a more in - depth and aggressive review.  If there were belated decisions to investigate an officer-involved allegation criminally, a review of the decision-making process should determine why there was a delay, and what can be done to prevent similar delays in the future.



**FINDING #40**

Existing OPD policies and practices do not meet current standards and preferred practices regarding assertive, thorough, objective, and appropriate criminal and administrative investigative processes.  In particular, these policies and practices have impeded on-time opportunities to establish fact patterns regarding public safety actions

---

[48] Examples may include reasonable suspicion of excessive use-of-force, assault under color of authority, etc.

BEY000182

prior to, during, and immediately following the collapse of xxxx, and other high-profile events throughout the course of Occupy Oakland.

## RECOMMENDATION #40

A Level I Use of Force investigation (a high-level administrative investigation), may reveal information regarding what agency(s) were involved, which officer may be responsible for the use of force, consideration of all possible criminal activity, and the roles of supervision and command. Investigations can disclose actions by law enforcement that may include, but are not limited to, being:

- Non-contributory to an individual's injury
- Unintentional and/or accidental - although possibly a violation of the Manual of Rules*
- A purposeful intent to use appropriate force resulting in unintended consequences*
- A purposeful intent to use inappropriate force in violation of the Manual of Rules/Department General Orders
- A willful intent to use inappropriate force in violation of California and Federal criminal statutory law, including civil rights violations*

OPD must assess what diligence has been made in gathering information pertaining to the xxxx injury. Inquiry should include, but not be limited to, the following:

- What public safety personnel observed, or reasonably should have observed, cause of injury to xxxx, his collapse, and prostrate position on the ground?
- What efforts were made to immediately identify potential witnesses,[49] and/or what efforts were made post-event to identify and contact witnesses?
- What efforts were made, and how timely were the efforts, to ensure potentially involved public safety personnel and their less-lethal weapons, ammunition, Personal Digital Recording Devices (PDRD), inventory rosters, and other potential evidence, were identified and secured?[50]
- What efforts were made to make sure personnel who were potentially involved [51] were not permitted to communicate,[52] or would be pre-maturely afforded information, about any investigation?[53]

If appropriate, policy revision and/or training curricula should be developed to prevent any similar future delays or oversights regarding both the investigative process and the results of the investigations.

---

[49] *OPD Department General Order K-IV.*
[50] Ibid.
[51] As potentially culpable or as a witness.
[52] Sometimes referred to as "huddling."
[53] Recognized as fundamental investigative procedures, and related to *OPD Department General Order K-IV.*

BEY000183

## FINDING #41

Current OPD policies and practices do not meet current standards or preferred practices regarding the level of gravity[54] associated with officer-involved criminal allegations, and their commensurate investigations.  CID investigative activity related to potential or confirmed officer-involved criminal allegations must be more diligent, robust and objective.

Deciding which[55] officer-involved allegations are adopted for criminal investigation (often precursory to an administrative investigation), how criminal investigations proceed,[56] and the degree to which leaders seek criminal prosecution, all potentially serve as indicators of departmental ethics and values.

## RECOMMENDATION #41

OPD must review department policy and practice regarding officer-involved criminal allegations.  This should include policy and training that incorporates organizational values, principles, and expectations.  Current policy[57] may serve as a baseline. Criminal and administrative investigations are imperative, though they serve entirely different yet important purposes.  The Internal Affairs Division should not bear the department's sole responsibility for establishing the facts and fostering accountability. The final decision and order to assign cases to CID rests with the Chief of Police.

## FINDING #42

Current OPD policies and practices delegate inordinate discretion to the Criminal Investigations Division (CID) commanders to decide whether or not to initiate[58] an officer-involved criminal investigation.  In addition, OPD policies and practices reveal that members of both CID and IAD chains of command should be more aware of timely information specific to officer-involved criminal and administrative investigations as it is developed.

## RECOMMENDATION #42

OPD policy[59] regarding the investigation of felony and "serious" misdemeanor allegations against OPD officers is general in nature and inconsistent in practice.  On

---

[54] The impacts and influences on community trust, organizational standards, determining patterns and practices, etc.
[55] And the criteria for doing so.  In most organizations, typically the final decision to criminally investigate rests with the Office of the Chief of Police.
[56] Including the expansiveness, identification of potential criminality, and intensity of investigative effort
[57] Including but not limited to *Department General Order M-4, M-4.1, K-4, and the Negotiated Settlement Agreement.*
[58] *OPD Departmental General Order M-IV.I.*
[59] Ibid.

BEY000184

October 25, 2011 (and in subsequent Occupy Oakland events), actions by some OPD members[60] provided reasonable suspicion that an officer-involved criminal act may have occurred.

OPD practices subsequent to the development of reasonable suspicion that a department member may have been involved in criminal activity are inconsistent.  When interviewed, some OPD members indicated discomfort with current practices, and stated the investigative process often occurs as follows (paraphrased):

1. IAD becomes aware of an officer-involved criminal allegation
2. IAD command personnel contact CID command personnel and provide a brief about the allegation
3. CID command gives consideration whether or not to conduct an officer-involved investigation
4. CID may opt to not investigate, but rather be kept updated if further information arises
5. If CID opts to not investigate, but IAD personnel believe a criminal investigation should occur, IAD will work to persuade CID to pursue an investigation, often with success, but at times without
6. Regardless which division(s) conducts the investigation; the chain of command is not aware of current case information.

The OPD must obligate itself to review and update current policies and practices used when allegations of criminal misconduct are made against OPD members. It is vital that top executives are notified without delay in any such allegation, and that subsequent direction be provided immediately.  One policy and practice model is as follows:

- Allegation of criminal misconduct involving a department member comes to the attention of, or is discovered by, OPD IAD Intake.
- The IAD chain of command is immediately notified of the circumstances surrounding the allegation
- The Office of the Chief of Police is notified without delay
- If the Chief of Police concurs reasonable suspicion exists that criminal misconduct occurred, the Chief of Police considers ordering the following be done:

   1. CID command to initiate a criminal investigation
   2. CID keeps IAD abreast of all significant investigative activities (interviews, interrogations, etc.)
   3. IAD monitors, but does not contribute to, the CID investigation
   4. The Chief of Police, or his designee, is provided timely updates on the progress of the CID investigation
   5. Regardless of investigative findings, the case is reviewed by CID command first, then the Alameda County District Attorney for input

---

[60] Some incidents were recorded on commercial Bay Area news television and amateur videos uploaded to YouTube.

BEY000185

related to additional investigative steps, quality of the investigation, a decision about filing or not filing a complaint, and the reasons for the decision documented in the case file

6. Dependent upon the gravity of the allegation, IAD may conduct a parallel investigation, or withhold investigative steps until the CID case is completed and returned from the District Attorney.[61]

7. The Chief of Police or his designee may facilitate a post-investigation de-brief for lessons learned.

The intent of this Recommendation is to create a process whereby the Chief of Police is notified, without delay, of potential criminal allegations and makes the decision whether to refer the investigation to CID. The Chief of Police is responsible for directing the internal response, but can only do so when appropriately informed by the chain of command.

## FINDING #43

Current OPD policies and practices, regarding the degree to which some CID supervisory and command staff interact with their subordinate chain of command, do not consistently meet current standards and preferred practices.

## RECOMMENDATION #43

Interviews and case review reveal a necessity for some CID supervisors and command officers[62] to be more proximate to important investigations assigned to their personnel. It is vitally important that high-profile, sensitive, confidential, and major investigations, are closely monitored by supervisors and command officers.  Establishing an investigative plan, providing insight and advice, identifying risk and ministering counsel to avoid missteps, consistent communication with subordinates and superiors, and holding personnel to account for professional work results, are required.

OPD must review policies, training, and the actual practice of CID commanders and supervisors as they relate to ongoing investigations.

## FINDING #44

Current OPD policies and practices, regarding risk management and quality assurance of IAD and CID investigations, do not meet current standards and preferred practices. Additionally, current OPD policies and technology do not meet current standards regarding equipment and software necessary to adequately compare and reconcile information available from multiple sources.

---

[61] Remaining attentive to the status of the department member during the investigation, and the requirements of *California Government Code 3304.*

[62] Command officers are typically lieutenants (mid-level managers) and captains (upper-level managers)

BEY000186

## RECOMMENDATION #44

The OPD would benefit from a robust policy and practice that ensures that investigations in both CID and IAD are diligently reviewed and audited by OPD's Office of the Inspector General. Following the events of October 25, 2011 (and subsequent Occupy Oakland events), a substantial number of criminal and administrative investigations became the responsibility of OPD IAD and CID.  A sampling indicates an opportunity to incorporate department policy that assures *early recognition of complaint categories and consistent review of investigators' work.*

For example, does the PDRD recording corroborate written documentation?   Is departmental training congruent with law and policy?  Is public video consistent with CID interrogatory questions and answers?  Is data maintained in one CID unit available to other units?

OPD should explore the means (technology-based or manual) to correlate, and validate, information as it relates to both CID and IAD investigations.  The data to be "cross-checked" and reconciled should include, but not be limited, to:

- Internal stand-alone databases
- PDRD, Internet, OPD video team, and commercial video and  photos
- Communications (9-1-1 and dispatch) recordings and CAD event text
- OPD Department policy[63]
- Operations and Incident Plans

## FINDING #45

Current OPD policies and practices, regarding CID efforts to utilize subject-matter experts[64] and provide IAD of advance notice when important CID activities in an officer-involved investigation occur, do not meet current standards and preferred practices.

## RECOMMENDATION #45

As with IAD investigations, CID investigators should be vetted for conflict of interest or perception of bias when they are assigned to officer-involved criminal investigations. OPD must insist, to the degree possible, the same level of objectivity be borne by outside persons that participate, monitor, or are otherwise engaged in any facet of the

---

[63] *Manual of Rules, Training Bulletins, Special and General Orders, Bureau-Division-Unit policies, etc.*
[64] Not simply allegation specific (domestic violence, narcotics, police tactics and use-of-force) but experts in policy and practices surrounding the process of investigating law enforcement personnel.

BEY000187

investigation.[65] Examples of outside persons are forensic experts agencies outside of OPD, and presenters at Force Review Boards.

OPD should consider the advantages of developing policy which includes:

- Requiring   notification of Internal Affairs *prior* to CID commencing with meaningful investigative steps[66]
- If necessary, assigning a recognized expert with a demonstrated history of impartiality related to officer-involved CID investigations
- Ensuring proximate involvement of supervisory and command personnel
- Discounting real, or appearances of, conflicts of interest or partiality


**FINDING #46**

Current OPD policies and practices, regarding the release and communication of information obtained from an Internal Affairs (administrative) investigation to criminal investigators (and others who do not have a need or right to know), do not meet current standards and preferred practices.


