CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER AND BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS
ALI SALEEM BEY
JOHN MUHAMMAD BEY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ALI SALEEM BEY and JOHN MUHAMMAD BEY,<br><br>                    Plaintiffs,<br><br>        v.<br><br><br>CITY OF OAKLAND and DOES 1-100<br>                    Defendants. | Case No. 14-cv-01626-JSC<br><br>**PLAINTIFFS' NOTICE OF APPEAL**<br><br><br><br><br><br>Judge: Honorable Jacqueline Scott Corley |

NOTICE IS HEREBY GIVEN that Plaintiffs ALI SALEEM BAY and JOHN MUHAMMAD BEY, appeal to the United States Court of Appeal for the Ninth Circuit from the July 30, 2019 Order ("Order") "ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT"; and the July 30, 2019 Judgment ("Judgment") entered in favor of Defendants.  The Court entered the Order as Docket No. 193, a copy of which is attached hereto and marked as Exhibit "1." Plaintiffs are unaware of any related case pending in the Court of Appeals. Attached hereto and marked as Exhibit "2" is a representation statement. The Court entered Judgment as Docket No. 194, a copy of which is attached hereto and marked as Exhibit "3".

14-cv-01626-JSC

DATED:  August 27, 2019                    RESPECTFULLY SUBMITTED,


                                           By:  */s/ CHARLES A. BONNER*
                                                CHARLES A. BONNER
                                                Attorneys for Plaintiffs

14-cv-01626-JSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

I, CHARLES A. BONNER, am an attorney with the Law Offices of Bonner & Bonner, counsel of record for the Plaintiffs in this action.

I certify that on August 27, 2019, I caused the attached document to be served via this Court's Electronic Filing System on counsel for Defendants who are registered users of the system. *See* Local Civil Rule 5.4.

DATED: August 27, 2019

*/S/ CHARLES A. BONNER*
CHARLES A. BONNER
ATTORNEY FOR PLAINTIFFS

14-cv-01626-JSC

# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI SALEEM BEY, et al., | Case No. 14-cv-01626-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| CITY OF OAKLAND, | Re: Dkt. No. 174 |
| Defendant. | |

Plaintiffs Ali Saleem Bey ("Saleem Bey") and John Muhammed Bey ("John Bey") (together, "Plaintiffs") bring this action against the City of Oakland ("Defendant") for alleged civil rights violations by the Oakland Police Department ("OPD").  (Dkt. No. 60.)[1]  Now before the Court are Defendant's motion for summary judgment, (Dkt. No. 174), and accompanying request for judicial notice, (Dkt. No. 175).[2]  After careful consideration of the parties' briefing, and having had the benefit of oral argument on July 29, 2019, the Court GRANTS Defendant's motion.  Defendant has satisfied its burden on summary judgment of demonstrating the absence of evidence on an essential element of Plaintiffs' claims, and Plaintiffs fail to raise a genuine dispute of material fact on that score.

## BACKGROUND

### I.    Factual Background

Plaintiffs are "businessmen, family men and community leaders in the Oakland Black and Muslim community."  (Dkt. No. 185-2 at ¶ 3.)  Plaintiffs formerly had leadership roles in Your Black Muslim Bakery (the "Bakery"), a now defunct Black Muslim-owned business and

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 7, 8, 26.)

organization located in Oakland.[3]  (Dkt. Nos. 178-1, Ex. B at 27 (304:1-11) & 185-1 at ¶¶ 4-5.)

The gravamen of Plaintiffs' claims is that OPD failed to adequately investigate Plaintiffs' 2013

Internal Affairs Division ("IAD") complaint because of Defendant's policy or custom of racial and

religious animus toward Black Muslims.  Plaintiffs' 2013 IAD complaint arose out of two

independent OPD investigations: (1) the 2004 murder of Waajid Bey; and (2) the 2005 attempted

murder of Plaintiff John Bey.  The 2013 IAD complaint also concerns an earlier IAD complaint

Plaintiffs filed in 2007.[4]

### A.     Underlying OPD Investigations

#### 1.     2004 Murder of Waajid Bey

In or around early March 2004, Waajid Bey's wife filed a missing person's report with

OPD after Mr. Bey had been missing for several days.  (Dkt. Nos. 185-1 at ¶¶ 4-6.)  At the time of

his disappearance, Waajid Bey was acting CEO of the Bakery and an associate of Plaintiffs.  (*Id.*

at ¶ 5.)  OPD officers Andre Rachal and Todd Crutchfield and an FBI agent interviewed John Bey

regarding Waajid Bey's disappearance.  (*Id.* at ¶ 6.)  John Bey met with OPD, FBI agents, and

ATF agents on "several occasions" in connection with the ensuing investigation.  (*Id.* at ¶ 7.)

In August 2004, Waajid Bey's body was discovered in the hills of East Oakland.  (*Id.* at ¶

8.)  OPD assigned Sgt. Bruce Bock[5] to investigate the murder.  (*Id.* at ¶ 9.)  Plaintiffs "continued

to provide leads to OPD" in connection with the investigation.  (*Id.* at ¶ 8.)  The parties do not

dispute that the case remains unsolved.

#### 2.     2005 Attempted Murder of Plaintiff John Bey

On the morning of June 17, 2005, John Bey was ambushed by "three to four" gunmen and

---

[3] According to Saleem Bey, the Bakery ceased operations "[a]s a legal entity" under the name
Your Black Muslim Bakery in 2004.  (Dkt. No. 191-2, Ex. 1 at 8 (203:1-8).)
[4] As discussed in the Procedural History section, the Court previously dismissed as time-barred
Plaintiffs' claims related to OPD's investigation into the 2004 murder of Waajid Bey and 2005
attempted murder of John Bey, and the 2007 IAD complaint regarding those investigations (IAD
case number 07-0538).  *See Bey v. City of Oakland*, No. 14-cv-01626-JSC, 2015 WL 8752762, at
*5-6 (N.D. Cal. Dec. 15, 2015).  The Court includes that background information here, however,
because it is relevant to the remaining claims.  *See id.* at *9 (noting that the factual allegations
related to those claims "may still serve as relevant evidence regarding the timely Section 1983 and
1985 claims").
[5] Individuals identified by rank are current or former members of OPD unless otherwise noted.

Case 3:14-cv-01626-JSC   Document 196   Filed 09/30/19   Page 7 of 37

United States District Court
Northern District of California

shot outside of his home in the Montclair community of Oakland.  (Dkt. Nos. 185-1 at ¶¶ 10-11.)
OPD opened an attempted murder investigation into the incident.  (Dkt. No. 178-2, Ex. C at 47.)
John Bey did not know that OPD closed the case until 2011, after he filed a request for records
under the Freedom of Information Act ("FOIA").  (Dkt. No. 185-1 at ¶ 14.)

**B.      2007 Citizens' Police Review Board Complaint and Internal Affairs Case**

In July 2007, Plaintiffs met with then-Oakland Mayor Ronald Dellums's office to express
their dissatisfaction with the investigations into Waajid Bey's murder and John Bey's attempted
murder.  (Dkt. No. 178, Ex. A at 5 (137:18-138:6).)  The Mayor's chief of staff recommended that
Plaintiffs file complaints with the District Attorney's office and the Citizens' Police Review Board
("CPRB").  (*Id.*)  Plaintiffs did so on July 12, 2007 and July 13, 2007, respectively.  (*See* Dkt. No.
178, Ex. A at 15-18.)  The District Attorney did not respond to Plaintiffs' letter.  (*Id.* at 5 (138:24-
25.)

Plaintiffs' CPRB complaint names Sgt. Brock and Officer Crutchfield as subject officers,
and states, in pertinent part:

> There was a very involved OPD investigation into the kidnapping and
> murder of Waajid Bey [and] the lie in wait ambush by 4 shooters of
> John Bey.
>
> Their family is concerned that after 37 [months] of intense
> investigation in Waajid's murder [and] 24 [months] of intense
> investigation into John's attempted murder there have been no
> progress even with family members feeding leads.

(*Id.* at 17.)  Saleem Bey spoke with Karen Tom from the CPRB and gave "two hours . . . of
recorded interview" in conjunction with Plaintiffs' CPRB complaint.  (*Id.* at 6 (142:7-19).)
CPRB then issued a "Notice to Complainant" letter to Saleem Bey stating that Plaintiffs'
complaint could not "be accepted for investigation because the complaint does not allege
misconduct by any specific Oakland officer."  (*Id.* at 18.)  The letter further states that although
the complaint names two OPD officers as "involved personnel" the complaint itself contains no
allegations of misconduct by those officers, and "[Saleem Bey] indicated to Complaint
Investigator Audrey Schonborn that [he] did not have a complaint against a specific Oakland
police officer but instead [his] main concern was the general investigation process being slow and

not progressing after several years." (Dkt. No. 178, Ex. A at 18.)  The letter explains:

> The Citizens' Police Review Board Ordinance . . . applies to misconduct complaints against Oakland police officers or park rangers.  Your complaint as written alleges failure to solve a homicide and attempted homicide and not a specific Manual of Rules violation by a specific officer.
>
> As with all service complaints,[6] we are forwarding your complaint to Oakland Police Chief Wayne Tucker and we will maintain your complaint in our database.