**RECOMMENDATION #46**

State laws regulate confidentiality of personnel files,[67] access/use of the files,[68] and/or information obtained as a result of information in the files (the fruits of the information). It may be arguable, dependent upon case-by-case circumstances, exactly what information procured by IA investigators may be provided to criminal investigators, and what information may be deemed a part of a "personnel file,"[69]  and thus restricted in the access and release of information.  However, statutory law is clear that information obtained as a result of a compelled *Lybarger* statement (or fruits of that statement) from a subject officer interrogation *may not* be used for criminal prosecution purposes, absent some unique circumstances.[70]

To avoid any perception or reality the Internal Affairs process could:

- Be used as an extension of, or "back door" source of information to criminal investigators
- Improperly(accidental or otherwise) provide information that is used in the criminal arena

---

[65] City Attorney's Office, crime labs, District Attorney's Office, outside agency personnel, etc.
[66] While IAD will monitor the investigation, they shall not participate, choreograph, or suggest a course of action by CID.
[67] E.g. *California Penal Code section 832.5, 832.7, and 832.8.*
[68] *California Penal Code, Evidence Code, Civil Code.*
[69] *California Penal Code section 832.5 and 832.8.*
[70] E.g. *California Penal Code section 832.7*, *California Government Code 3304, California Evidence Code,* criminal court impeachment of officer's alleged false testimony.

BEY000188

- Compromise sensitive and/or confidential personnel information, and thus a criminal investigation,

Many law enforcement agencies severely restrict the degree of communication from IA investigators (and associated files) to criminal investigators.  In many departments, the information IA investigators communicate to criminal investigators is limited to witness and complainant contact information, and the discovery of additional alleged criminal activity which should be criminally investigated.

OPD should diligently review existing policies and training regarding communication of information CID receives from IAD.  Both IAD and CID personnel must be circumspect, and well trained regarding this issue.


**FINDING #47**

Current OPD policy and practices do not meet current standards and preferred practices regarding personnel who are in critical assignment[71] positions, to ensure:

- Redundancy
- Expertise
- Staff availability 24/7/365

**RECOMMENDATION #47**

Declaring a Level I Use of Force creates an immediate response requirement for both IAD and CID investigators to commence investigations. Lack of availability of investigative personnel during an Occupy Oakland incident provided reasons for concern. In anticipation of future events, and recognizing the tremendous value in immediate investigative response, policy and practice must be enacted to ensure CID personnel are appropriately available.




**FINDING #48**

Current OPD policy and practices regarding the assignment of evidence technicians do not meet current standards, preferred practices, or the needs of a large-city police department.

---

[71] CID, IAD, etc.

BEY000189

OPD evidence technicians are presently assigned to the patrol structure and work out of the Eastmont substation.  No evidence technicians are assigned full-time, explicitly to major crimes or homicide investigations.

The investigation of homicides and other major crimes (officer-involved allegations similar to those related to Occupy Oakland events)[72] is a law enforcement specialty in and of itself.  Developing OPD evidence technicians into specialists intimately familiar with the intricacies of homicide and other criminal evidence[73] is a high priority need that would greatly strengthen OPD's professional investigative capacity.

## RECOMMENDATION #48

OPD should conduct a cost/benefit analysis of assigning a limited number of evidence technicians to the homicide unit(s) or elsewhere in CID.  Part of the analysis should include on-site reviews of the homicide investigative organization in other major cities, and should be done collaboratively with all stakeholders.


## FINDING #49

Current OPD policy and practice regarding the assignment of IAD and CID personnel create potential conflicts of interest.

Interviews and review of policy and practices disclosed issues of concern regarding CID and/or IAD investigators, as they relate to Occupy Oakland activities.  To illustrate:

1. During the Occupy Oakland event on October 25, 2011, (and subsequent events) several members of the OPD IAD, of many ranks, were assigned to field positions on both the morning (A Watch) and afternoon (B Watch) shifts.  Other CID and IAD investigators may have been assigned to site security, liaison with mutual aid agencies as they conduct enforcement activities, mass arrest responsibilities, and so forth.

Assigning OPD CID/IAD personnel to uniformed positions of responsibility during a protest event likely to result in confrontation and force has the potential to "conflict out" the CID/IAD member from conducting, or managing investigations related to the event. The investigator may be a witness to an alleged misconduct incident, or the investigator may themselves become the subject officer in an alleged criminal or administrative complaint. The IAD member may find themselves scrutinized for the possibility of bias as a result of being on-site at the time of the incident.

## RECOMMENDATION #49

---

[72] E.g. Level I Use-of-Force
[73] E.g. blood splattering analysis, DNA, fiber collection, technology-assisted diagramming, etc.

BEY000190

OPD should develop policy whereby certain IAD and CID personnel are not assigned to uniformed field assignments when a reasonable possibility of confrontation, force, or subsequent alleged misconduct or officer – involved criminal complaints may occur.

## FINDING #50

Current OPD policy and practice regarding receipt of written responses from the District Attorney's Office subsequent to review of investigations, does not comport with current Alameda County practices.

A written document outlining the reasoning for the decision - filing or no filing - can serve any law enforcement organization well. This document would typically include reasons why the decision was made to not file charges, e.g., lack of evidence, statute of limitations, contradicting reports and statements, etc.  The purposes served include:

- Creating a statutory matter of record
- Identifying additional investigative work that may need to be completed to secure a charging
- Identify common denominators at the division, unit, team and individual level that reinforce professional practices (that may be shared with others) or areas that require improvement (which can then be trained to).
- Quality assurance or performance measurement processes
- Provide a more complete historical record in the case file

## RECOMMENDATION #50

OPD should participate in the current practices and database utilized by the District Attorney's Office and all other law enforcement agencies in Alameda County.

## UPDATE

The concerns regarding policy and practices currently in use by all other law enforcement agencies in Alameda County and the District Attorney's Office, as outlined in the finding and recommendation, were brought to the attention of the Chief of Police. The information was received favorably and the Chief has committed to participating in the countywide system.

# K. INVESTIGATIONS (INTERNAL AFFAIRS/ADMINISTRATIVE)

BEY000191

**FINDING #51**

Current OPD policies and practices regarding *timely decisions* to implement department policy[74] - particularly considering the injury to xxxx, and the chemical munitions utilized to disperse people surrounding him - do not meet current standards and preferred practices.

At approximately 7:40 PM on October 25, 2011, a protestor was standing at the intersection of 14th and Broadway wearing military fatigues and a military style hat.[75] As chemical munitions were deployed into the crowd, this person turned and began to run north on Broadway, parallel to the skirmish line.  He suddenly collapsed to the ground, and was likely unconscious before he fell as he did not appear to brace himself during the fall.

Efforts were made by fellow protesters to determine his welfare and assist.[76] After the discharge of a chemical munitions device in the immediate area of the prostrate party, and those attempting to assist him,[77] he was evacuated from the immediate area and transported to the hospital by private parties.

At approximately midnight on October 25, 2011, an OPD Criminal Investigations Division (CID), Major Crimes Unit sergeant was present at the protest.  He was advised of the possibility of a person with major injuries, possibly incurred during the protests, at the hospital.  Two CID investigators responded to the hospital.

At approximately 3:30 AM on October 26, 2011, the CID sergeant briefed an OPD executive about what the investigators at Highland Hospital had determined. A subsequent conversation occurred between the executive and a high ranking command officer.  Consideration was given to declaring a Level I Use-of-Force investigation[78] at this time, but no formal callout of investigative resources occurred, nor were any inter or intra-agency notifications made. This resulted in a significant delay in OPD CID and IAD investigations.

At approximately 10:30 AM on October 26, 2011, the OPD CID sergeant who was initially notified over ten hours earlier of a person with major injuries incurred during the protest, was informed that OPD commanders had initiated a Level I Use-of-Force investigation.  The CID investigation advanced from approximately this time.

An administrative investigation of this magnitude involves several critical steps that should occur sooner (as close to the time of alleged misconduct) rather than later to ensure a thorough and impartial investigation.   These include collection and examination of evidence that informs an administrative investigation, identifying law

---

[74] *OPD Department General Orders K-IV, M-III, M-IV, M-IV.I.*
[75] Documented on commercial Bay Area news channels and amateur video uploaded to YouTube.
[76] This appears obvious on public video.
[77] Many had their backs toward the skirmish line and/or were focused on Mr. Olsen.
[78] *OPD Department General Order K-IV.*

BEY000192

enforcement personnel who may be directly involved as potential users of force or witnesses to same, obtaining associated internal and/or external reports-documents-recordings, and so forth. Regarding case integrity, the practice of "noticing,"[79] ensuring minimal contact,[80] and ordering no communication occur about the investigation amongst personnel allegedly or potentially involved in a misconduct incident, are also matters of serious consideration.

## RECOMMENDATION #51

OPD must review the incident to determine events between the time department command personnel were notified (at approximately 10:00 PM) of xxxx's arrival at Highland Hospital, to the time CID was notified, to the time a final decision was made to declare and conduct a Level I Use of Force investigation. This is part and parcel of IAD investigative activities that occurred after the declaration. Following this review, OPD needs to assess the impact the delay may have had on the investigations. A determination must then be made regarding accountability at all levels. Policy revision and/or training curriculum should be developed simultaneously, if necessary.

## FINDING #52

Current OPD policies and practices related to IAD do not represent current standards and preferred practices regarding assertive, thorough, objective, and appropriate criminal and administrative investigative processes. These policies and practices have definitive impact on the determination of a fact pattern about assignments, identification, responsibilities, and actions-taken of/by on-scene public safety personnel.[81]

Frazier Group review and analysis revealed a need for departmental investigators to better comply with OPD policy,[82] and utilize contemporary IAD investigative procedures.

Administrative investigations determine possible culpability for the actions of involved officers. This is different, in part, from the responsibilities of the CID investigation. A critical component of IAD investigations involves determining public safety observations and actions prior to, during, and after the collapse of xxxx.[83] OPD IAD must ensure

---

[79] *California Government Code* requires subject officers be notified of particular information in advance of their administrative interrogation.
[80] Sometimes referred to as "anti-huddling."
[81] Identities are typically available on personnel "details," subsequent reports, assignment rosters, radio communications logs, timesheets, video, and interviews.
[82] *OPD Training Bulletin TB V-T01 Part 3.*
[83] xxxx has been frequently identified by the news media, and acknowledged by OPD, as the individual who collapsed.

BEY000193

every reasonable and legal administrative investigative action[84] is, and will be, taken to determine (at a minimum) the following of on-scene public safety personnel:[85]

- What public safety personnel observed, or reasonably should have observed, i.e. xxxx collapsed and/or lying on the ground?
- Who made efforts to immediately notify supervisory personnel?[86]
- Who made immediate efforts to direct or request medical attention?
- Who made immediate efforts to determine whether the cause of the xxxx injury should result in an immediate Level I Use of Force[87] investigation, and who immediately considered the possibility of an officer-involved criminal investigation or unnecessary use-of-force investigation[10] (regardless of agency)?
- Who made immediate efforts to ensure potentially involved public safety personnel and their less-lethal weapons, ammunition, Personal Digital Recording Devices (PDRD), and other available potential evidentiary items were identified and secured?[88]

## RECOMMENDATION #52

OPD must complete a robust, collaborative investigation and review regarding this Finding, including shortfalls in policy (or compliance with policy),[89] process, and supervisory and command accountability.