(*Id.*)  The letter directed Plaintiffs to contact "Complaint Investigator Audrey Schonborn" if they had any questions or wished to amend their complaint.  (*Id.*)

CPRB and IAD conduct "parallel and separate investigations" regarding CPRB complaints, (*see* Dkt. No. 178-3, Ex. D at 6:12-14); Plaintiffs' complaint was thus forwarded to IAD on July 26, 2007 and became IAD case number 07-0538, (Dkt. No. 186-11, Ex. 11 at 2 (noting that the "complaint came in via CPRB notification")).  Officer C. Bolton handled the initial intake of the complaint and spoke with Saleem Bey on August 6, 2007.  (*Id.*)  Officer Bolton's report of that contact states, in pertinent part:

> I informed S. Bey that OPD has accepted his service complaint, that I would note that I was unable to informally resolve it, assured him that OPD is on the path to bring Dept. to full strength and increase number of investigators so that OPD has ability to investigate further on more cases than current.

(Dkt. No. 186-11, Ex. 11 at 2.)  Officer Bolton recommended "Admin Closure" of the complaint, finding "no benefit in forwarding th[e] unresolved service complaint for COP or BOI review."  (*Id.*)  Officer Bolton forwarded the complaint to Sgt. P. Freeman for review; four days later Sgt. Freeman indicated that he had reviewed the case and recommended Admin Closure.  (*Id.*)  Sgt. Freeman then forwarded the complaint to Lt. David Downing, who agreed with Sgt. Freeman's recommendation and concurred that "this is a service complaint."  (*Id.*)  Lt. Downing further noted

---

[6] According to Patrick Caceres of the CPRB, a service complaint is one in which the complainant "believes that the quality of service that they're receiving from the police department is inadequate or insufficient."  (Dkt. No. 178-3, Ex. D at 10 (23:21-24).)  The CPRB does not investigate such complaints.  (*Id.* at 11(24:2-3).)  CPRB instead investigates "individual misconduct complaints against officers and misconduct constituting violations of the [OPD Manual of Rules]."  (*Id.* at 24:5-9.)  As explained by OPD Sgt. William Griffin, IAD likewise does not provide findings for "service complaints," which are complaints "express[ing] dissatisfaction with a finding or result."  (Dkt. No. 178-2, Ex. C at 4 (14:4-19).)

that "[t]he Complainant makes no specific allegation toward a single officer, but a broad brushstroke allegation against the entire department for not solving a homicide case to his satisfaction." (Dkt. No. 186-11, Ex. 11 at 2.) Lt. Downing recommended Admin Closure and forwarded the complaint to Capt. B. Fairow for review. (*Id.*) Capt. Fairow reviewed the complaint but did not approve Admin Closure; instead, Capt. Fairow sent the complaint back to Lt. Downing, noting: "Prior to making this a service complaint, or otherwise Admin Closing, it will need to be established that the CPRB has no differing allegations and that they will also be Admin Closing." (*Id.*) Lt. Downing then sent the complaint back to Sgt. Freeman "to coordinate with CPRB to determine their anticipated finding." (*Id.* at 3.)

On August 20, 2007, Sgt. Freeman reported: "Case reviewed with Capt. Fairow. The CPRB in their Notice of Complaint Not Accepted for Investigation stated that they cannot accept this case for investigation, because the complaint does not allege misconduct by any specific Oakland Police Officer." (*Id.*) Capt. Fairow approved the Admin Closure, and on September 1, 2007, IAD mailed a "closeout letter" to Saleem Bey, stating, in pertinent part:

> Service Complaint: You initiated a complaint regarding an improper policy, procedure, practice, service level or legal standard of the Department. The Internal Affairs Division has documented and worked toward resolving your complaint. The circumstances will be further reviewed in order to improve our future service to the community.

(Dkt. No. 188-12, Ex. 12 at 2.) IAD closed the case on September 4, 2007. (Dkt. No. 186-11, Ex. 11 at 3.)

### C. 2011 Citizens' Police Review Board Complaint and Internal Affairs Case

Plaintiffs filed another CPRB complaint in September 2011. (Dkt. Nos. 178, Ex. A at 6-7 (144:20-145:10) & 186-11, Ex. 11 at 3.) CPRB again forwarded the complaint to IAD. (Dkt. No. 178-4, Ex. E at 10 (120:7-25).) IAD assigned the complaint the same case number as the July 2007 complaint—07-0538.[7] (*Id.*; *see also* Dkt. No. 178, Ex. A at 6-7 (144:20-145:1) (noting that

---

[7] In support of its motion for summary judgment, Defendant submits the declaration of John Lois, former OPD Assistant Chief of Police and Internal Affairs Investigations Commander. (Dkt. No. 174-1 at ¶¶ 1, 4.) Mr. Lois attests that the IAD's Intake Unit reviews complaints "to determine whether the incident complained of is currently being investigated or has already been

United States District Court
Northern District of California

1   Plaintiffs' complaint "was reopened as the same complaint" and assigned the same case number).)

2       On September 30, 2011, Officer Robyn Clark emailed then-Sgt. Robert Supriano regarding

3   the new IAD complaint, stating, in pertinent part:

> Salem Bey filed a repeat complaint with CPRB.  It is related to a complaint made 07/13/07 07-0538 in which he was upset at how a kidnap/murder case was being handled.  We admin closed it as a service complaint (common practice at the time).

7   (Dkt. No. 178-4, Ex. E at 22.)  Officer Clark also noted that the complaint "references all the [Sgt.]

8   Longmire [illegible] related to the Bey Investigations."[8]  (Id.)  That same day, Sgt. Supriano

9   emailed then-Lt. Danielle Outlaw and Capt. Paul Figueroa the following:

> I need to make you both aware of documents that Saleem Bey filed with the CPRB on 26Sep11 regarding Sgt. D. Longmire.  IAD received the complaint yesterday afternoon from the CPRB.  As Robyn indicates below, [Saleem Bey] is reiterating his displeasure about how OPD handled a kidnap/murder case in 2007 that IAD closed as service [sic] as well as referenced [sic] subsequent cases handled by Sgt. Longmire.  We are currently evaluating the documents to establish the need to initiate a new complaint and interview Saleem Bey as to the allegations.  The CPRB has informed us they intend to initiate a case.

16  (Id.)

17      On October 4, 2011, Officer Robert Messier drafted an IAD "Chronicle Log" entry for

18  case 07-538 stating:

> On 28 Sep 11, IAD received a citizen complaint form from the [CPRB] which was turned in by Mr. Ali Saleem Bey.  IAD reviewed the documents and found there were no new allegations mentioned or discovered.
>
> After further investigation, it was brought to Capt. Figueroa's attention regarding the complaint.  Per Capt. Figueroa the subject

---

investigated, or whether the complaint is already on file."  (Id. at ¶ 6.)  Complaints that are already on file are "typically . . . incorporated into the existing complaint or investigation file."  (Id.)

[8] Sgt. Longmire was the subject of an independent IAD investigation (07-0553) initiated in August 2007 that was subsequently investigated by the California Department of Justice.  (Dkt. Nos. 178-2, Ex. C at 7 (19:11-20) & Dkt. No. 181, Ex. C-2 at 37.)  The investigation involved allegations of misconduct by Sgt. Longmire in connection with OPD's investigation into the murder of journalist Chauncey Bailey on August 2, 2007.  (Dkt. No. 181, Ex. C-2 at 36, 40.)  Mr. Bailey was "conducting an investigative report" on the Bakery at the time of his death.  (Id. at 36.)  Sgt. Longmire was the lead investigator on the Bailey case and was alleged to have had "a relationship or connection with the [B]akery" that obstructed the murder investigation.  (Id.)

personal [sic] have been investigated and outside investigation has been conducted.

At this time, there are no new allegation [sic] and the complaint form and documents will be placed into the existing case folder 07-0538.

(Dkt. No. 186-11, Ex. 11 at 3.) IAD thus closed the complaint.

The CPRB administratively closed the complaint in October 2012. (Dkt. No. 178, Ex. A at 19.) In a letter to Plaintiffs dated October 9, 2012, CPRB Policy Analyst and Manager Patrick Caceres, writes:

> Thank you for your and your family's attendance at the September 27, 2012 CPRB Board Meeting.
>
> This letter serves to inform you that the Board voted to administratively [sic] the complaint you filed on September 26, 2011 with the CPRB due to lack of jurisdiction. However, the Board also voted to draft a letter to United States Department of Justice recommending that it conduct an investigation. The Board will proceed at this time to prepare the letter.