## FINDING #53

Current OPD policies and practices regarding IAD investigations do not consistently meet current standards or preferred practices when measured against characteristics of being:

- Assertive and thorough
- Willing to challenge inconsistencies
- Committed to reconciling incongruity
- Committed to finding the facts regardless of the outcome

OPD has clear opportunities to re-frame policy and practices related to internal affairs investigations.  Some paraphrased comments from OPD members include:

---

[84] Primary authority arising from the *California Penal Code* and *Government Code*, and *OPD Policy, Bulletins,* and *Guidelines.*
[85] Identities typically available on personnel "details," subsequent reports, assignment rosters, radio communications logs, timesheets, video, and interviews.
[86] *OPD Department General Order K-IV.*
[87] Ibid.
[88] Ibid.
[89] *OPD Training Bulletin TB V-T01 Part 3.*

BEY000194

- There is a long time culture of not challenging subject and witness officers
- Members of the department observe tacit approval of misconduct by supervisors and commanders, so the behavior continues
- Concern that if misconduct is not reported (internally/department initiated) that misconduct may continue until eventual reporting occurs
- IAD investigators do not want to be the individual who sustains a complaint against a particular member
- Regarding a significant misconduct complaint and officer-involved criminal investigation, an interviewed ranking member said "I have little faith that IA can get it right and have even less faith that CID will do the case right.  The CID investigation would be a waste of time. I do not have faith in the IA or CID process."

Some of the reasons for current practices point not only to historical and legacy issues, but are also a result of voluminous case loads, pressing timelines, complexities of investigations, and the IA investigator position not being considered to be a desirable assignment.

## RECOMMENDATION # 53

OPD policy and practice must consider the following:

- Recruit and assign the best available investigative, supervisory, and command personnel to these critical IAD and CID positions
- Establish a process to audit[90] and review IAD investigations during, and after investigations are complete
- Identify investigative deficiencies that require improvement and train to improve them
- Collaborate with members currently assigned to IAD to determine issues of concern, and possibilities for resolution
- Determine strategies or proposals to address the issue of timelines
- Place an assignment cap on personnel who are selected to work in IAD; a maximum of 3 years and no rotation back to IAD for 6 years.
- Acknowledge the professional and dedicated efforts made by IAD personnel by considering them for subsequent desirable assignments and promotion
- Offer command support for the individuals in IAD who do good work and make difficult decisions
- Consider reducing the layers in the chain of command between the IAD Commander and the Office of the Chief of Police.  It is common in law enforcement to have  IAD Commanders report directly to the Chief's Office

---

[90] Also referred to as police performance auditing, performance measuring, quality control, quality assurance.

BEY000195

## FINDING #54

Current OPD policies and practices, regarding consistent and appropriate coordination between IAD and CID, do not meet current standards and preferred practices.

IAD and CID investigators do not consistently coordinate their investigations when criminal allegations are made against a department member   In California law enforcement it is quite common, when a criminal allegation is made against an officer and a CID criminal investigation commences, for the organization's Internal Affairs Division to also open (or will already have opened) an administrative investigation. It is important to recognize these are two entirely different investigations; the CID investigation is to explore any criminal culpability on the part of an officer and then forward the complete investigation and all evidence to a prosecutor. This is normally the county District Attorney (or in some instances the State Attorney General or U.S. Department of Justice) for consideration of criminal prosecution.  The IAD investigation explores the officer's alleged misconduct--often referred to as a violation of the department Manual of Rules or Duty Manual.

Under existing statutory law, evidence and findings legally obtained in a criminal investigation are accessible, and may be utilized, by IAD investigators. However, a significant amount of information obtained by IAD investigators may not be accessed or shared with CID investigators.  Common practice among California law enforcement ensures the IAD investigator is apprised in advance of significant CID steps.  OPD must appreciate the need for IAD investigators to "monitor" key CID investigative steps in real-time to be better informed.

## RECOMMENDATION #54

OPD must establish policy requiring CID to make timely notification to IAD investigators regarding significant CID investigative tasks.  The direction should come from the authority of the Office of the Chief of Police.


## FINDING #55

Current OPD policy and practices, regarding the assignment of CID and IAD personnel to responsibilities that do not pose inherent conflict of interest or individual negative consequences, do not meet current standards and preferred practices.  OPD policies, practices, and assignments have placed both CID and IAD investigators in positions of potential investigative conflict, and/or personal negative consequence.

BEY000196

Interviews and review of policy and practices disclosed issues of concern regarding some IAD investigators, as they relate to Occupy Oakland activities.  To illustrate:

1. The OPD and IAD current practice, when a misconduct investigation involves a subject officer[91] of higher rank than the investigator,[92] is to assign an IAD sergeant as the dedicated case investigator.  Although common policy is to include a department member of equal or higher rank in the interrogation of the ranking subject officer, this does not always occur. Regardless, the entire Internal Affairs investigation, and a recommendation for a finding, remains the responsibility of the case sergeant.[93]  It is important to note this is not the policy when an administrative investigation is assigned at the division level.[94] When this occurs in CID, the IAD investigation must, by special order, be assigned to a department member at least one rank higher than the subject officer or member.

2. During the Occupy Oakland event on October 25, 2011, (and subsequent events) several members of the OPD IAD, of all ranks, were assigned to field positions on either the morning A-Watch or afternoon B-Watch.  Other IAD investigators have been assigned to site security, liaison with mutual aid agencies as they conduct enforcement activities, mass arrest responsibilities, and so forth.  One IAD sergeant participated in the physical arrest of a protest participant.

3. OPD department leadership has assigned IAD investigative personnel to produce Use of Force reports[95] resulting from Occupy Oakland events, while at the same time assigning Manual of Rules misconduct investigations with criminal potentiality -from the same event - to the same IAD investigator.

There is potential for negative consequence to an IAD investigator and the Department. Assigning a subordinate department member to investigate a superior officer has inherent and plausible negative consequences for the investigator.  This is particularly true because a majority of peace officers remain with their department of choice for the duration of their career.  In a close-knit work environment the possibility exists for real or perceived retribution, both overt and covert.

Assigning OPD IAD personnel to uniformed positions of responsibility during a protest event may result in them being present at, or part of a confrontation that will "conflict out" the IAD member from conducting or managing administrative investigations related to the event.  Possibilities exist that the investigator may be a witness to an alleged

---

[91] "Subject Officer" refers to the primary department member(s) under investigation, as compared to a witness officer who is likely not responsible for the misconduct under investigation.
[92] Typically an OPD IAD investigator holds the rank of police sergeant.
[93] For example, a sergeant in IAD can be responsible for the investigation of a police lieutenant or captain.
[94] *OPD Special Order No. 9041, 11 June 10.*
[95] Use of Force reports are over-arching reports that encompass the review of all supplemental reports written by OPD personnel who used, witnessed, or have knowledge of force being used.  The report is intended to evaluate several considerations, one of the more important being a finding as to whether the force used was appropriate (typically defined as within policy and legal). These USE OF FORCE reports are typically assigned to non-IAD personnel.

BEY000197

misconduct incident, the investigator may themselves become the subject officer in a misconduct allegation, or the IAD member may find themselves scrutinized for the possibility of bias as a result of being a witness or being on-site at the time of an alleged misconduct incident.

When an OPD IAD investigator is assigned responsibility for an event Use of Force report[96]   the time necessary to complete the report and make a finding may be prohibitive. This is particularly true when the report incorporates the volume of department members and supplemental reports generated by an event like Occupy Oakland.  The timelines for completing use of force reports is 15 days.[97]    However, the timeline for IAD misconduct investigation reports is 180 days.  Thus, focus for the IAD investigator is placed immediately on the use of force report, while a potentially high priority administrative investigation languishes. Finally, the possibility exists that OPD personnel related to a use of force report are also intrinsic to a formal IAD misconduct investigation. The crossover of information becomes problematic.

## RECOMMENDATION #55

The resolution of this Finding is three-fold:

1.  OPD should develop policy that ensures any IAD misconduct investigation involving ranking department personnel be assigned to an IAD investigator of equal or higher rank.

2.  OPD should develop policy whereby IAD personnel are not assigned to uniformed field assignments when a reasonable possibility of confrontation, force, or subsequent misconduct complaints may occur.

3.  OPD should craft and implement policy which minimizes the possibility of IAD personnel reviewing individual use of force reports and writing the overarching, non-IAD related Use of Force report.

## FINDING #56

Current OPD policies and practices, regarding when subject and witness officers are notified ("noticed")[98] of a misconduct investigation, and the orders related to confidentiality pertaining thereto, do not meet current standards or preferred practices.

The OPD IAD practices of determining when witness and subject officers are notified of a pending administrative investigation are not appropriately guided by policy.[99] Additionally, there are opportunities for more consistent application of *when* subject

---

[96] *OPD Department General Order M-IV.I.*
[97] The timeline was subsequently extended for Occupy Oakland events.
[98] A term used for notifying an officer prior to their IAD interrogation, required by the *California Government Code.*
[99] This also applies to CID, re: witness and suspect department members.

BEY000198

officers are ordered not to communicate[100] with others about the components of an IAD interview or interrogation,[101]   e.g., "...are not to disclose any of the information discussed in the interview except to his or her representative or attorney."[102]   This applies to pre and post-investigative activity.

OPD IAD should consider, in particular circumstances:
- Ordering department personnel not to discuss any part of the misconduct allegation/investigation (except with counsel or their representative) at the time they are "noticed" of a pending investigation
- Incorporating steps to ensure compliance with the order(s)
- Re-admonish the member at the conclusion of their administrative interview or interrogation

Few occasions during an administrative internal investigation are as critical and revelatory as witness officer interviews and subject officer interrogations. The more pristine the statements made, the more confidence they are done with veracity.

The time and manner in which subject and witness officers are "noticed" of the IAD investigation can be very important.  For instance, the decision when to advise ("notice") a multitude of involved personnel that an IAD investigation is pending is vital. This must occur when it is clear the aggregate of statements and reports by those department members will be critical to determining the facts.

While OPD statutory policy addresses issues of interfering and assisting with internal investigations,[103] the language does not affirmatively, and with certitude, order department personnel not to speak about misconduct allegations prior to or during a misconduct or officer-involved criminal investigation.   Although policy requires IAD investigators, at *the conclusion* of an interview or interrogation, to advise department members not to disclose information, this order is not consistently applied.

## RECOMMENDATION #56

Revised policy and training may include:

- Established criteria for when, how, and under what circumstances,[104] department members are advised by IAD or CID of pending investigations
- At the time of IAD or CID notice, ordering department members ( under the authority of the Chief of Police) who are associated with an investigation, to not communicate with any person (other than counsel, or representative in non-

---

[100] "Huddling."
[101] Required by the *California Government Code.* In administrative investigations, witness officers are considered to be 'interviewed,' while subject officers are often considered to be 'interrogated.'
[102] *OPD Training Bulletin TB V-T01 Part 3* and *OPD form TF-722 (Feb 09).*
[103] *OPD Manual of Rules 314.38.*
[104] Subject to the *California Government Code.*

BEY000199

criminal cases) within or outside the department about anything associated with the allegations

- At the time of IAD "noticing," provide the order in writing and obtain a signed and dated acknowledgment from the involved department member
- Direction that the department member is required to immediately notify appropriate department authorities if he/she has knowledge about *any* member violating the order
- Re-admonish the witness or subject officer of the order at the conclusion of their respective interview/interrogation.
- Provide the re-admonishment verbally, while still recording, and in writing with attendant signature by the witness or subject officer(s)

## FINDING #57

Current OPD policy and practices regarding the release and communication of information obtained from an Internal Affairs (administrative) investigation to criminal investigators (and other members who do not have a need or right to know) do not meet current standards and preferred practices.