(*Id.*) The CPRB sent the letter to the United States Department of Justice ("DOJ") on November 7, 2012. The letter refers and recommends an investigation into the complaints made by Plaintiffs to the DOJ's "Civil Rights Division, Initiative to Combat Post 9/11 Discrimination Backlash," and states, in pertinent part:

> The [CPRB] had initially closed the Beys' case in 2007 for insufficient information. The Beys provided additional details to their original complaint to reopen the investigation in 2011, but due to statute of limitations, any action on these complaints is no longer timely under California law. Additionally, the complaints are beyond the resources of this Board. Therefore, by request of the complainants and by vote of the Members of the [CPRB], we are forwarding the attached information for further action.

(*Id.* at 20.) The DOJ responded to the CPRB's letter on April 17, 2013, (*id.* at 21), but did not launch an investigation, (*id.* at 7-8 (148:14-151:2)).

### D.    2013 Internal Affairs Case

In 2013, Plaintiffs contacted the office of Thomas Frazier, who had been appointed as Independent Monitor and Compliance Director to oversee OPD pursuant to a 2003 Negotiated Settlement Agreement (the "*Allen* Agreement") in another federal action in this district, *Allen v.*

United States District Court
Northern District of California

7

United States District Court
Northern District of California

*City of Oakland*, No. 00-cv-04599-WHO.[9]  (Dkt. Nos. 60 at 4, 9 & 178, Ex. A at 8 (152:16-22).)

Plaintiffs requested that Mr. Frazier investigate OPD's conduct regarding the underlying

investigations and Plaintiffs' IAD complaint 07-0538.  (*Id.*)  On July 23, 2013, Richard

Cashdollar, a representative from the Compliance Director's office, sent a letter to Capt. Figueroa,

stating in part:

> Yesterday afternoon Mr. John Bey knocked on the door of our office and lodged a verbal complaint against OPD for not aggressively investigating a case that he alleges involves several homicides. He left the following business card.[10]
>
> Per our conversation yesterday, I understand that you process encounters like this as [IAD] complaints.  As such I forward this information to you for appropriate action.

(Dkt. No. 178, Ex. A at 22.)  IAD Intake Officer Nguyen contacted Plaintiffs by phone and letter

the next day indicating that IAD was opening a new case based on Plaintiffs' complaint.  (*Id.* at 9-

10 (155:1-8, 159:9-21); Dkt. No. 178-1, Ex. B at 21 (265:18-24).)  IAD designated the complaint

as case number 13-1062.  (Dkt. No. 178, Ex. A at 10 (160:12-14, 21-25).)  Plaintiffs were

disappointed that the Compliance Director's office "rerouted or returned" their complaint to IAD,

(*id.* at 9 (155:9-11)), and sent a letter to Mr. Frazier "formally disagree[ing]" with that decision

because Plaintiffs' new complaint concerned IAD's failure to properly investigate 07-0538, (*id.* at

26).  The Compliance Director's office did not respond to Plaintiffs' letter.  (*Id.* at 10 (159:22-

160:2).)

---

[9] Pursuant to the *Allen* Agreement, the Compliance Director is empowered to (1) review closed IAD investigations, (2) access and evaluate the quality and timeliness of investigations, (3) recommend reopening investigations that the Compliance Director determines are incomplete, (4) recommend additional measures that should be taken with respect to future investigations, and (5) review and evaluate disciplinary actions or other interventions taken as a result of misconduct investigations.  (Dkt. No. 141 at 4-5 (citing Dkt. No. 112-15 at 52).)  As this Court previously noted, the *Allen* Agreement was entered into by the City of Oakland and the *Allen* plaintiffs and it is binding on and enforceable by those parties only.  (*Id.* at 4 (citing Dkt. No. 112-15 at 7-8).)  No person or entity is intended to be a third-party beneficiary of the *Allen* Agreement for purposes of any civil, criminal, or administrative action; thus, no third party may assert any claim or right as a beneficiary or protected class under the *Allen* Agreement.  (*Id.* (citing Dkt. No. 112-15 at 8).)  Accordingly, this Court previously concluded that Plaintiffs have no right to enforce the *Allen* Agreement or otherwise seek to benefit under its provisions.  (*Id.* at 5-6.)

[10] The letter includes a copy of the business card, with the name "John M. Bey" circled and a handwritten note reading "IA 07-0538."  (Dkt. No. 178, Ex. A at 22.)

United States District Court
Northern District of California

1    Plaintiffs met with Officer Nguyen "[p]ossibly twice" in person and once on the phone to

2    discuss 13-1062 and "get the facts around the complaint." (Dkt. No. 178-1, Ex. B at 21 (263:3-

3    264:11).) Officer Nguyen explained to Plaintiffs that he was an IAD Intake Officer and would not

4    be investigating the complaint but would collect the facts from Plaintiffs before passing the case to

5    the IAD investigator. (*Id.*) Plaintiffs' meetings with Officer Nguyen totaled two to three hours.

6    (*Id.*)

7    In August 2013, Plaintiffs contacted the Compliance Director's office to complain "that

8    nothing had been done since the intake." (*Id.* at 265:6-10.) IAD Capt. Oliver Cunningham then

9    contacted Plaintiffs by phone to discuss 13-1062, and Plaintiffs met with him in September 2013.

10   (*Id.* at 266:4-23.) Capt. Cunningham told Plaintiffs that the 13-1062 would focus on the 2004

11   Waajid Bey murder investigation, 2005 John Bey attempted murder investigation, and previous

12   IAD investigation 07-0538. (*Id.* at 23 (272:10-21); *see also id.* at 28-29 (September 16, 2013

13   email from John Bey to Compliance Director and Saleem Bey relaying understood scope of

14   investigation "[a]ccording to Capt. Cunningham").) Thereafter, Plaintiffs met with Capt.

15   Cunningham once more and had "a couple of hallway meetings" to discuss 13-1062. (Dkt. No.

16   178-1, Ex. B at 22 (267:3-15).) Saleem Bey described Capt. Cunningham's demeanor as

17   "dismissive" during their encounters. (*Id.* at 23 (273:7-12).)

18   The case was assigned to IAD Sgt. William Griffin in August or September 2013 with

19   directions to focus the IAD investigation on OPD's investigations into the 2004 murder of Waajid

20   Bey and 2005 attempted murder of John Bey, and OPD's closing of Plaintiffs' previous IAD

21   complaint, 07-0538. (Dkt. No. 178-2, Ex. C at 11-12 (52:17-53:6), 23-24 (77:24-78:1).)

22   Plaintiffs "met with [Sgt. Griffin] a couple of times" during the investigation. (Dkt. No. 178-1,

23   Ex. B at 24 (276:16-17).) Sgt. Griffin recalls speaking to John Bey "multiple times," as well.

24   (Dkt. No. 178-2, Ex. C at 37 (189:3-7).) Saleem Bey testified that Sgt. Griffin "kind of fell off

25   and disappeared" after his initial meetings with Plaintiffs. (Dkt. No. 178-1, Ex. B at 24 (276:16-

26   18).)

27   In conducting his investigation, Sgt. Griffin "reviewed the case evidence that was available

28   and "case notes regarding actions taken [by OPD]" regarding the 2004 Waajid Bey murder

9

investigation and the 2005 attempted murder of John Bey.  (Dkt. No. 178-2, Ex. C at 14 (56:21-23).)  Sgt. Griffin also reviewed documents related to IAD case 07-0538, IAD case 07-0553, correspondence from the CPRB, and statements and evidence submitted by Plaintiffs.  (*See* Dkt. No. 181, Ex. C-1 at 27, 29 (Report of Internal Investigation File No. 13-1062) (noting that "the complaints and evidence gathered totaled several thousand pages of information").)  Sgt. Griffin drafted a report of his findings and presented them to then-Chief Sean Whent.  (Dkt. No. 178-2, Ex. C at 18 (62:8-12).)

According to Sgt. Griffin:

> So technically, I was specifically directed [by Chief Whent] to sustain the Department for some failures, and I believe I documented in my report that there were policies not in place to ensure that everything was done appropriately, case files were handled appropriately, . . . to address how we handle investigative leads, things like that.  There were policies that were not in place that would – you know, that might have provided for a sustained finding for not taking certain steps during an investigation.  So there was [sic] recommendations on my part that [OPD] needed to refine their policies and procedures for investigators.