OPD must remain sensitive to the proper sharing of information within the department that is deemed confidential in nature.[105]

Information that is obtained during IAD investigations is often confidential and should not be shared, accessed, or communicated in any manner with department members who do not have a need and a right to know.  This is typically complied with in law enforcement organizations by instituting policy designed to frustrate sharing virtually all information garnered during an IAD investigation with department criminal investigators or department members who are not associated with IAD. This preventative measure fosters confidence that errors will not occur when appropriateness is obscure.  In addition, IAD is not perceived as a possible access point for CID investigations.  The OPD addresses this concern, in part, with policy.[106]

## RECOMMENDATION #57

OPD must establish explicit policy and accountability which safeguards against broadcast of confidential IAD information outside of the IAD purview, in settings where multiple components[107] of the department are gathered.  Suggestions to accomplish this include making sure all who are present for any discussion are aware that IAD is present, and all understand IAD will not share confidential information and should not be solicited for same.  More often than not, IAD should be the last to share information with executive decision-makers after other department representatives have departed.

---

[105] *California Penal, Government, and Evidence Codes.*
[106] *OPD Training Bulletin TB V-T01 Part 3.*
[107] E.g. OPD bureaus, divisions, units, teams or other personnel.

BEY000200

**FINDING #58**

Current OPD policy and practices in IAD and CID do not meet current standards and preferred practices regarding their personnel who are in critical-assignment[108] positions to ensure:

- Redundancy
- Expertise
- Staff availability 24/7/365

During the Occupy Oakland event(s), an on-scene OPD manager determined the necessity to declare a Level I Use of Force investigation.  Doing so was appropriate and complied with policy.

Declaring a Level I Use of Force puts into place an immediate response of both IAD and CID investigators to conduct investigations.  In this case, it was determined that CID investigators were not available to respond.  This was due, in large measure, to a spate of major crimes in the community that had occurred over a compressed period of time, and CID investigators were simply overwhelmed, over-tasked, and exhausted.   Not only does policy require the response of CID and IAD to Level I declarations, but investigative principles allow that, the sooner a response (collection and examination of physical evidence, locating and identifying potential witnesses, statements from alleged victims and suspects, alleged crime scene geography and atmosphere; all which often serve to inform the investigation) the higher the quality of the investigation.

In this instance, once more information became available, department personnel were able to determine that a Level I investigation was not necessary.  The absence of CID personnel did not have negative consequence in this case.

With the possibility of Occupy Oakland or other major, staffing-intense and mutual aid events occurring in the future, the risk for both CID and IAD investigators becoming unavailable must be addressed.

**RECOMMENDATION #58**

In anticipation of future events, and recognizing the tremendous value of immediate investigative response, policy and practice must be in place to ensure IAD investigative personnel are available for call back.  When taking into consideration staff assignments, CID and IAD commanders should consider exempting an investigator(s), and placing them in abeyance to assure availability when urgent situations occur. Commanders may consider specialized training for more personnel within these divisions to ensure a larger pool of trained investigators remains available.

---

[108] CID, IAD, etc.

BEY000201

**FINDING #59**

Current OPD policies and practices regarding subject-officer admonishment and potential consequences do not meet current standards and preferred practices.

Subject officers in misconduct investigations are often provided a *Lybarger*[109] Advisement. Some organizations may provide *Lybarger* to all subject officers, while others may provide *Lybarger* to subject officers who initially refuse to provide an administrative statement. When a department member[110] is the subject of an administrative investigation that has potential criminal implications, the member is first afforded their Miranda Rights by IAD investigator(s),[111] and when those rights are not waived (they typically are not), the officer is afforded a *Lybarger* Advisement.

The *Lybarger* Advisement is ubiquitous in California law enforcement, and in essence requires that a subject officer must provide a statement to the IAD investigator(s) regardless of the nature (criminal or administrative) of the alleged misconduct. If the subject officer refuses to provide a statement (answer questions, draw diagrams, and other reasonable solicitations by investigators) after being provided the Advisement, he/she is exposed to disciplinary action, typically classified as insubordination.[112]

OPD requires subject members who are administratively investigated (IAD) for potential criminal misconduct to be afforded the Advisement. Policy requires the subject officer read and sign a document[113] that contains the advisement, before questioning commences. They do not require the statement be verbally read to the subject officer.

The document[114] chronicles, in part:

*...I am compelled to give a statement; and neither this statement nor any information derived from this interview may be used in any criminal and/or civil proceeding pursuant to the Public Safety Officers Bill of Rights Act. Government Code Section 3300 et seq.*

However, there are circumstances where a subject officer's statement resulting from a *Lybarger* Advisement, may be accessed, and *potentially* used during criminal prosecution. These include but are not limited to California District Attorneys, State Attorney General, and Grand Juries[115] who may access the statement, given particular circumstances. State courts may access information.[116] The information in the

---

[109] *Lybarger v. City of Los Angeles, 40 Cal. 3rd 822, 829, 221 Ca. Rptr. 529, 533 (1985).*
[110] *OPD Training Bulletin TB V-T01 Part 3.* Civilian members of the OPD are afforded Government Code rights the same as sworn personnel.
[111] *California Government Code.*
[112] Usually documented in a department *Manual of Rules, Duty Manual,* or similar.
[113] *OPD form TF-722 (Feb 09).*
[114] *Ibid.*
[115] *California Penal Code section 832.7.*
[116] *Pitchess v. Superior Court 11 Cal. 3d 531, 537, 538, 113, Cal. Rptr. 897.*

BEY000202

statement may be used to impeach a subject officer's contradictory testimony during criminal trial. In addition, federal investigators and prosecutors[117] may access the statement. Department members should be reasonably informed of the vulnerability inherent in providing a statement, when measured against the consequence of refusing to provide one.

## RECOMMENDATION #59

OPD should consider a revision of policy and practice regarding *Lybarger* statements. The proposed revision process should include surveying the language used by other California departments as well as soliciting input from city and labor attorneys. The draft policy may consider language that addresses:

- *Verbally* admonishing the subject officer of *Lybarger*, (in addition to a written version signed by the subject officer) when applicable, while recording the interview
- Text that informs the subject officer of plausible access to their statement beyond protections outlined in the California Government Code. This may include the applicability of:
  - CA Penal Code 832.5 and 832.7
  - Representations from State and Federal case law
  - Language similar to "...shall be kept confidential in accordance with law."

## FINDING #60

Current OPD policies and practices regarding the massive IAD intake and investigator caseload do not meet current standards and preferred practices.

## RECOMMENDATION #60

Taken as a snapshot-in-time, the Intake and Investigative case load in OPD IAD is immense, and requires a professional reassessment of the systems, policies and practices that are currently in place. This should be done with a focus toward improving the day-to-day efficiencies of the division.

A statistical study of IAD workload was not necessary to establish this finding. Nor was comparison of IAD caseload to other law enforcement when the situation is obvious. Our personal observations of the dimensions of the workload bear this out. Four comments from different individuals who are intimately aware of IAD dynamics said the following (paraphrased):

---

[117] *US v. Henthorn 931 F .2d 29 (2001).*

BEY000203

- We are approaching crisis, the organization (department) is slowly grinding to a halt, there is too much work
- The sink is overflowing but we are not turning off the faucet
- We are so overwhelmed we are not able to pay the correct amount of attention to cases that need it, or once we do get to them, we are too burned out to give the attention needed
- The case volume is too high; IAD is overwhelmed

Even if IAD caseloads amongst law enforcement agencies have similar ratios of staff per case, many other factors influence the degree of effort that can and should be applied to each individual case.  Additionally, many factors influence the volume of cases.  A rude conduct complaint may require little research, few interviews, and minimal written documentation. A Use-of-Force investigation may require a criminal investigation by CID, and an extensive IAD investigation including multiple interviews, physical evidence, and thorough documentation and report writing.

The OPD leadership should commission a vigorous, empirical needs-assessment of the IAD, both for the complaint Intake and the Investigation units.  The needs-assessment should also identify IAD industry preferred practices from other law enforcement agencies.  High priority should be attached to the study, and it should be done collaboratively to embrace many stakeholders. OPD may consider re-framing their IAD policy (California Penal Code 832.5).


## FINDING #61

Current OPD policies and practices regarding soliciting and obtaining information from reluctant complainants or witnesses provide an opportunity for improvement.

Our interviews disclosed that some individuals who have misconduct complaints or criminal concerns about OPD members, or who could serve as sources of information during CID and IAD investigations, choose not to initiate contact with the OPD IAD, and/or identify themselves.  This same reluctance occurs with some complainants who may want to contact the CPRB.[118]

It is essential that OPD be made aware of possible misconduct (criminal and/or administrative) to the degree possible.  Three common denominators why some people choose not to report to IAD are:

1. The complainant is concerned about being identified as a criminal
2. The complainant may fear retaliation
3. The complainant is hesitant to trust the OPD IAD, and in some cases the CPRB

---

[118] City of Oakland Citizens' Police Review Board, Ord. 12454, Nov 12, 2002.

BEY000204

## RECOMMENDATION #61

While remaining mindful that a criminal suspect should be held responsible for their actions, it is also vitally important that the OPD make every reasonable effort to reach out and communicate with the community, and develop expanded methods of complaint receipt.

## FINDING #62

Current OPD policies and practices regarding risk management and quality assurance[119] of IAD and CID investigations do not meet current standards and preferred practices. Additionally, current OPD policy and practices regarding the use of manual or technology-based systems to compare and reconcile information and data do not meet current standards and preferred practices.

The OPD would benefit from a robust policy and practice whereby investigations in both CID and IAD are diligently reviewed and audited. This is a critical responsibility of "risk management." Following the events of October 25, 2011 (and subsequent Occupy Oakland events), a substantial number of criminal and administrative investigations became the responsibility of OPD IAD and CID. A sampling indicates an opportunity to incorporate and review department policy which assures early and consistent review of an investigator's work.

Regarding reconciliation of information and data, the OPD IAD would substantially benefit by implementing a technology-based system[120] to achieve this in an effective and efficient manner. The intent is to ensure:

- Veracity
- Consistency
- Awareness of information previously unknown
- Identify training and policy needs
- Quality assurance and control

## RECOMMENDATION #62

OPD should explore the means (technology-based or manual) to correlate, and validate, information as it relates to IAD investigations. Systems exist or are advancing in other large-city departments which may be evaluated for applicability in Oakland.

---

[119] Also quality control, police performance auditing, performance measuring.
[120] In the absence of technology, a manual system, which addresses reconciliation of priority information, should be considered a high priority.

BEY000205

The data to be "cross-checked" and reconciled should include, but not be limited, to:

- Internal stand-alone databases
- Arrest and event reports
- Supplemental reports
- Evidence reports
- Lab reports
- CID evidence
- CID interview and interrogation data
- PDRD, Internet, OPD video and film

# L.  <u>MEDIA AND PUBLIC IMAGE</u>

## <u>FINDING #63</u>

OPD has a Public Information Section that reports directly to the Office of the Chief of Police.  The OPD Public Information Officer (PIO) is a police officer who has responded to numerous public and media inquiries regarding the actions of OPD during various protests initiated by the "Occupy Oakland" groups.   During this period the Oakland Police Department's image within the community has been shaped by written, visual and electronic images of helmeted police, confrontations with Occupy protesters, political controversy and the inability to comply with the Negotiated Settlement Agreement (*SRI Louise Coles, et al. v. City of Oakland, the Oakland Port incident March 7, 2005)*.  OPD's ability to "positively" influence the community and create a favorable image via the media has been limited and ineffective.