(*Id.* at 17 (61:13-24).)  Sgt. Griffin testified that he could not sustain findings against individual officers because he did not have evidence of individual wrongdoing regarding the underlying investigations.  (*Id.* at 18-21 (62:14-65:2) (noting that OPD did not have a "set policy" of required investigative procedures at the time of the investigations against which Sgt. Griffin could compare the actions of the subject officers).)  Sgt. Griffin was also unable to speak directly with the OPD officers responsible for the 2004 Waajid Bey murder investigation (Sgt. Brock) and the 2005 attempted murder of John Bey (Sgt. Ray Sethna) because those officers were no longer employed by OPD[11] and they did not respond to Sgt. Griffin's requests for an interview.  (*Id.* at 31 (107:16-108:12); *see also* Dkt. No. 181, Ex. C-1 at 28 (noting that Sgt. Griffin left phone messages for

---

[11] Defendant submits the declaration of Kiona Suttle, Personnel Manager for OPD, who attests that "Officer Brock's last day of employment with OPD was December 3, 2006," and his direct supervisor between 2004 and 2005, Lt. James Every, left OPD on June 29, 2006.  (Dkt. No. 174-2 at ¶ 2(a).)  Ms. Suttle further attests that "Officer Crutchfield's last day of employment with OPD was October 17, 2011," and his direct supervisor, Lt. Kenneth Paris, left OPD on November 3, 2012.  (*Id.* at ¶ 2(b).)  As for Sgt. Sethna, Ms. Suttle attests that his last day with OPD was October 17, 2011, and his supervisor between 2004 and 2005, Lt. Whitman, left OPD on December 30, 2009.  (*Id.* at ¶ 2(c).)

United States District Court
Northern District of California

"Ret. Sgt. R. Sethna" and "Ret. Sgt. Brock" but neither responded).) Further, Sgt. Griffin was unable to review the case file in the 2004 Waajid Bey murder investigation because the file was missing.[12] (Dkt. No. 178-2, Ex. C at 22 (66:3-5) ("As to Waajid Bey, I looked at what was available to me, though that case file at the time was missing.").)

Sgt. Griffin's findings are documented in his Report of Internal Investigation for 13-1062 (the "Report"). The Report details Plaintiffs' statements and allegations of wrongdoing by OPD and deems Plaintiffs credible. (Dkt. No. 181, Ex. C-1 at 26-30.) The Report affirms IAD's previous characterization of case 07-0538 as a "service complaint" and finds that the facts of the complaint supported its administrative closure; specifically, the complaint did not allege facts that "if substantiated[ ] would constitute a [Manual of Rules] violation" by an individual officer but instead, "stated a concern that there was no progress with the [underlying] investigations." (*Id.* at 28.)

The Report further finds, however, that OPD failed to properly investigate both Waajid Bey's murder and John Bey's attempted murder; specifically, "[OPD] did not have proper policies and procedures in place to ensure that these investigations were completed thoroughly and that proper documentation was retained to ensure follow up investigations could be completed." (*Id.* at 30.) As for the investigation into Waajid Bey's murder, the Report recommends a finding of "Sustained" and details Sgt. Griffin's unsuccessful attempts to locate the missing case file. (*Id.* at 31-32.) The Report further notes that OPD's Property and Evidence Unit documented "11 separate evidence sheets" for the case. (*Id.* at 32.) The Report states that although "the quantity of evidence collected is indicative of a detailed investigation, it does not provide insight into the quality of the investigation without investigative notes." (*Id.*) The Report asserts that "CID has initiated efforts to locate the investigative file for [the Waajid Bey murder investigation]," and "[o]nce the file has been located, a review and thorough follow up of the case will be conducted." (*Id.*)

---

[12] Sgt. Griffin testified that "[t]he case file of Waajid Bey's murder was missing from OPD records. Upon closing the case, it was determined that retired Sergeant Brock had copies of the case file with him at the district attorney's office." (Dkt. No. 181, Ex. C-1 at 12 (53:20-24).)

11

As for the investigation into John Bey's attempted murder, the Report likewise recommends a finding of "Sustained" and details the following "steps that should have been taken prior to closing the case": (1) a "[p]hoto lineup of four 'young male blacks' arrested in weeks following the shooting" who possessed shotguns at the time of arrest; (2) "[f]ollow up results from [the Integrated Ballistic Identification System] regarding expended shell casings collected at the scene; and (3) "[p]hoto lineup containing Antar Bey."  (Dkt. No. 181, Ex. C-1 at 31.)  The Report further states:

> These steps are not documented in Sgt. Sethna's case notes but should have been.   Additionally, there was no evidence obtained and reviewed that indicated the investigative steps were made, but not documented.  Without an interview from Sethna (retired) or additional documentation (none located in the course of the investigation), there is no way to further determine the extent of the investigation.

(*Id.*)

As to liability for individual officers, the Report notes that "[t]he assigned investigators to the Waajid [Bey] and John Bey incidents would normally be the subject officers of the allegations that each conducted inadequate follow up investigations," and  "that under normal circumstances, policy would guide us not to investigate these subject officers and admin close the case because they are no longer employed by the City."  (*Id.* at 28.)  The Report continues:

> However, given the depth and seriousness of the allegations, the IAD Commander made the determination to investigate the allegations to ensure the associated criminal and administrative cases were properly handled.  In addition to opening the investigation [into the complaint underlying 13-1062], it was determined that the subject of the complaint would be the actions of the Department as a whole. Unknown Officer is utilized as the subject representing the Department.

(*Id.*)  The Report concludes with a recommended finding of "Sustained" as to OPD for violation of Manual of Rules 314.39-2 ("Performance of Duty").  (*Id.* at 32.)  The Report is signed by Sgt. Griffin, and signed as "Approved by" IAD Lt. Eric Lewis, Capt. Cunningham, and Chief Whent. (*Id.* at 33.)

In March 2014, Capt. Cunningham and Lt. Outlaw met with Plaintiffs to give them the IAD closeout letter regarding 13-1062.  (Dkt. No. 178-1, Ex. B at 24 (276:19-24).)  The letter

states, in pertinent part:

> Performance of Duty- The complainants alleged that there was a systemic failure on the part of the [OPD] during the investigation of the murder of Waajid Bey and the attempted murder of John Bey as it relates to the follow up criminal investigation. The investigation disclosed sufficient evidence to determine that the alleged conduct did occur. A finding of "Sustained" has been determined. This finding is applied to the [OPD] as the individual Subject Officers and their immediate supervisor are no longer employed by the [OPD].

(Dkt. No. 60, Ex. 1 at 62.) The meeting lasted "[f]orty-plus minutes," but "less than hour." (Dkt. No. 178-1, Ex. B at 24 (276:25-277:3).) Plaintiffs told Capt. Cunningham and Lt. Outlaw that Plaintiffs were not satisfied with the closeout letter. (*Id.* at 277:4-9.) According to Saleem Bey, Plaintiffs were treated dismissively at the meeting, and "basically told, here is the letter that you're going to take." (*Id.* at 277:23-25.) Following the meeting Plaintiffs sent emails to Lt. Outlaw expressing their dissatisfaction with the closeout letter; Lt. Outlaw answered Plaintiffs' emails and acknowledged their displeasure. (*Id.* at 277:12-15.)

Plaintiffs then contacted Compliance Director Robert Warshaw,[13] who assigned Capt. Figueroa "to address the shortcomings in the investigation." (*Id.* at 278:2-10.) Plaintiffs had two one-hour "sit-down meetings" with Capt. Figueroa at OPD headquarters to discuss their dissatisfaction with the 13-1062 closeout letter; specifically, Plaintiffs felt that the investigation was not complete because it did not name current OPD employees. (*Id.* at 24 (277:11-21), 25 (279:8-10).) OPD did not issue a new closeout letter to Plaintiffs' specifications. (Dkt. No. 186-4, Ex. 4 at 49 (174:22-25).)

By letter dated April 12, 2019, the Oakland Police Commission notified Compliance Director Warshaw that:

> On March 14, 2019, at the request of [Saleem or John] Bey, the Oakland Police Commission voted to provide notice the Independent Monitor appointed in [*Allen v. City of Oakland*, No. 00-cv-04599-THE] of Mr. Bey's complaint [regarding 13-1062] and Mr. Bey's request that the Independent Monitor investigate the substance of his complaint and comments.

---

[13] Robert Warshaw succeeded Thomas Frazier as the Independent Monitor and Compliance Director appointed to oversee OPD pursuant to the *Allen* Agreement.

13

(Dkt. No. 188-27, Ex. 27 at 2.) .)  According to John Bey, in June 2019 the Oakland Police Commission voted to approve funding to perform an independent investigation into 07-0538 and 13-1062.  (Dkt. No. 185-1 at ¶ 32.)