## <u>RECOMMENDATION #63</u>

It is recommended that the current PIO position be elevated to a command level individual (sworn or civilian). This person would preferably be public relations professional retained to develop an overarching messaging campaign which includes the use of electronic media.  The City and OPD must position themselves in front of the continued negative media reports regarding crowd management and use of force and begin to control the information released about the department with an organized and focused message.  Strategies should include informing the community of OPD's current Department reforms and on a renewed quest for excellence. The addition of a public relations professional moves the department into a more proactive position, and into alignment with other major police departments with regards to taking control of community perceptions of their activities.

BEY000206

# M. <u>TRAINING</u>

### <u>FINDING #64</u>

Review of Occupy Oakland event video, and departmental personnel interviews have revealed that the crowd control tactics used by OPD are outdated, dangerous, and ineffective.

### <u>RECOMMENDATION #64</u>

That OPD immediately adopt current preferred practice crowd management and crowd control tactics, and train all personnel in these concepts and tactics. An integral part of this recommendation is to replace existing obsolete and dangerous equipment and munitions with state of the art equipment. Concurrently it is necessary to train officers on the proper use of these strategies, tactics, and options.

### <u>FINDING #65</u>

Careful review of existing investigations stemming from Occupy Oakland events shows that many assigned investigators and supervisors lack the technical proficiency, and in many cases, the experience to conduct comprehensive, aggressive, and unbiased investigations.

### <u>RECOMMENDATION #65</u>

OPD should immediately implement an aggressive training program for all CID and IAD investigators and supervisors designed to raise their skill levels to the point where outside contract support will no longer be necessary. Organized rotation of departmental members through units involved in crowd management and crowd control activities (SWAT, Tango Teams, and Hostage Negotiations) will expand the knowledge base of investigator candidates as well.

### <u>FINDING #66</u>

After considerable interaction with the command and executive leadership levels of OPD, we find that the general level of experience, and the accompanying formal training in leadership, management, and specialized skills is low. Additionally, there is no formal program in place to train future leaders in the many broad and complex components of a modern police department.

BEY000207

## RECOMMENDATION #66

Formal training, not just on-the-job training, is an absolute necessity for senior leaders responsible for decisions with profound community impact. Opportunities like the FBI National Academy, and the Senior Management Institute for Police, should be aggressively sought out. As many senior decision-makers as possible should attend. Furthermore, OPD should establish a formalized career development program of rotational assignments and temporary detail assignments for developing leaders to expose them to the many facets of modern policing and prepare them for effective leadership.

## FINDING #67

During OPD review process three training sessions were conducted by Frazier Group involving all levels within OPD.  The training sessions included:

- February 15, 2012, "Introduction to 21st Century Crowd Management, Intervention and Control Strategies and Shadow Team operations", eight hours; March 24, 2012
- March 24, 2012, "Critical Incident Command for OPD leadership and command personnel", eight hours
- April 6, 2012, Subject Matter Expert (SME) crowd control tactics, use of force, chemical agents and specialty impact munitions, six hours.

The aforementioned training sessions provided great insight into OPD leadership and expertise. Based on hours of Frazier Group interviews, personnel interaction and observations in the practical application portions of the training, it is the opinion of Frazier group Subject Matter Experts that OPD does not have adequate mid-level management (Lieutenant level) critical incident management expertise.

## RECOMMENDATION #67

Mid-level management critical incident and leadership training should be provided for all Lieutenants.  Training should focus on clarity of OPD command expectations of Lieutenants during crisis, an understanding of tactical implementations and the associated limitations, leadership and team building.  Additionally, formalized First Amendment, use of force, and force reporting training should be addressed.  Training sessions should be provided by law enforcement, leadership and tactical experts, as well as selected recognized leaders within OPD. Newly promoted lieutenants should be detailed to assist more experienced and ranking commanders at every opportunity. This policy will expose future leaders to the planning, implementation, and review strategies of major events in a way that provides training, but does not force untrained and inexperienced leaders to make decisions in live events.

BEY000208

**FINDING #68**

During this review it was noted through direct contact and interviews that numerous police officer and sergeant level members had limited confidence in OPD Captain level personnel regarding critical incident decision making.  Perceived or real this perception was verbalized and seemed to stem from a lack of communications as to why decisions were made under specific circumstances.

**RECOMMENDATION #68**

Critical Incident Debriefs ("Hot Washes") should be conducted by command personnel with a vertical representation (officer-sergeant-lieutenant-captain) of sworn members participating following major incidents. These debriefs should be led by those command personnel having direct knowledge and involvement in the incident.   Department personnel should be able to discuss issues and concerns openly, professionally, and constructively.

BEY000209

# <u>CONCLUDING THOUGHTS</u>

Aircraft accident investigations frequently reveal that airplane crashes are caused by a series of cascading events, not a singular problem. We at Frazier Group feel that this analogy appropriately describes our observations within the Oakland Police Department. Years of diminishing resources, increasing workload and failure to keep pace with national current standards and preferred practices led to the cascading elements resulting in the flawed responses noted during the events of October 25, 2011. The most important of these multiple causal factors that we observed are as follows:

1.  <u>COMMAND TURNOVER: The Department's executive leadership team has been unstable for years</u>. Turnover at the senior levels of Chief, Assistant Chief, and the Deputy Chiefs and Captains has been frequent. While bright and dedicated personnel have recently been appointed to fill these important positions, many do not have the formal training, and the breadth of experience that most departments exhibit at this level of organizational leadership.

2.  <u>BENCH STRENGTH: We did not see OPD historically as a "learning organization"</u> – one which senior leadership has placed a high value on succession planning, career development, formal training, and post-incident reviews designed to provide departmental members the opportunity to learn from, and to improve from, recent experiences. To the credit of the current administration, these training deficiencies have been recognized and a focused effort to close the training gap is ongoing.

3.  <u>STAFFING CUTS: Substantial and  cumulative budget cuts and personnel losses have seriously weakened the Department.</u> According to the published FBI Uniform Crime Reports, in 2000 OPD had a total of 1131 law enforcement personnel (sworn and civilian). In 2010 this number had been reduced to 935 ( - 17%). This has caused significant morale issues and "brain drain" within the Department. Given the operational challenges of high crime, repeated civil disorder events, and community distrust, the Department is struggling to handle a workload demand that far outstrips its current staffing level. (See Appendix 5 for more statistical analysis of this issue.) OPD is so busy trying to keep pace with the operational requirements of daily events that they have little time or resources for strategic long-term improvement. The resulting problems play out in the media on a routine basis, further undermining the community's confidence in its police department.

BEY000210

We feel that these primary cascading factors ultimately were the principal contributing elements to the following organizational points of failure on October 25, 2011 which are identified in this report:

1.  The decision to conduct the Occupy Oakland eviction operation ("Notice of Violations and Demand to Cease Violations," issued October 24, 2011)[121] on October 25, 2011 should have been postponed until adequate planning, key command personnel, intelligence updates, and sufficient resources could be obtained.

2.  The primary Plans Chief was the A-Watch Incident Commander. He had significant input into the selection of the date and time of the Occupy Oakland eviction strategies and staffing assignments.  This planning process failed to foresee the repercussions of the morning eviction action as it related to the subsequent Occupy Oakland reaction that evening.

3.  There was a failure of the OPD Incident Commanders (A and B-Watches – A-Watch Midnight to 2:00 PM, and B-Watch 2:00 PM to 2:00 AM) to "jointly" confer and adequately coordinate a balanced OPD staffing and leadership plan throughout both operational periods.

4.  The late assignment of the Internal Affairs Division Commanding Officer to the B-Watch as the Operations Section Chief was improper -  a conflict of interest that should have been avoided.

5.  When Occupy Oakland departed the Oakland City Public Library (14th and Madison Streets) and marched to FOP Park (14th and Broadway) the Incident Commander remained inside the City EOC and did not have adequate situational awareness. The Incident Commander should have responded to the field, met with the Operations Section Chief, assessed the situation, asserted a leadership role and implemented a tactical plan to disperse and/or arrest violent protesters.

6.  Crowd control tactics utilized by the combined law enforcement forces at approximately 8:30 PM, at 14th and Broadway Streets were not well planned, were not well coordinated, were confrontational, and were poorly executed.

7.  Documentation and personnel accountability during B-Watch regarding use of force reporting, arrests, deployment of less-lethal munitions and chemical agents by both OPD and mutual aid responders was incomplete, inaccurate, and inadequately reported.

---

[121] Email from Emergency Public Information Officer, To City Council; sent Tuesday, October 25, 2011, 4:14AM

BEY000211

8. OPD concepts of crowd management and crowd control employed during the events of October 25, 2011 do not reflect current crowd management, intervention and control strategies, or preferred tactical practices. The OPD Crowd Control and Crowd Management Policy, Index Number III-G is outdated and requires substantial revision. OPD command and executive personnel lack an understanding of modern crowd management, intervention and training practices widely used in other large police departments. This was a systems shortcoming - the result of long-standing leadership, policy, accountability, forecasting, and training shortfalls.

While OPD faces daunting problems, we at Frazier Group noted many positive elements within the organization. The most important of these are as follows:

1. In almost all cases OPD personnel we interviewed and interacted with at all levels were open, forthright, professional, and positive in their comments about their work and their department. The aggregate of these impressions leads us to believe that the Department is open to change, and clearly recognizes the many needs for improvement that we discussed.

2. Training already delivered by Frazier Group was well received by all participants, again signaling overall receptiveness to change.

3. Newly appointed Chief Howard Jordan has set the tone for his organization, making Departmental improvement his highest strategic priority. His cadre of bright young leaders bodes well for the future as they mature in their professional careers.

We at Frazier Group wish the Oakland Police Department and the City of Oakland well as they jointly address the significant challenges that lay before them.

BEY000212

# APPENDICIES

BEY000213

# APPENDIX 1

## Statement of Work

**BEY000214**

# FRAZIER GROUP LLC



# Independent Investigation

# Occupy Oakland Response

# October 25, 2011

**January 20, 2012**

BEY000215

# __STATEMENT OF WORK__

This review will analyze the morning and evening events of October 25, 2011.   Areas of greatest focus will be:

### 1.  __Training and Equipment__

Training:

- OPD Officer and supervisor crowd control and use of force training from January 1, 2009 to present.
- Supervisor, middle-manager, and command level unusual occurrence planning and training

Crowd control equipment:

- Individual officer equipment
- Less-lethal weapons, including chemical munitions
- Communications interoperability and adequacy

### 2.  __Planning__

The review will analyze:

- Applicable OPD policies, and how well they were integrated into planning efforts for 10/25/11

- The Incident Action Plans (IAP) for both A Shift and B Shift

### 3.  __Mutual Aid__

The review will include analysis of the mutual aid process and its conformance with the California Emergency Management Agency (CalEMA), 2009 Edition of the California Law Enforcement Mutual Aid Plan (Blue Book) and the 2003 Edition of the Law Enforcement Guide to Emergency Operations (Red Book).  The review will look at:

- Levels of control that receiving municipalities have over mutual aid officers
- Use of force guidance given to responding agencies
- Incident command and control
- After-action reporting

BEY000216

4.  **Plan Implementation and Tactics**

The review will analyze:

- Deployment of law enforcement resources
- Command effectiveness

5.  **Use of Force**

The review will analyze:

- Level 1 use of force incidents occurring on 10/25/11
- Use of chemical and less-lethal specialty impact munitions.