### E.     2013 CPRB Complaint

On November 6, 2013, Saleem Bey filed a complaint with the CPRB naming Capt. Cunningham and Chief Sean Whent as subject officers.  (Dkt. No. 186-18, Ex. 20 at 2.)  Plaintiffs named Capt. Cunningham "because of his failure to investigate 13-1062 up to that point," and named Chief Whent "because he was involved in [the independent IAD investigation involving Sgt. Longmire, 07-0553] but failed to include 07-0538 in [that] investigation."  (Dkt. No. 185-1 at ¶ 23.)  The CPRB complaint lists the following grievances: (1) "failure to investigate IAD 13-1062"; (2) "conflict of interest: an appointee of Interim Chief Whent who is named in the complaint is in charge of the investigation"; (3) "failure by IAD to accept material evidence related to complaint"; (4) "chain of command racism [and] discrimination against black Muslims resulting in failure to report known [Manual of Rules] violations"; and (5) "conflict of interest: IAD 13-1062 is an investigation of IAD 07-0538 resulting in IAD investigating IAD."  (*Id.*)  Plaintiffs' CPRB complaint requested an independent investigation into those grievances.  (*Id.*)  The CPRB "opened a parallel investigation" regarding 13-1062 and assigned Joan M. Saupe as investigator.  (Dkt. Nos. 178, Ex. A at 10 (160:12-17) & 181, Ex. A-1 at 4.)

The CPRB issued an Administrative Closure Report on July 10, 2014.  (Dkt. No. 181, Ex. A-1 at 4.)  The CPRB report details Ms. Saupe's April 2014 interview with Plaintiffs in connection with their CPRB complaint, including Plaintiffs' specific allegations of wrongdoing by OPD and Plaintiffs' responses to Ms. Saupe's questions.  (*See id.* at 4-15.)  The report further notes the evidence Ms. Saupe reviewed in connection with Plaintiffs' complaint, and the applicable law and OPD Manual of Rules provisions.  (*See id.* at 16-18.)  The CPRB report sustained no findings as to any of Plaintiffs' grievances and submitted the case for administrative closure.  (*See* Dkt. No. 181, Ex. A-1 at 18-23.)  Plaintiffs were aware of the report and its findings. (Dkt. No. 178, Ex. A at 13 (171:2-9).)

//

### F.  Occupy Oakland

In October 2011, a group calling itself Occupy Oakland "set up an encampment in front of Oakland City Hall."  (Dkt. No. 175, Ex. D at 29.)  Occupy Oakland was part of "an international protest movement directed toward social and economic inquality."  (*Id.*)  City of Oakland officials (the "City") became concerned over the next two weeks with the "health, safety[,] and welfare" of city employees, Occupy Oakland protestors, and those in the surrounding community due to "devolving conditions" within the encampment.  (*Id.* at 29-30.)  The City thus directed OPD "to develop an eviction plan."  (*Id.* at 30.)  OPD executed that eviction plan on October 25, 2011.  (*Id.*)  Subsequent clashes between OPD and Occupy Oakland protestors "result[ed] in controversial uses of force."  (*Id.*)

On December 19, 2011, the City contracted Frazier Group, LLC to provide "an impartial review of the events of October 25th," based on serious concerns with OPD's "use of unreasonable force, overall police performance, . . . ability to manage future events in an acceptable manner[,]" and OPD's ability "to effectively and impartially investigate the widely reported allegations of police use of force and other misconduct."  (*Id.* at 31.)  The City tasked the Frazier Group with focusing on OPD's response to the events of October 25, 2011; the Frazier Group's review thus did not "investigate any individual event or complaint" and instead concentrated on "identifying areas of policy, procedure, and tactics within OPD that needed immediate revision or updating."  (*Id.*)

According to former IAD Investigations Commander John Lois, the events of October 25, 2011 "and subsequent Occupy Oakland protests resulted in an unprecedented number of Internal Affairs complaints against OPD almost immediately thereafter and in the months that followed." (Dkt. No. 174-1 at ¶ 3.)  "OPD ultimately received over 1,000 complaints of misconduct related to Occupy Oakland" and "did not have sufficient investigators to handle the volume."[14]  (*Id.* at ¶ 5.)  In May 2012, the *Allen* court addressed the Occupy Oakland IAD complaints in its "Order

---

[14] Commander Lois attests that "many of the Occupy Oakland-related complaints were administratively closed[,]" and "the overwhelming majority . . . did not result in sustained findings."  (Dkt. No. 174-1 at ¶ 8.)  "Out of all of the complaints, only about 50 cases resulted in discipline, and that discipline ranged from termination to counseling and training."  (*Id.*)

United States District Court
Northern District of California

Requiring Plan re: Occupy Oakland Internal Affairs Investigations." (Dkt. No. 175, Ex. A at 5.) The court recognized that "many complaints . . . have been filed arising out of Occupy Oakland activities, including large-scale events on October 25 and November 2, 2011," and determined that the City would be "unable to comply with the 180-day investigation deadline, mandated by both the Negotiated Settlement Agreement . . . and [OPD] policy," because of those outstanding IAD complaints. (*Id.* at 5.) Further, the court was concerned that the City would be unable meet the statute of limitations for imposition of discipline arising out of an IAD investigation under California Government Code 3304. (*Id.* at 5-6.) The court noted that "multiple City officials themselves have expressed the view that [OPD] lacks capacity to complete all of the outstanding investigations without outside assistance," and recognized that the need for such assistance "seem[ed] probable." (*Id.* at 6.) The court thus ordered the City to provide the Compliance Director "in writing a specific plan, including timelines, as to how [the City] will address all outstanding internal affairs investigations stemming from Occupy Oakland activities prior to December 31, 2011." (*Id.*)

In response, the City and then-Chief of Police Howard A. Jordan drafted a memorandum for Compliance Director Warshaw detailing the City's plan to address the outstanding Occupy Oakland IAD complaints, including the need for outside consultants. The memorandum states, in pertinent part:

> The events of 25 Oct 11 generated more complaints from citizens than any other single event in the [OPD's] history. Complaints came not just from involved protestors and activists but from people around the world that watched the police response on television. The volume of complaints forced [IAD] to modify existing intake protocol to accommodate them all.

(Dkt. No. 175, Ex. C at 15.) The City noted that its "current staffing in [IAD] is unable accommodate the significant increase in complaints caused by the 2011 Occupy Oakland events given their existing caseload, hundreds of hours of video to be reviewed, and serious and complicated nature of the force allegations which occurred during major urban protests." (*Id.* at 16.) The City further noted "a possible conflict of interest because many of the IAD investigators had been deployed to Occupy demonstrations and could have been subjects or witnesses to the

United States District Court
Northern District of California

complaints being received." (Dkt. No. 175, Ex. C at 16.) The City thus "decided [that] it would be more productive to have an independent investigator look into the remaining 2011 Occupy Oakland allegations of misconduct." (*Id.*)

The City issued its Occupy Investigation Plan on June 8, 2012. (Dkt. No. 175, Ex. B at 9.) The plan details the assignment of IAD complaints to five outside investigators and one attorney in the City Administrator's Office. (*Id.* at 10-11.) OPD also "assigned five additional investigators to Internal Affairs" to support the "two regular Internal Affairs investigators" assigned to the Occupy Oakland investigations. (*Id.* at 11.) According to IAD Commander Lois, "the reason IAD sought outside investigators was due to the sheer volume of complaints." (Dkt. No. 174-1 at ¶ 5.)

## II.      Procedural History

Plaintiffs filed their original complaint on April 9, 2014. (Dkt. No. 1.) After reviewing the first three iterations of the pleadings pursuant to 28 U.S.C. § 1915, (*see* Dkt. Nos. 11, 14, 16), the Court concluded that the allegations in the Second Amended Complaint ("SAC") were sufficient to survive Section 1915 review, (Dkt. No. 16). Defendant then filed a motion for judgment on the pleadings, which the Court granted. *See Bey v. City of Oakland*, No. 14-cv-01626-JSC, 2015 WL 8752762, at *15 (N.D. Cal. Dec. 15, 2015). The Court's Order dismissed as time-barred Plaintiffs' claims related to OPD's investigation into the 2004 murder of Waajid Bey and 2005 attempted murder of John Bey, and the 2007 IAD complaint regarding those investigations. *Id.* at *5-6. The Court further concluded that Plaintiffs failed to state a claim to the extent their claims were premised on OPD's investigation regarding the 2013 Internal Affairs Complaint. *Id.* at *10-15.

Plaintiffs then filed the TAC, bringing nine claims, including a newly-alleged claim under 42 U.S.C. § 1986, and ten newly-alleged defendants—all individual officers with OPD. (Dkt. No. 60.) Because the Court never authorized Plaintiffs to add a new claim or new parties, Plaintiffs did not seek leave to amend, and there was no basis for Plaintiffs to substitute the individual officers for the previous Doe defendants, the Court sua sponte dismissed the Section 1986 claim and claims against the newly-named individual defendants without leave to amend. (Dkt. No. 63.)