6.  **Use of Force Reporting**

The report will analyze use of force reporting by OPD and mutual aid providers.  The review will determine whether or not these agencies followed applicable reporting requirements, and the timeliness and completeness of this reporting.

7.  **Criminal and Administrative Complaint Intake and Investigation**

This report will review the following:

- Complaint intake systems
- Complaint investigations against known, unknown, or mutual aid officers

This review will not investigate citizen complaints filed with OPD or other agencies regarding their officers or officers responding under mutual aid for the purposes of establishing findings and recommendations for discipline.

Information received on the dedicated tip line will be logged, evaluated and sorted. Information pertaining to the systems and protocols will be included in this review. Individual complaint information will be referred to OPD IAD for appropriate follow up, referral, and disposition.

**Thomas C. Frazier**, Frazier Group, L.L.C.

BEY000217

# APPENDIX 2

## Materials and Information
## Requested by Frazier Group

BEY000218

# DOCUMENTS AND INFORMATION REQUESTED FOR THIS INVESTIGATION

**NOTE:   During the course of the Frazier Group Investigation, the following documents and information were requested from the Oakland Police Department. Most, but not all, of these requests were filled.**

1. United States District Court, Northern District of California Master Case No. C00-4599 THE (JL). Settlement Agreement Re: Pattern and Practice Claims

2. Oakland Police Dept. Negotiated Settlement Agreement 16th Semi-Annual Report August 1, 2010 – January 31, 2011

3. Seventh Quarterly Report of the Independent Monitor for the Oakland Police Department. October 20, 2011

4. United States District Court, Northern District of California Case No.C03-2961 TEH (JL). Stipulation and Order Approving Partial Settlement of Plaintiff's Claims for Injunctive Relief.

5. P25 Radio Performance Evaluation Proposal RCC Consultants, Inc.  November 28, 2011.

6. City of Oakland, city administrator's office memo dated October 18, 2011. ATTENTION OCCUPY OAKLAND DEMONSTRATORS

7. OPD Frank Ogawa Plaza Log 13 October 0400 to 14 October 0400.

8. OPD Frank Ogawa Plaza Log 15 October 0400 to 16 October 0400.

9. Eighth Quarterly Report of the Independent Monitor for the Oakland Police Department. January 17, 2012

10. XL Spreadsheet: Oct 25th 2011 Occupy Oakland Complaints source, summary, and disposition.

11.  OPD Complaint Memorandum, Form TF-3329 (Aug 09)  - Blank Form

12. Recommendations for First Amendment-Protected Events for State and Local Law Enforcement Agencies.  USDOJ/Global Justice Information Sharing Initiative. December, 2011.

BEY000219

13. First Amendment Events – Rights of Participants. USDOJ/Global Justice Information Sharing Initiative. December, 2011.

14. Roster/Categorical Summary/Log of all IA complaints received regarding Oct. 25, 2011 and the Unit's disposition/referrals (similar to an Excel spreadsheet or whatever they have available).  Please identify which complaints have been determined "administrative" and which have been determined "criminal."

15. Policies and criteria regarding the intake, review, and disposition/referral process.

16. Crime reports, supplements, evidence logs, photos-videos, diagrams, medical reports, regarding all criminal investigations related to Oct. 25, 2011.

17. CID policies and procedures regarding the investigations of criminal allegations of Oct. 25, 2011, only if any policies and procedures differ from standard, long-term practices.

18. After Action Reports authored by OPD.

19. Intelligence Reports indicating hostilities toward OPD.

20. Criminal Investigation Summary re Injury to xxxx.

21. After Action Reports authored by outside agencies.

22. All OPD Use of Force Reports or reporting on Supplemental Reports.

23. A Microsoft WORD compatible file copy of the Oakland PD Logo (patch).

24. A Microsoft WORD compatible file copy of the City of Oakland Logo – as it appears on City business cards.

25. All "Situational Update" emails for 10/25/11.

26. IA Complaint Unit log pages for 10/25/11 to 10/27/11.

27. Dispatcher IA complaint receipt script.

28. IA complaint memo.

29. Video analysis report prepared by SGT xxxx.

30. CID Occupy Oakland Criminal Report (to date).

BEY000220

31. Audio of radio traffic (all related channels) from for the time periods from 0330 to 1030 on 10/25, and 1330 01/25 to 0200 on 10/26. Please insure that the time periods and channels are identified.

32. All administrative messages, mobile computer (MDT) messages, public safety communications recorded phone calls to/from the following:

    xxxx
    xxxx
    EOC personnel/sections
    xxxx
    xxxx

33. City Attorney Opinion on mutual aid laws.

34. Tango Team records for 10/24, 10/25, and 10/26 Specifically:

    - Less lethal weapons check-out
    - "roll out" bags checkout
    - Specific inventory lists of less lethal weapons and munitions issued to each TT member
    - Specific lists by TT member of replacement munitions necessary after both A and B shifts on 10/25

35. Any records of OPD attempts to contact mutual aid agencies to both identify their personnel who were at 14th and Broadway or the immediate vicinity the night of 10/25, and OPD requests for reports, accounts of less lethal and use of force, injuries and crimes committed against their personnel, and videos from other agencies. This includes emails, memos, logs of phone calls, etc.

36. The document that SGT xxxx re the area of 7th and Washington submitted "up the chain" that was returned to him.

37. All video from the 7th/8th St region and Washington St, during the times of confrontation with protesters.

38. The first versions of the Use of Force report(s) CAPT Whent received from Sgt. xxxx in IAD.

39. The first versions of the After Action reports CAPT Whent received from command personnel who worked 10/25.

40. Training files for IAD intake and IAD investigative personnel.

BEY000221

41. Provide a detailed chronology with dates, times and personnel involved, regarding planning process - October 25, 2011.

42. Documents defining planning "accountability" (approval) for October 25, 2011.

43. Specific documents outlining "mutual aid" missions briefed to all outside agencies.

44. Accurate accounting of all mutual aid agencies, personnel and times - who responded to October 25, 2011 – both A and B Watches.

45. Documents specifically detailing, munitions assigned to OPD Tango Teams for October 25, 2011; those returned by Tango Teams following October 25, 2011; and amounts/ types of munitions replenished and, to whom (by name) within Tango Teams.

46. Detailed training syllabus regarding crowd management and crowd control policy (including Power Point instructional aides) and tactical training prior to Mehserle.  Who provided training (by name), how long, who attended etc. (any training provided to command/executive staff).

47. Findings of 2003 Port, use of force incident that led to current III-G Policy.

48. Any and all copies of AARs provided by (1) OPD (2) Allied Agencies re: October 25, 2011.

49. Any and all documents describing total number of use of force incidents (all agencies including OPD):  (1) physical restraints;  (2) impact weapons – batons;  (3) less lethal impact munitions – types;  (4) chemical agents – types; (5) any other devices deployed, e.g., SCAT munitions, smoke etc.

50. P25 Radio Performance Evaluation Proposal. RCC Consultants, Inc. November 28, 2011.

51. All of the Tango Team's reporting 1/28/12 and the ordinance log from the range, i.e., how much was checked out/replenished.

52. Training and job assignment (including length of assignment) records for IAD investigators and command personnel.

53. Job assignment (including length of assignment) records for IAD intake personnel.

BEY000222

54. Updated CID investigation of xxxx, and any CID case documentation regarding the xx, xxxxxx, xxxxxx incidents.  In addition, the same docs for the officer who is viewed on the video.

55. An updated roster of all Occupy Oakland related IAD complaints that are being investigated in IAD, and who is assigned to them.

56. Sgt. XXXX video analysis report.

57. Any updated AA reports since the first submissions regarding both the A and B shifts from 10/256/11.

58. Any updated Use of Force reports for 7th/8th & Washington, events after the xx incident at 14th/Broadway, Snow Park, and the xx incident.  Use of Force reports regarding the xx and the xxxxxx incidents.

59. Any records (email) regarding requests for submission of AA reports to the authors. Including any guidelines, time lines, or other direction.

60. Written guidelines regarding the circumstances when an IAD complaint shall be referred to CID, the process, and the authority.  Any guidelines or policy regarding the interaction between IAD and CID when a criminal allegation against a member of OPD is being investigated.

61. Any documents that outline notification or requests to any other law enforcement agencies about criminal investigations involving OPD personnel, related to OCCUPY OAKLAND.

62. Any documents (emails, handouts, documentation of conversation, PP) that were provided to mutual aid (MA) agencies in advance about the policy/process to utilize if MOR or criminal complaints were observed or reported to MA personnel while at OCCUPY OAKLAND incidents.

63. Documents that outline how/who determines findings of IAD investigations, and how/who contributes to the determination of discipline in sustained cases?

64. In-house training checklists for IAD Investigative personnel and IAD intake.

65.  Federal Monitor Eighth Quarterly Report (July-September 2011) dated 17 January 2012.

66.  Use of Force Coordinator Interview Questions 18 October 2011.

67.  OPD Order of merit List Interest/Removal Form.

68.  Use of Force Coordinator Candidate List 18 October 2011.

93

69. OPD C.I.D. / Lab Reports re xxxx analysis (4 documents) Internal

70. Internal Affairs Policy and Procedure 11 – Acceptance and Processing of Complaints related to the Occupy Oakland Operations.

**71. Police Reports**
   a. Any report(s) describing the <u>cause/mechanism</u> of injury to xxxx.
   b. OPD incident investigation summary regarding incident that occurred on east side of Occupy movement in FOP Park.
   c. Arrest reports for A-Watch and B-Watch on Oct 25, 2011.
   d. Medical/EMT treatment reports describing injuries to xxxx.
   e. Evidence Reports containing recovered police munitions and protester weapons.
   f. Supplemental reports authored by OPD regarding use of force.
   g. Un-redacted version of OPD A-Watch IAP, Operations Plan and any annexes.
   h. Un-redacted version of OPD B-Watch IAP, Operations Plan and any annexes.
   i. Interview of OPD Officer xxxx actions at 14th and Broadway.
   j. OPD list of personnel authorized to carry specialized munitions? (Chemical agents, less-lethal munitions and Flash and Sound Distraction Devices), and what they are authorized to carry.
   k. Mutual Aid Resources Supplemental Reports submitted to OPD describing: actions while deployed; use of force; number of less-lethal munitions expended; chemical agents deployed; injuries to citizens and officers; who approved deployment.
   l. Copy of interview of xxxx standing adjacent to xxxx?