Defendant then moved to dismiss the TAC, (*see* Dkt. No. 65); the Court granted that motion in part on April 26, 2016, (Dkt. No. 72 at 28).

Following the Court's April 2016 Order, six claims remain against the City of Oakland: (1) Counts 2, 5, 7 & 8 under 42 U.S.C. § 1983 for violations of Plaintiffs' constitutional right to equal protection under the law from racial and religious discrimination based on OPD's alleged failure to conduct an adequate investigation into IAD complaint 13-1062; and (2) Counts 3 & 6 under 42 U.S.C. § 1985 based on an alleged conspiracy to violate Plaintiffs' civil rights. (*See* Dkt. Nos. 60 & 72 at 28.) Plaintiffs allege that they received a lower level of police services in connection with 13-1062 because they are Black Muslims and by contrast OPD provided a higher level of service to Occupy Oakland-related allegations of misconduct, all of which, Plaintiffs allege, involved only non-Black Muslims. (Dkt. No. 60 at 13-14.)

Defendant moves for summary judgment on all claims. (Dkt. No. 174.) The motion is fully briefed, (*see* Dkt. Nos. 188 & 191), and the Court heard oral argument on July 29, 2019.

## PRELIMINARY ISSUES

### I.      Request for Judicial Notice

Pursuant to the Federal Rules of Evidence, a judicially noticed adjudicative fact must be one "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In support of its motion for summary judgment, Defendant requests judicial notice of three exhibits comprising documents filed in *Allen v. City of Oakland*, No. 00-cv-04599-WHO: (1) the *Allen* court's May 2012 Order Requiring Plan Re: Occupy Internal Affairs Investigations; (2) the City's June 2012 Occupy Investigation Plan; and (3) the City's May 2012 response memorandum to the *Allen* court's May 2012 order. (*See* Dkt. No. 175 at 2 (requesting judicial notice of Exs. A-C).) Judicial notice is appropriate for "undisputed matters of public record, including documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted); *see also Bennet v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) (recognizing that courts "may take notice of proceedings in other courts, both within and

1   without the federal judicial system, if those proceedings have a direct relation to matters at

2   issue.").  The Court thus grants judicial notice of the proffered documents because they are

3   undisputed matters of public record.

4       Defendant also requests judicial notice of a June 2012 report entitled "Independent

5   Investigation Occupy Oakland Response October 25, 2011."  (Dkt. No. 175 at 2 (requesting

6   judicial notice of Ex. D).)  Defendant asserts that the report is publicly available and was

7   "prepared by an independent contractor for the City of Oakland."  (*Id.* at 3.)  Plaintiffs do not

8   oppose judicial notice of the report or otherwise dispute the report's authenticity.  Accordingly, the

9   Court grants judicial notice of the report because it is an undisputed matter of public record.  *See*

10  *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (noting that district courts may take judicial

11  notice of "[r]ecords and reports of administrative bodies").

12  **II.      Evidentiary Objections**

13      Defendant objects on various grounds to the following evidence Plaintiff submitted in

14  opposition to the instant motion: (1) portions of John Bey's declaration (Dkt. No. 185-1 at ¶¶ 3-20,

15  23-32); (2) portions of Saleem Bey's declaration (Dkt. No. 185-2 at ¶¶ 3-47); (3) portions of

16  exhibits 1-5 & 38 to the declaration of A. Cabral Bonner (Dkt. Nos. 186-3 – 186-5, 187-35, &

17  188-1); and (4) exhibits 6-10, 13, 15-23, 27-31, 33-35, 37, 39, 40, 42, 44, 53, 55, 57-59 to Mr.

18  Bonner's declaration in their entirety (Dkt. Nos. 186-6 – 186-10, 186-12, 186-14 – 186-16, 186-

19  17, 186-18, 187-1 – 187-3, 187-7 – 187-9, 187-12, 187-13, 187-20, 187-22 – 187-24, 188-18, 188-

20  27, 188-31, 188-33 – 188-35, 188-37, 188-42, 188-44, & 188-57).  (*See* Dkt. No. 191 at 15-17.)

21      Defendant's objections are overruled as moot because the evidence was unnecessary to

22  resolve the instant motion.

23                              **DISCUSSION**

24      On summary judgment, the movant must demonstrate "that there is no genuine dispute as

25  to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

26  56(a).  Where the movant does not bear the burden of proof at trial for the underlying claims, it

27  satisfies its burden if it can show that there is an absence of evidence to support "an element

28  essential to [the nonmovant's] case, and on which [the nonmovant] will bear the burden of proof at

United States District Court
Northern District of California

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment, [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks and citation omitted) (alteration in original).

## I.  Section 1983 Claims

To prevail on a claim under Section 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that a state actor "'acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class,' and that [the] plaintiff was treated differently from persons similarly situated."  *Lam v. City & Cty. of San Francisco*, 868 F. Supp. 2d 928, 951 (N.D. Cal. 2012) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1988)); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (noting that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").  Where the defendant is a municipality, a plaintiff is "required to establish that the [municipality] had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered."  *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978)).  There can be no municipal liability without an underlying constitutional violation.  *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

As previously discussed, Plaintiffs' Section 1983 claims are premised on OPD's alleged failure to conduct an adequate IAD investigation into 13-1062 because of racial and religious animus toward Black Muslims.  Thus, to survive summary judgment Plaintiffs must proffer evidence that reasonably supports an inference that OPD treated Plaintiffs differently than it treated similarly situated individuals because of Defendant's policy or custom of racial or religious discrimination against Black Muslims.

Defendant argues that summary judgment is warranted for the threshold reason that Plaintiffs fail to demonstrate that they were treated differently than others similarly situated.  The Court agrees.

United States District Court
Northern District of California

### A.      Plaintiffs Fail to Show That Similarly Situated IAD Complainants Received More Favorable Treatment

"The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination."  *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989) (analyzing selective prosecution claim "under ordinary equal protection standards" and noting that "[t]he similarly situated group is the control group"), *superseded on other grounds by statute, as recognized in United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002). Identifying the similarly situated class is thus "[t]he first step in determining whether [OPD] violated [Plaintiffs'] right to equal protection."  *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).

Plaintiffs assert that the comparative class of similarly situated individuals is the Occupy Oakland complainants.[15]  (*See* Dkt. No. 185 at 18 ("Plaintiffs were treated differently than young white [Occupy Oakland] protestors with IAD complaints against OPD.").)  Plaintiffs cite the following as instances where Occupy Oakland complainants received a more fulsome level of service: (1) "OPD failed to make findings about particular officers' alleged misconduct in response to [13-1062], but they did so for the non-Black Muslim Occupy Oakland complainants"; (2) "IAD identified and augmented [Occupy Oakland] complaints based on evidence they found during their investigation"; and (3) the City hired the Frazier Group to "perform an independent review of the response to the Occupy protests."  (*Id.* at 21-23.)  Plaintiffs' argument that they are similarly situated to the Occupy Oakland complainants as a whole is flawed for two reasons.

First, the Occupy Oakland complainants cannot serve as a "control group" because their

---

[15] Plaintiffs' opposition also asserts that OPD's "treatment of [Plaintiffs] is in sharp contrast to the treatment of . . . white police officer Jesse Grant[,]" (*see* Dkt. No. 185 at 6), whose allegations of wrongdoing against Sgt. Longmire led to IAD 07-0553—the investigation into alleged misconduct by Sgt. Longmire and other officers regarding the Chauncey Bailey murder investigation, (*see* Dkt. No. 188-18, Ex. 18).  In support of that argument, Plaintiffs note that Officer Grant "was provided an outside review of his complaints through an independent investigation by the [California] DOJ[,]" and Officer Grant's complaint "involved very similar" allegations of wrongdoing.  (Dkt. No. 185 at 9, 24.)  However, Plaintiffs do not develop that line of argument beyond those conclusory statements.  Further, no reasonable trier of fact could find that Plaintiffs were similarly situated to Officer Grant given that he was an OPD officer at the time of his underlying complaints regarding Sgt. Longmire and the allegations involved misconduct by another officer in relation to a then-ongoing murder investigation.  There are no similar circumstances regarding IAD 13-1062.