**72. Policies**
   a. Less-lethal training outline/Bulletins
   b. Chemical agent Training Bulletins
   c. Use of Force investigation protocols
   d. Use of Force review and approval
   e. Crowd Management

**73. Planning**
   a. Specific documentation indicating <u>who </u>requested OPD to start planning for removal of tent encampments in Frank Ogawa Park.
      1) Specific date the request was made (e.g. any electronic messages and written memos indicating date request made to OPD).

BEY000224

    b. List of City planners including Fire Department and other agencies involved in planning – by name of individuals. How often did planning meetings occur? Were COP and DCs involved in planning?

    c. Any briefings regarding status of planning to City Administrator? How often and who provided details?

    d. Was City Attorney Office represented in planning meetings?

    e. Copies of all emails and/or text messages between Chief of Police and City Attorney, City Attorney and Mayor, Chief of Police and Mayor that have been provided to any other entity by request, including FOIA.

**74. Deployment**

    a. Specifically what resources (agencies) by name, agency and assignment were behind the barricades at 14th and Broadway at time xxxx was injured?

    b. Who by name, agency and assignment deployed any less-lethal impact munitions, chemical agents and/or other munitions at 14th and Broadway at time xxxx injured? Who authorized use of these munitions?

    c. Who provided Unlawful Assembly announcements at 14th and Broadway at time of xxxx injury?

    d. What resources did OPD deploy at Snow Park?

**75. Mutual Aid**

    a. A-Watch and B-Watch Mutual Aid Resources provided to OPD (numbers of personnel and names of supervisors)

    b. When and who made formal OPD Mutual Aid resource request to Alameda County SD.

    c. Briefing format (instructions provided) – PPT provided by OPD to Mutual Aid Resources (A-Watch and B-Watch) prior to deployment.

    d. Missions described for A-Watch Mutual Aid resources

    e. Missions described for B-Watch Mutual Aid resources

    f. What agencies had "pathfinders" (OPD representatives) assigned to each Mutual Aid resources?

    g. OPD instructions to Mutual Aid providers regarding use of force and conduct.

    h. OPD Mutual Aid Command protocols (of responders)

    i. Any OPD MOUs/MOAs, Mutual Aid agreements regarding allied agency assistance?

BEY000225

    j.  All recordings, including video, made by Mutual Aid responding departments, particularly Palo Alto. This includes body-worn cameras, and all video from vehicles, mobile command posts, and handheld.

**76. Training**

a. During 2011 - specific dates and hours: crowd control, less-lethal munitions, chemical agent deployment, OPD crowd control policy, squad tactics, community relations, First Amendment, legal issues provided to OPD police officers.

b. During 2011 - specific dates and hours: Supervisors, Lieutenants, Captains, Deputy Chiefs and Chief regarding the aforementioned, but most importantly regarding: crowd management, planning, incident command, unusual occurrence strategies, mutual aid and supervisory responsibilities involving use of force investigation.

c. Specific command and control training in crowd management and crowd control for Captains, Deputy Chiefs, and the Chief.

d. Any course syllabi for aforementioned.

e. Who provided training?

**77. Tactics**

a. How many arrests were made during A-Watch and B-Watch and for what?

b. How many arrestees were from outside Oakland area?

**78. Decision Making**

a. Who was the Department Commander during A and B watches?

b. Location of the Incident Commander when xxxx injured?

c. Location of the Operations Section Chief when xxxx was injured?

d. What supervisors approved deployment of less-lethal munitions, chemical agents?

e. What supervisors declared an Unlawful Assembly and how?

f. When was the xxxx incident categorized as a level I investigation and by who?

g. Describe rationale for unlawful assembly announcement at 14th and Broadway prior to xxxx injury.

BEY000226

**79. Use of Force**
   a. Total use of force reports by all agencies.  Types of force, location and time of day for October 25, 2011.
   b. OPD list of "authorized" specialized munitions (chemical agents, less-lethal impact munitions, Flash and Sound Distraction Devices - FSD)
   c. OPD list of "authorized" munitions for crowd control.
   d. Were there any FSD devices deployed during A and B Watches? If so, how many of each type of munition, and by which officers. Who approved this use?
   e. Total amounts, type of ordinance and agencies utilized on both A and B Watches, October 25, 2011 (ordinance includes: chemical agents, less-lethal impact munitions, rifle launched, 37 and 40mm type, hand thrown devices e.g., chemical, impact munitions and FSDs.

**80. City Government**
   a. Who initially approved Occupy encampment in FOP Park?

   b. Who withdrew permission for Occupy to continue encampment in FOP Park?
   c. Who and how were announcements of revocation of permission for Occupy group distributed?
   d. Copies of Announcement by City to occupy?
   e. Any reports authored by Public Works regarding Occupy activities.

**81. Follow-Up Questions**

 **NOTE: All requests are for October 25, 2011**

a. <u>Morning operation</u>
   i)   How many total arrests were made?
   ii)  How many reported use of force incidents during the morning operation?
   iii) How many less-lethal specialty impact munitions were deployed?
   iv)  How many and types of chemical agents deployed?
   v)   How many documented injuries to Officers?
   vi)  How many documented injuries to community/protesters/etc.?

b. <u>Evening operation</u>
   i)   How many total arrests were made?
   ii)  How many reported use of force incidents during the morning operation?
   iii) How many less-lethal specialty impact munitions were deployed?
   iv)  How many and types of chemical agents deployed?
   v)   How many documented injuries to Officers?

BEY000227

vi) How many documented injuries to community/protesters/etc.?

c.  During B-Watch/FOP Park, how many total OPD personnel were deployed at 14th and Broadway (2030 hours?)

d.  During B Watch/FOP Park, how many mutual aid personnel were deployed at 14th and Broadway (2030 hours?)

e.  During B Watch/FOP Park, how many Tango Team personnel were deployed at 14th and Broadway (2030 hours?)

f.  Total OPD sworn staffing (Department)?

g.  Total OPD civilian staffing (Department)?

BEY000228

# APPENDIX 3

**Meetings and Interviews Conducted
By Frazier Group for this Investigation**

**BEY000229**

# MEETINGS AND INTERVIEWS

| | MEETINGS HELD | |
|---|---|---|
| **PERSON** | **POSITION** | **DATE(S)** |
| Ms. Jean Quan | Mayor | 12/29/11 |
| Ms. Deanna Santana | City Administrator | 12/29/11 |
| | | 1/24/12 |
| | | 1/26/12 |
| | | 2/14/12 |
| | | 2/16/12 |
| Mr. Howard Jordan | Chief of Police | 12/29/11,1/24/12,2/29/12 |
| Mr. Michael Yeoll | OPD (Retired)/Investigator | 3/1/12 |
| | | 2/16/12 |
| Mr. Robert Warshaw | Federal Monitor | 1/26/12 |
| | | 2/15/12 |
| Mr. Charles D. Reynolds | Deputy Federal Monitor | 1/26/12 |
| | | 2/15/12 |
| Ms. Rocio Fierro | Supervising Deputy City Attorney | 2/14/12 |

| | | |
|---|---|---|
| Ms. Linda Lye | ACLU | 2/28/12 |
| Ms. Rachel Lederman | National Lawyers Guild | 2/28/12 |
| Mr. Brian Stretch | First Assistant US Attorney, Northern District of California | 2/28/12 |
| Ms. Susan Badger | Assistant US Attorney/Civil Rights Division, Northern District of California | 2/28/12 |
| Mr. Patrick Caceres | Manager and Policy review/Oakland Civilian Police Review Board | 2/29/12 |
| Ms. Karen Tom | Attorney/Investigator, Oakland Civilian Police Review Board | 2/29/12 |
| Mr. George Hart | Retired OPD Chief (20 yrs.) | 3/19/12 |
| Mr. Jim Chanin | Attorney | 2/29/12 |

BEY000230

| INTERVIEWS* | | |
|---|---|---|
| | | |
| **PERSON** | **POSITION** | **DATE(S)** |
| Jeff Israel* | Deputy Chief OPD/Field Ops 1 | 12/29/11 |
| Anthony Toribio* | Interim Deputy Chief/Assistant Chief | 12/29/11 2/29/12 |
| David Elzey* | LT OPD/Internal Affairs | 12/30/11 3/1/12 |
| Paul Figueroa* | CAPT/OPD Internal Affairs Commander | 12/30/11 |
| Ms. Kristen Burgess-Mederios | OPD Police Programs and Performance Auditor | 1/10/12 |
| David Carmen | SGT OPD  - Patrol/East Oakland | 1/10/12 |
| Eric Breshears* | OPD Deputy Chief/Field Ops 2 | 1/11/12 |
| Ms. Danielle Outlaw | LT OPD/IA Administrative | 1/11/12 3/1/12 |
| | | 2/15/12 |
| Ms. Drennon Lindsey | LT OPD/Major Crimes Unit 2 | 1/11/12 |
| Jimmy Wong | SGT OPD/IA Investigator | 1/11/12 |
| | | 1/24/12 |
| James Rullamas | SGT OPD/Major Crimes Unit 2 | 1/11/12 2/29/12 |
| | | 2/15/12 |
| Mike Reilly | SGT OPD/Intel Division Leader | 1/11/12 |
| Inez Ramirez III | SGT OPD/Special OCCUPY OAKLAND Video Project | 1/11/12 |
| | | 2/15/12 |
| Ed Tracey | CAPT OPD/Training Division | 1/25/12 |
| Sean Whent | CAPT OPD/Risk Management | 1/26/12 |
| Sean Whent | Acting Deputy Chief | 2/15/12 2/29/12 |
| | | 2/15/12 |

BEY000231

| Ms. Regina Harris-Gilyard | Public Safety Communications Supervisor | 2/15/12 |
|---|---|---|

| Mr. Arturo Sanchez (telephone interview) | Assistant to City Administrator | 5/11/12 |
|---|---|---|

**\*NOTE:  With the exception of those persons noted with an asterisk (\*), the following preamble was read to each person prior to the beginning of the interview:**

- We are members of the Frazier Group commissioned by the Oakland City Administrator to conduct a review of the events of October, 25, 2011 regarding the Occupy movement.

- The review we are conducting will result in a public report.

- We have been made aware you have information regarding the October 25, 2011 incident and that you are not a subject officer to an internal investigation regarding the Occupy movement.

- The Chief of Police is in support of the Frazier Group Review, as directed by the City Administrator.

- The Review will focus on: Planning, Policies, Training, Command, Operations, Mutual Aid, Reporting, Use of Force, Personnel Complaint Intake Processing and Accountability.

- The interviews are not recorded nor transcribed.

- The interviews are voluntary and not compelled.

- If, at any time you feel uncomfortable answering questions please advise us and we will move on to another question.

- The interview will last approximately an hour.

- Do you have any questions?

- Are you willing to speak to us?

BEY000232

- Could you please state and spell your name and assignment.

- Please describe your primary role on October 25, 2011.