United States District Court
Northern District of California

United States District Court
Northern District of California

IAD complaints were handled on a case-by-case basis and did not receive similar treatment. Former IAD Commander Lois attests that "there was no uniform treatment of Occupy Oakland-related complaints," and not all complaints "resulted in actual investigations." (Dkt. No. 174-1 at ¶ 6 (noting that "[a]n administrative closure or service complaint . . . would not typically result in any findings").) Indeed, "the great majority of [Occupy Oakland] complaints were resolved administratively." (Dkt. No. 175, Ex. C at 15.) Plaintiffs do not dispute that fact and cite Commander Lois's testimony for the proposition that "[o]f the more than [1,000] complaints, only 50 were sustained." (Dkt. No. 185 at 15.) Based on the disparity of treatment of IAD complaints *within* the Occupy Oakland class, the Occupy Oakland complainants as a whole are not similarly situated to Plaintiffs.

Second, the Frazier Group's report makes clear that the City did not retain the firm to investigate IAD's response to individual Occupy Oakland complainants but to instead focus on OPD's response to the events of October 25, 2011. (*See* Dkt. No. 175, Ex. D at 31.) The Frazier Group's review thus did not "investigate any individual event or complaint" regarding Occupy Oakland and instead concentrated on "identifying areas of policy, procedure, and tactics within OPD that needed immediate revision or updating." (*Id.*) In other words, the City did not retain the Frazier Group based on a need for impartial review on behalf of the Occupy Oakland complainants. Plaintiffs' argument that they are similarly situated to the Occupy Oakland complainants based on a similar need for independent review thus fails.

Plaintiffs are correct, however, to the extent they argue more broadly that they are similarly situated to the Occupy Oakland complainants because both groups consist of individuals who filed IAD complaints. (*See* Dkt. No. 185 at 20-21; *see also* Dkt. No. 72 at 25 (Court's April 2016 Order noting that Plaintiffs' equal protection claims are "predicated on the assertion that they were treated differently than the Occupy Oakland complainants (i.e., they were not given specific findings) even though they engaged in the same behavior (i.e., reporting particular officers' misconduct in Internal Affairs complaints).").) That said, given that IAD 13-1062 was not administratively closed, the similarly situated class for purposes of Plaintiffs' equal protection claims is any IAD complainant whose case was also not administratively closed. The Court must

thus determine whether Plaintiffs have proffered evidence that raises a triable issue of material fact regarding whether IAD's investigation into 13-1062 reflects discriminatory treatment when compared with the non-administratively closed Occupy Oakland complainants.  Plaintiffs have not done so.

As previously discussed, Plaintiffs argue that "OPD failed to make findings about particular officers' alleged misconduct in response to [13-1062], but they did so for the non-Black Muslim Occupy Oakland complainants."  (*Id.* at 21.)  In support of that assertion, Plaintiffs submit IAD complaint investigation reports and closeout letters regarding five Occupy Oakland complainants.  (*See* Dkt. Nos. 187-14 – 187-17, 187-19, Exs. 45-48, 50.)  However, none of the closeout letters identify the "particular officers" specified in their respective complaint investigation reports.[16]  Instead, the closeout letters received by the relevant Occupy Oakland complainants and Plaintiffs are the same in all material respects.  (*Compare* Dkt. Nos. 187-14 – 187-17, 187-19, Exs. 45-48, 50 *with* Dkt. No. 60, Ex. 1 at 62.)  There is also no indication from the Occupy Oakland complaint investigation reports that the non-administratively closed Occupy Oakland complainants received more detailed findings than those reflected in Sgt. Griffin's Report for 13-1062.  (*Compare* Dkt. Nos. 187-14 – 187-17, 187-19, Exs. 45-48, 50 *with* Dkt. No. 181, Ex. C-1 at 26-30.)

Further, Saleem Bey testified that in September 2013 Plaintiffs understood that the scope of 13-1062 would concern the 2004 Waajid Bey murder investigation, 2005 John Bey attempted murder investigation, and previous IAD complaint 07-0538.  (Dkt. No. 178-1, Ex. B at 23 (272:10-21); *see also id.* at 28-29 (September 16, 2013 email from John Bey to Compliance Director and Saleem Bey relaying understood scope of investigation "[a]ccording to Capt. Cunningham").)  The subject officers for the underlying investigations into the murder of Waajid Bey and attempted murder of John Bey were Sgt. Brock and Sgt. Sethna, respectively, both of whom retired years prior to the investigation into 13-1062.[17]  (*See* Dkt. No. 174-2 at ¶ 2.)

---

[16] The Occupy Oakland complaint investigation reports are redacted for privacy but clearly identify "involved personnel" by name and serial number.  (*See* Dkt. Nos. 187-14, Ex. 45 at 4; 187-15, Ex. 46 at 3; 187-16, Ex. 47 at 4; 187-17, Ex. 48 at 4-5; 187-19, Ex. 50 at 3.)
[17] As previously discussed, Sgt. Griffin attempted to interview both Sgt. Brock and Sgt. Sethna in

United States District Court
Northern District of California

1    Although Plaintiffs' assert that other officers (specifically, "Whent, Cunningham, Joyner,

2    Longmire, and Crutchfield") were involved personnel for purposes of 13-1062, (*see* Dkt. No. 185

3    at 21), Plaintiffs submit no evidence giving rise to triable issue of fact as to whether IAD's failure

4    to name those officers changed the outcome of 13-1062, *which resulted in a sustained finding of*

5    *misconduct against OPD as a whole*.  (*See* Dkt. No. 60, Ex. 1 at 62.)

6          To the extent Plaintiffs' assert that IAD 13-1062's lack of specific findings regarding

7    particular officers involved in previous IAD complaint 07-0538 is indicative of disparate

8    treatment, that argument fails because specific findings were not required.  Sgt. Griffin's Report

9    affirmed IAD's previous determination that 07-0538 was a service complaint.  (*See* Dkt. No. 181,

10   Ex. C-1 at 28 (noting that the facts of the complaint supported its administrative closure;

11   specifically, the complaint did not allege facts that "if substantiated[ ] would constitute a [Manual

12   of Rules] violation" by an individual officer but instead, "stated a concern that there was no

13   progress with the [underlying] investigations.").)  IAD does not provide findings for service

14   complaints.  (*See* Dkt. No. 178-2, Ex. C at 4 (14:4-19).)

15         Plaintiffs' argument that "IAD identified and augmented [Occupy Oakland] complaints

16   based on evidence they found during their investigation," specifically, video footage of excess

17   force, also fails to demonstrate disparate treatment because it concerns the administrative closure

18   of previous IAD complaint 07-0538, not the investigation under 13-1062.  (Dkt. No. 185 at 21-22

19   (arguing that "unlike for the white Occupy protestors, IAD did not even review the underlying

20   criminal case file in 2007 before administratively closing 07-0538").)  As previously discussed,

21   the Court has ruled that claims relating to discriminatory conduct in connection with 07-0538 are

22   time-barred.  (*See* Dkt. No. 72 at 13, 20.)  Plaintiffs acknowledge that "in 2013, armed with the

23   same complaint that [Plaintiffs] made in 2007, Sgt. Griffin correctly identified that [Plaintiffs]

24   complaint that the murder/attempted murder was insufficiently investigated raised a [Manual of

25

26   ────────────────

27   connection with IAD 13-1062.  Dkt. No. 178-2, Ex. C at 31(107:16-108:12); *see also* Dkt. No.
     181, Ex. C-1 at 28 (noting that Sgt. Griffin left phone messages for "Ret. Sgt. R. Sethna" and "Ret.
28   Sgt. Brock" but neither responded).)  Plaintiffs assert that "[t]here is no evidence that in the 13
     months of investigation Griffin made more than one attempt at contact for each [officer]."  (Dkt.
     No. 185 at 24.)  However, Plaintiffs present no evidence that Sgt. Griffin was required to do so.

Rules] 314.39 complaint." (Dkt. No. 185 at 22.) Thus, Plaintiffs "identified and augmented" argument does not concern 13-1062.

Finally, Plaintiffs' argument that the City's retention of the Frazier Group to "perform an independent review of the response to the Occupy protests" reflects disparate treatment fails for the reasons previously discussed.[18] The City did not retain the Frazier Group to investigate IAD's response to individual Occupy Oakland complainants; it instead tasked the firm with analyzing OPD's overall response to the events of October 25, 2011. (*See* Dkt. No. 175, Ex. D at 31.) In other words, the City retained the Frazier Group not based on a need for impartial review on behalf of the Occupy Oakland complainants, but in response to an event. Indeed, the Frazier Group's June 2012 report notes that it "made concerted efforts <u>not</u> to interview OPD members who were under any type of investigation related to Occupy Oakland events." (*Id.* at 32.) Because the Frazier Group did not investigate individual Occupy Oakland IAD complaints, no reasonable trier of fact could find that the City's retention of the Frazier Group reflects more favorable treatment toward Occupy Oakland complainants in comparison to IAD's investigation into 13-1062.