BEY000233

# APPENDIX 4

## Identifying Patches of Law Enforcement Organizations Involved on October 25, 2011

BEY000234







BEY000235







BEY000236







BEY000237



WWW.MIKE-SNOOK.COM





BEY000238



WWW.MIKE-SNOOK.COM



WWW.MIKE-SNOOK.COM

109

BEY000239







BEY000240





111

BEY000241

# APPENDIX 5

**Oakland PD
Comparative Data**

BEY000242

# COMPARATIVE DATA

# Police Department Size Comparisons*
# California Cities - 2010

| City | Population | Sworn Officers | Civilian LE FTE | Sworn per 1,000 population |
|---|---|---|---|---|
| Fresno | 484,734 | 793 | 214 | 1.64 |
| Long Beach | 462,267 | 889 | 363 | 1.92 |
| Los Angeles | 3,841,707 | 9,858 | 2,896 | 2.57 |
| Oakland | 409,723 | 674 | 261 | 1.64 |
| Sacramento | 472,469 | 696 | 323 | 1.47 |
| San Diego | 1,313,433 | 1,863 | 653 | 1.42 |
| San Francisco | 818,594 | 2,250 | 379 | 2.75 |
| San Jose | 970,252 | 1,259 | 365 | 1.30 |

# OPD Staffing and Violent Crime*

| YEAR | TOTAL LE PERSONNEL** | SWORN STRENGTH | CIVILIAN STAFF FTE | UCR REPORTED VIOLENT CRIME*** |
|---|---|---|---|---|
| | | | | |
| 2000 | 1131 | 737 | 394 | 5,038 |
| 2005 | 1019 | 730 | 289 | 5,692 |
| 2010 | 935 | 674 | 261 | 6,297 |

*Data extracted from FBI Uniform Crime Reports (UCR)
** Total strength is sworn plus PD civilian personnel
*** UCR defines "Violent Crime" as including Murder, Forcible Rape, Robbery, and Aggravated Assault

**OPD Percent of personnel changes 2000 – 2010:**

Total Personnel (1131 to 935):  - 17%
Sworn Personnel (737 to 674):  - 9%
Civilian Staff (394 to 261):  - 34%

**Oakland UCR Violent Crime reported 2000 – 2010:**  5,038 to 6,297:  + 25%

BEY000243

# APPENDIX 6

**Frazier Group LLC
Investigative Team**

**Members
Biographical Sketches**

114

BEY000244

# THOMAS C. FRAZIER

Tom Frazier served as Executive Director of the Major Cities Police Chiefs Association from 2001-2010, representing the Chiefs of the sixty-three largest police agencies in the United States and Canada.   He has been on the Federal Monitor Team of United States Department of Justice (USDOJ) Consent Decrees for both the City of Los Angeles and the City of Detroit, specializing in Use of Force, Departmental Policy, and Training.   He is the President of Frazier Group LLC.

Prior to creation of Frazier Group, he was Director of the USDOJ's Office of Community Oriented Policing, a ten billion dollar grant program created to put 100,000 police officers on the streets of America.



During his thirty-two years of sworn service, he served Police Commissioner of Baltimore, Maryland from 1994-1999. While in that position he was responsible for the overall operation of the police department.  Signature programs included 3-1-1, Departmental Reorganization, CrimeStat, and a significant reduction in crime.  From 1967 to 1994 he served in every rank through Deputy Chief in the San Jose, California Police Department.   He was Chief of Patrol, Chief of Detectives, Chief of Administration, Chief of Technical Services, Director of Communications, and Tactical Division Commander among others.. During his career has served in Internal Affairs, Special Weapons and Tactics, Planning and Research, Field Training, the City Manager's Office, and Criminal Intelligence.

He served in the U.S. Army in Viet Nam as a Military Intelligence officer, and was awarded the Combat Infantryman's Badge, the Bronze Star, and the Air Medal.

He is Past President of the Board of Directors of the Police Executive Research Forum, and Past Chairman of the Board of the Baltimore-Washington HIDTA.  He holds a Masters in Criminal Justice Administration from San Jose State University, and has instructed internationally on a range of tactical and community policing topics.  He has served on a number of advisory boards to the Department of Justice and the Department of Homeland Security such as Global Intelligence Working Group, the Criminal Intelligence Coordinating Committee, the ITACG Advisory Committee, and the Fusion Center Management Group.

BEY000245

# MICHAEL R. HILLMANN



Deputy Chief Michael R. Hillmann retired from the Los Angeles Police Department (LAPD) in September 2008, following 42 years of service. The majority of his career has been focused on special operations including city-wide gang enforcement, Civil Disorder and Crowd Control, Special Weapons and Tactics (SWAT), Emergency Management, Special Event Planning and Aviation Support (Air Support Division).  His last assignment was Special Assistant to the Office of Chief of Police.

In 1976,  Deputy Chief Hillmann developed the Department's Crisis Negotiation Team (CNT), in 1983 the Tactical Intelligence Support (TOC) model for the 1984 Los Angeles, Summer Olympic Games and the Department's Mobile Field Force (MFF) program following the 1992 civil unrest in Los Angeles.  He has instructed numerous law enforcement and military personnel in the subject areas of SWAT, Hostage Rescue, Tactical Supervision, Civil Disorder and Crowd Control, Use of Force, Field Tactics, Special Event Planning, Unusual Occurrence Management and Critical Incident Decision Making (Command Officers).

Beginning in 1981, Deputy Chief Hillmann was assigned by the Chief of Police as liaison to Department of Defense special operations units.  During this period he interacted with many Joint Special Operations Command Tier Groups providing training and special mission support.  Many LAPD/ DOD support functions were provided throughout the following years and continue to this day.  Beginning in 2002, Deputy Chief Hillmann was responsible for reconstituting City-wide gang enforcement operations that included responsibility for approximately 39,000 documented gang members.

Following his retirement from LAPD in 2008, he was selected as Assistant Sheriff  for the Orange County Sheriff-Coroner Department (OCSD) to assist in revitalizing the organization following criminal indictments of the former administration.  Due to budget deficits, in February 2010, Assistant Sheriff Hillmann's position was eliminated.  During the nearly, one and a half years with OCSD, Assistant Sheriff Hillmann exercised executive management over Field Operations and Investigative Services Command. This command included patrol functions for 12 contract cities, Harbor Patrol for three harbors, Airport Security for John Wayne Airport, Counter-terrorism (Joint Terrorism Task Force), Special Weapons and Tactics, Aviation Operations, Emergency Management, Mutual Aid Coordinator, Investigative Services and Gang Enforcement.

BEY000246

Currently, Mr. Hillmann is a law enforcement consultant and is assisting the Federal Emergency Management Administration (FEMA) in development of a national SWAT Resource Typing model.  Additionally, he is currently a panel member constituted by the City of Los Angeles to examine security issues at the Los Angeles International Airport.

Mr. Hillmann possesses a FBI Secret Clearance and Bachelor of Arts Degree from the University of Redlands, California.

BEY000247

# DONALD K. ANDERS

Deputy Chief Donald K. Anders retired from the San Jose Police Department in June, 2010 after thirty – two years of service.   His diverse career included command of the major bureaus of the department as well as its' most prestigious and sensitive units, including Special Operations and Internal Affairs. His command at retirement was Deputy Chief of the Bureau of Investigations.



Throughout his career Chief Anders was selected for increasingly responsible and sensitive assignments.  He was a Field Training Officer and member of the Special Action Unit (SWAT) as a Deputy Sheriff in the Monterey County Sheriff's Department.  Upon his transfer to SJPD he      promoted rapidly to Lieutenant where he commanded the Internal Affairs Unit, the Narcotics and Covert Investigations Unit, and the Robbery Unit.

As a Captain Mr. Anders served in the Bureau of Administration, with Personnel, Training, and Fiscal under his command.  He was transferred to the Bureau of Investigations where he served as Acting Chief.    Homicide, Gang Investigations, Assaults and Juvenile, Narcotics, Robbery, Sexual Assaults, Burglary, Financial Crimes, and Auto Theft were under his command.   Upon his assignment to the Bureau of Field Operations he commanded the Southern Patrol Division, and subsequently the Special Operations Division.  The Special Operations Division included the Violent Crimes Enforcement Team, the METRO Unit (downtown covert), Traffic Enforcement, and the MERGE Unit. MERGE responsibilities included SWAT, VIP protection, high risk and hostage/barricade response, crowd control and similar assignments.  Canine, Explosive Ordinance Demolition, and Hostage Negotiators were attached to MERGE as well.  As Special Operations Commander he commanded virtually all of the City's major events, VIP visits, festivals, demonstrations, parades, and other large gatherings.

As a Deputy Chief he provided executive leadership and management for the Bureau of Field Operations, with all of its responsibilities of patrol service delivery, Community Oriented Policing, special events, and Special Operations.   As Chief of the Bureau of Investigations he exercised the same responsibilities for all line investigative operations. As Chief of the Bureau of Technical Services he provided leadership and guidance to the 9-1-1 Communications Center, and the Data Systems Development Unit.

BEY000248

Chief Anders holds a Masters of Arts in Education from San Diego State University, and a Bachelors of Arts in Management from Saint Mary's College.  He is a graduate of the 171st Session of the FBI National Academy, the Senior Management Institute for Police, and the California P.O.S.T. Command College.  He served as an Adjunct Professor at San Jose State University, and taught over 1500 students in the P.O.S.T. certified Internal Affairs Investigation and Command courses.

He was elected Speaker of Command College Class #24, holds an Advanced Certificate from California P.O.S.T., is a P.O.S.T. Certified Academy Instructor, and received both the SJPD Hazardous Duty Award and the National Exchange Club Blue and Gold Wounded-in-Service Award.

BEY000249

# <u>RICHARD L. CASHDOLLAR</u>

During his first career, Captain Cashdollar served twenty-six years of active duty in the U.S. Coast Guard. His tours of duty included operational commands afloat and ashore, as well as sensitive political and diplomatic assignments with the State Department, the Justice Department, the Office of the Vice President, and the Executive Office of the President. He developed and supervised an eleven-agency Intelligence Fusion Center responsible for all tactical drug intelligence in the Caribbean during the height of the drug war in the mid-eighties, and served as Commander of the U.S. Coast Guard Group headquartered in Mobile Alabama for a three-year tour of duty from 1990 to 1993. During most of his career he held a Top Secret security clearance with special background investigation.



During his second career, he served over eleven years as Executive Director of Public Safety for the City of Mobile, AL. He was responsible for Mobile's Police and Fire-Rescue Departments, supervising two professional Chiefs with over 1,100 sworn first responders. He was also program manager for the City's Municipal Court and Animal Control Departments, and managed a nearly $180 Million public safety budget. During this period he also served three terms as Chairman of the Board of Directors of the Mobile County Emergency Management Agency. Under his guidance at EMA, the organization adopted Incident Command and developed an active Weapons of Mass Destruction Task Force in a system that coordinated the activities of over 50 agencies in a NIMS/ICS all-threat environment – five years before these command and coordination initiatives were mandated by the Department of Homeland Security in the original National Response Plan.

Director Cashdollar is a 1968 graduate of the U.S. Coast Guard Academy, and holds a Master's Degree (with high honors) in Business Administration from the University of Miami. He is a graduate of the FBI Academy's National Executive Institute, Class XVII. He served as Chair of the International Association of Chiefs of Police (IACP) Standing Public Safety Director's Committee for three terms, and as a member of IACP's Homeland Security Committee for four years.

Captain Cashdollar has served as a Senior Advisor to the Major Cities (Police) Chiefs Association since 2005, and has represented the Chiefs in numerous DHS and FEMA initiated projects. In addition he also serves as MCC's representative to the National Homeland Security Consortium and the EMAC Advisory Group.

BEY000250

BEY000251