\*\*\*

It is beyond dispute that "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010) (internal quotation marks and citation omitted). In the absence of evidence that similarly situated IAD complainants received more favorable treatment, however, there is nothing to suggest that OPD conducted its investigation into 13-1062 in a discriminatory manner. To the extent Plaintiffs allege a policy of discriminatory animus against Black Muslims based on deposition testimony of Lt. Joyner in 2009, (*see* Dkt. No. 186-3, Ex, 2 at 10-11 (139:12-140:2)

---

[18] Although not challenged by Plaintiffs, the City's use of outside investigators to resolve the non-administratively closed Occupy Oakland complaints does not reflect disparate treatment because there are two clear, non-discriminatory bases for such action: (1) the volume of the Occupy Oakland complaints; and (2) the *Allen* court's May 2012 order requiring the City to adjudicate those complaints within the deadlines imposed by the *Allen* Agreement and California Government Code § 3304.

United States District Court
Northern District of California

United States District Court
Northern District of California

("everything related to the Bakery was handled differently"), and Sgt. Longmire (*see* Dkt. No. 188-3, Ex. 3 at 5 (9:9-12:25) (describing federal and state claims Sgt. Longmire brought against OPD based on alleged racial and religious discrimination), that evidence is insufficient to overcome Plaintiffs' failure to show that similarly situated individuals received more favorable treatment. *See Furnace*, 705 F.3d at 1031 (finding allegations of discriminatory statements insufficient to overcome plaintiff's "failure to show that he was treated differently" than similarly situated individuals).

Those statements, in any event, do not support a reasonable inference of discriminatory animus into the investigation of 13-1062 for several reasons. First, Lt. Joyner's statement that "everything related to the Bakery was handled differently" was taken in 2009 regarding the California Department of Justice's investigation into IAD 07-0538. (*See* Dkt. No. 186-16, Ex. 17 at 26.) Sgt. Griffin concluded his investigation into 13-1062 roughly five years later in 2014. Second, Lt. Joyner explained the impetus for the 2009 statement in his deposition testimony in April 2018, in which he states:

> In my opinion, and in my experience, I saw that cases involving the [B]akery were given additional thought in regards to the optics, not making any waves, and the potential issues associated with political backlash as well as societal issues in dealing with Your Black Muslim Bakery. In other words, I believe the department took a more of a hands-off approach to dealing with them.

(Dkt. No. 186-3, Ex. 2 at 10 (139:20-25).) Lt. Joyner then answered "[n]o" when directly asked whether "there was a culture in [OPD] to treat people who they believed were black Muslims unfairly as compared to other people." (*See* Dkt. No. 191-2, Ex. 2 at 33 (142:9-19).) Thus, Lt. Joyner's statement regarding the Bakery does not create a genuine issue of material fact regarding discriminatory animus into the investigation of 13-1062 because Lt. Joyner *expressly denied* a culture of discrimination against Black Muslims within OPD. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment."). Third, as for Sgt. Longmire's testimony, he acknowledged that his claims based on racial and religious

discrimination were dismissed in state and federal court.  (*See* Dkt. No. 188-3, Ex. 3 at 6 (10:13).)

The record shows that Plaintiffs were involved in the investigation into 13-1062 and met directly with high-ranking IAD officers to discuss their case.  Further, IAD proceeded with the investigation even though the officers involved in the underlying investigations into Waajid Bey's murder and John Bey's attempted murder had retired from OPD.  IAD ultimately sustained findings against OPD as a whole based on deficiencies in those underlying investigations.  Simply put, Plaintiffs fail to identify evidence sufficient to support an inference that the IAD investigation into 13-1062 reflects disparate treatment.

Accordingly, Plaintiffs' Section 1983 claims fail because of the absence of evidence giving rise to a genuine dispute of material fact regarding whether similarly situated IAD complainants received more favorable treatment.  *See Furnace*, 705 F.3d at 1031 (affirming summary judgment on Section 1983 equal protection claim where plaintiff "adduce[d] no evidence that he was treated any differently" than individuals who were similarly situated).

## II.     Section 1985 Claims

Because Plaintiffs' Section 1983 claims fail, their Section 1985 conspiracy claims premised on the same alleged constitutional violations fail as well.  *See Caldeira v. Cty. of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989) ("[T]he absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations.").

## III.    Administrative Motion to File Under Seal

Plaintiffs move to file under seal 40 exhibits submitted in support of its opposition to Defendant's motion for summary judgment, (*see* Dkt. Nos. 186 at 1 & 187), that were designated as "Confidential" by Defendant and produced pursuant to the stipulated Protective Order in this case, (*see* Dkt. No 96).  Pursuant to Civil Local Rule 79-5(e), Defendant—as the Designating Party—filed a responsive declaration in support of sealing portions of exhibit 4 (Dkt. No. 186-4 at 13-16 (57:9-60:15)), exhibit 6 (Dkt. No. 186-6 at 21 (125:14-25)), and exhibit 50 (Dkt. No. 187-19 at 8).  Defendant also requests sealing the following exhibits in their entirety: 7 (Dkt. No. 186-7), 8 (Dkt. No. 186-8), 10 (Dkt. No. 186-10), 15 (Dkt. No. 186-14), 16 (Dkt. No. 186-15), and 53 (Dkt. No. 187-20).

United States District Court
Northern District of California

The Court has reviewed the exhibits cited by Defendant as containing confidential information and agrees that exhibits 4, 6, 7, 8, 10, 15, and 53 contain confidential information regarding criminal investigations that warrants sealing.  Exhibit 16 likewise warrants sealing because it contains information regarding IAD 07-0553, which is not the subject of this case, including allegations of misconduct against specific subject officers, details regarding IAD's investigation, and identities of witnesses (including the identity and potential address of the complainant) and unrelated criminal defendants.  The last page of exhibit 50 also warrants sealing because it is a photograph of a person related to IAD 11-1416, which is an Occupy Oakland-related investigation, and thus has no bearing on this case.  Accordingly, the Court grants Plaintiffs' motion to seal in part.  The identified portions of exhibits 4, 6, and 50 shall be filed under seal.  Further, exhibits 7, 8, 10, 15, 16, and 53 shall be filed under seal in their entirety.  The remainder of the exhibits shall be filed on the public docket.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment.

This Order disposes of Docket Nos. 174, 175, and 186.

**IT IS SO ORDERED.**

Dated: July 30, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# EXHIBIT 2

CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER AND BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFF
ALI SALEEM BEY
JOHN MUHAMMAD BEY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ALI SALEEM BEY and JOHN MUHAMMAD BEY,<br><br>             Plaintiffs,<br><br>    v.<br><br><br>CITY OF OAKLAND and DOES 1-100<br>              Defendants. | Case No. 14-cv-01626-JSC<br><br>**REPRESENTATION STATEMENT**<br><br><br><br><br>Judge: Honorable Jacqueline Scott Corley |

**The following are the Appellant(s):**

ALI SALEEM BEY
JOHN MUHAMMAD BEY

**The following are the Counsel(s):**

CHARLES A. BONNER (State Bar No. 85413)
A. CABRAL BONNER (State Bar No. 247528)
LAW OFFICES OF BONNER & BONNER
475 Gate Five Road, Suite 212
Sausalito, California 94965
Telephone:      (415) 331-3070
Facsimile:      (415) 331-2738
Counsel is registered for ECF in the 9th Circuit.

**The following are the Appellee(s):**

CITY OF OAKLAND

**The following are the Counsel(s):**

BARBARA J. PARKER, City Attorney, SBN 069722
MARIA BEE, Chief Assistant City Attorney, SBN 167716
DAVID A. PEREDA, Special Counsel, SBN 237982
SELIA M. WARREN, Deputy City Attorney, SBN 233877
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:      (510) 238-6520 (Pereda)
Facsimile:      (510) 238-6500
Email:          depereda@oaklandcityattorney.org

DATED:  August 27, 2019          RESPECTFULLY SUBMITTED,

By:   /s/ CHARLES A. BONNER
            CHARLES A. BONNER
            Attorneys for Plaintiff

2

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI SALEEM BEY, et al., | Case No. 14-cv-01626-JSC |
| Plaintiffs, | |
| v. | **JUDGMENT** |
| CITY OF OAKLAND, | |
| Defendant. | |

By Order filed July 30, 2019, the Court granted Defendant's motion for summary judgment on Counts 2, 3, 5, 6, 7 and 8 of the Third Amended Complaint ("TAC"). (Dkt. No. 193.) In a previous Order filed February 2, 2016, the Court dismissed Count 9 of the TAC without leave to amend. (*See* Dkt. No. 63 at 2.) On April 26, 2016, the Court also dismissed Counts 1 and 4 without leave to amend. (*See* Dkt. No. 72 at 28.) Accordingly, the Court enters judgment in favor of Defendant and against Plaintiffs on all claims.

**IT IS SO ORDERED.**

Dated: July 30, 2019

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge